# SEALED

# FILED

MAY 2 1 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

McGREGOR W. SCOTT
United States Attorney
JASON HITT
AMANDA BECK
ROSS PEARSON
Assistant U.S. Attorneys
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700

## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF CALIFORNIA

2:19 - MJ - 0080 - -CKD

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **UNDER SEAL** |
| ) | |
| Plaintiff, ) | AFFIDAVIT IN SUPPORT OF |
| ) | CRIMINAL COMPLAINT |
| ) | |
| vs. ) | VIOLATIONS: |
| ) | |
| Ronald YANDELL, ) | 18 U.S.C. § 1962(d) – Conspiracy to Engage in a |
| also known as "Renegade," ) | Racketeer Influenced Corrupt Organization; 18 |
| Daniel "Danny" TROXELL, ) | U.S.C. § 1959(a)(5) – Conspiracy to Commit |
| William "Billy" SYLVESTER, ) | Murder (6 Counts); 21 U.S.C. §§ 846, 841(a)(1) |
| also known as "Billy from Norco," ) | – Conspiracy to Distribute and Possess with |
| Travis BURHOP, ) | Intent to Distribute Methamphetamine and |
| Brant DANIEL, ) | Heroin (2 Counts); 21 U.S.C. § 841(a)(1) – |
| also known as "Two Scoops," ) | Distribution of Heroin (3 Counts); and 21 U.S.C. |
| Donald MAZZA, ) | § 841(a)(1) – Distribution of Methamphetamine |
| also known as "Popeye," ) | |
| Pat BRADY, ) | |
| also known as "Big Pat," ) | |
| Jason "Jake" CORBETT, ) | |
| Matthew HALL, ) | |
| also known as "Psycho," or "Cyco," ) | |
| Samuel KEETON, ) | |
| Michael TORRES, ) | |
| also known as "Mosca," ) | |

Jeanna QUESENBERRY,                )
Kevin MACNAMARA,                   )
Kristen DEMAR,                     )
Justin PETTY,                      )
   also known as "Rune,"           )
and                                )
Kathleen NOLAN,                    )
                                   )
            Defendants.            )
_____  )

## **TABLE OF CONTENTS**

I.      OVERVIEW OF INVESTIGATION ................................................................. 1

II.     PURPOSE AND STRUCTURE OF AFFIDAVIT.......................................... 2

III.    CRIMINAL VIOLATIONS AND REQUESTED ARREST WARRANTS...................... 3

IV.    BACKGROUND OF INVESTIGATING AGENT........................................... 13

V.     PROBABLE CAUSE..................................................................................... 16

     A.    Introduction to this investigation.................................................................. 16

     B.    The Aryan Brotherhood's formation, command structure, leadership, rules of conduct, purpose, and symbols. ..................................................................................... 17

VI.    Criminal Activities of the Defendants .......................................................... 27

     A.    October 7, 2011 – Aryan Brotherhood member Billy SYLVESTER murdered Ronald Richardson at Folsom Prison to gain entrance to, and increase his position with, the Aryan Brotherhood. ..................................................................................... 28

     B.    August 12, 2015 – Aryan Brotherhood associates murdered Black Guerrilla Family member Hugo Pinell at Folsom Prison to gain entrance to, and increase their position with, the Aryan Brotherhood. ..................................................................................... 33

     C.    During 2016, the Investigating Agencies developed evidence of an Aryan Brotherhood-controlled drug trafficking conspiracy operating in Sacramento, Missouri, and elsewhere. ..................................................................................... 36

     D.    May 27, 2016 – Missouri police seize a pound of methamphetamine from Nickolas Perez; Perez later admits that the drugs belonged to Aryan Brotherhood member Travis BURHOP..................................................................................... 37

     E.    July 11, 2016 – As part of an ongoing DEA investigation of the Aryan Brotherhood's drug operation, DEA undercover agent purchased heroin from QUESENBERRY; Its delivery had been orchestrated by YANDELL and executed by Aryan Brotherhood associate Samuel KEETON........................................................................... 40

     F.    July 24, 2016 – DEA undercover agent purchased heroin from QUESENBERRY; Its delivery had been orchestrated by YANDELL and executed by Aryan Brotherhood associate Matt HALL. ..................................................................................... 42

     G.    July 27, 2016 – YANDELL and QUESENBERRY discussed getting a half-kilogram of heroin. ..................................................................................... 49

H.  August 11, 2016 – YANDELL intercepts uncovered a plot to use MACNAMARA and DEMAR to smuggle methamphetamine, cell phones, and tobacco into Folsom Prison. ........................................................................................................... 50

I.  YANDELL intercepts confirmed that DEMAR and MACNAMARA were told to blame their contraband smuggling on Billy SYLVESTER and the Aryan Brotherhood. ........................................................................................................... 59

J.  August 11, 2016 - YANDELL and BURHOP discuss Aryan Brotherhood business and distribution of the enterprise's drug proceeds. ............................................ 63

K.  August 11, 2016 – YANDELL and HALL discuss connecting Matt HALL to BURHOP's heroin supply and a plot to kill Aryan Brotherhood member Kenneth Johnson. ........................................................................................................... 65

L.  August 12, 2016 – DEA undercover agent purchased heroin from QUESENBERRY; Its delivery had been orchestrated by YANDELL and executed by KEETON, who delivered proceeds to BURHOP ..................................................................... 68

M.  August 14, 2016 – YANDELL, Rice, and QUESENBERRY discussed Folsom Prison interdiction and the Aryan Brotherhood's heroin business. ........................... 69

N.  August 16, 2016 – YANDELL and BURHOP discussed Mexican Mafia Member Michael TORRES connecting them to a high-quality heroin supplier. ...................... 70

O.  August 19, 2016 – YANDELL and BURHOP agreed that BURHOP would supply heroin to HALL. ............................................................................................... 72

P.  August 20–21, 2016 – YANDELL, BURHOP, and TROXELL discussed plot to murder Aryan Brotherhood member James Mickey at Calipatria Prison. .................. 75

Q.  August 21, 2016 – YANDELL promised CORBETT admission to the Aryan Brotherhood if he murdered AB associate Paul Diaz .................................................... 79

R.  August 26, 2016 – YANDELL and Aryan Brotherhood member Brant DANIEL discussed evidence of an ongoing criminal enterprise that would be gathered by wiretapping their contraband cellphones. ...................................................... 82

S.  August 27 and 28, 2016 - YANDELL and BURHOP discussed Aryan Brotherhood business including drug trafficking with Mexican Mafia Member Michael TORRES. ........................................................................................................... 83

T.  August 2016 - YANDELL and California prison contractor employee Justin PETTY plotted to send contraband into Folsom and High Desert Prisons. ................. 86

U.    September 2 and 6, 2016 – Prison officials disrupted Aryan Brotherhood plot to smuggle contraband by seizing parcels loaded with hidden cargo sent by Justin PETTY......................................................................................................................... 93

V.    Intercepted calls confirmed that PETTY sent contraband into Folsom and High Desert Prisons on behalf of the Aryan Brotherhood................................................................. 96

W.    September 2016 – YANDELL and BURHOP planned to receive heroin from Mexican Mafia Member Michael TORRES. ............................................................................... 98

X.    September 23, 2016 – Matt HALL burglarized an Orange County house, and stole a pistol, heroin, and a safe............................................................................................... 101

Y.    September 30, 2016 – Officers search Matt HALL's house and seize multiple firearms, body armor, and other items................................................................................... 103

Z.    October 1, 2016 – Matt HALL admitted to YANDELL that officers caught him possessing guns. ......................................................................................................... 105

AA.   August to October 2016 – YANDELL discussed the plan to murder Aryan Brotherhood member Michael Trippe and assigned the murder to AB member Donald "Popeye" MAZZA. ..................................................................................................... 106

BB.   October 15, 2016 – CORBETT ordered the murder of Doug Maynard at High Desert Prison; Aryan Brotherhood associate Bobby Stockton carries out the hit. ................ 111

CC.   October 17–18, 2016 – YANDELL arranged for heroin to be delivered from southern California by Travis BURHOP's courier Nickolas Perez; The UC bought the heroin from Jeanna QUESENBERRY in Sacramento. ......................................................... 117

DD.   October 21, 2016 – Las Vegas police seized five pounds of methamphetamine from Nickolas Perez, one of Aryan Brotherhood's drug couriers. ...................................... 119

EE.   October 24, 2016 – Officers seized one pound of heroin supplied by Mexican Mafia Member Michael TORRES from BURHOP's stash pad in Fontana, California. ....... 122

FF.   October 29, 2016 – Aryan Brotherhood member Brant DANIEL murdered Zachary Scott at Salinas Valley Prison to maintain and increase his position with the Aryan Brotherhood.............................................................................................................. 124

GG.   December 22, 2016 – QUESENBERRY sells additional heroin to the DEA undercover agent; Surveillance observes QUESENBERRY deliver proceeds to Kathleen NOLAN ................................................................................................................................... 128

HH.   July 20, 2018 – Aryan Brotherhood members Jake CORBETT and Pat BRADY
       murdered Donald Pequeen at High Desert Prison to maintain and increase their
       position with the Aryan Brotherhood............................................................................. 131

VII.   SUMMARY OF PROBABLE CAUSE............................................................................. 133

VIII.   SEALING REQUEST .................................................................................................... 136

I, Brian M. Nehring, being duly sworn, state the following:

## I.    OVERVIEW OF INVESTIGATION

A.    The investigation described in this Affidavit reveals that, between 2011 and 2016, Aryan Brotherhood (AB) members and associates conducted extensive, widespread, organized, criminal activity from within California's most secure prison environments. Specifically, Aryan Brotherhood members Ronald YANDELL and Billy SYLVESTER oversaw a significant heroin and methamphetamine trafficking operation from their shared Folsom prison cell. They used contraband cell phones to extend the reach of their drug trafficking activity from that cell to the streets of Sacramento and other cities throughout California. The YANDELL-SYLVESTER drug trafficking organization received heroin and methamphetamine from another imprisoned Aryan Brotherhood member, Travis BURHOP, who coordinated supply from his Calipatria State Prison cell. BURHOP controlled an extensive drug trafficking network based in San Bernardino County. It distributed methamphetamine and heroin in South Dakota, Missouri, and elsewhere.

B.    Throughout 2016, YANDELL and other Aryan Brotherhood members also used contraband cell phones and other means to orchestrate violent crimes both inside and outside of California's prisons. Through court-authorized wiretaps and other investigative means, the Drug Enforcement Administration (DEA), the California Department of Corrections and Rehabilitation (CDCR), and assisting agencies uncovered and disrupted multiple murder plots targeting AB members, AB associates, and other individuals who – according to Aryan Brotherhood members – had violated the gang's expectations or code of conduct.

C.    Moreover, YANDELL, SYLVESTER, BURHOP, and others charged here engaged in multiple criminal plots to import controlled substances, cell phones, and other

1

contraband into California prisons. Their objective was to profit from the contraband's sale and use within the prison walls. The contraband cell phones also gave YANDELL, SYLVESTER, BURHOP, and other incarcerated inmates unmonitored access to phone calls, encrypted chat applications, text messages, multimedia messages, and email – all of which posed a threat to the safety and security of the prisons. These contraband cell phones were critical in allowing the defendants to conspire and execute crimes against the public even while they were incarcerated.

D.      Finally, agents used intelligence from this investigation to seize a significant cache of firearms from a residence in Manhattan Beach, California; a large amount of methamphetamine from a vehicle in Las Vegas, Nevada; and heroin and methamphetamine from a stash house in Fontana, California.

## II.     PURPOSE AND STRUCTURE OF AFFIDAVIT

A.      I submit this Affidavit to support my request for a criminal complaint alleging violations of federal law and related arrest warrants. I have divided this Affidavit into three sections.

B.      First, in the section captioned "**Criminal Violations and Requested Arrest Warrants**," I set forth the charges, names, and other identifying information regarding the individuals for whom I am seeking arrest warrants (collectively referred to as the "defendants").

C.      Second, in the section captioned "**Background of Investigating Agent**," I explain the basis for my knowledge of the facts asserted in this Affidavit and my background, training, and experience as it relates to this investigation.

D.      Third, in the section captioned "**Probable Cause**," I describe the facts and circumstances that establish the probable cause necessary for this Court to issue the requested

2

criminal complaint and arrest warrants.

      E.      Fourth, in the section captioned "**Summary of Probable Cause**," I provide the Court with a brief summary of the charges for the defendants.

## III.    CRIMINAL VIOLATIONS AND REQUESTED ARREST WARRANTS

      A.      This Affidavit is submitted to support my request for a criminal complaint and arrest warrants for the crimes and individuals listed below.  These defendants have participated in conspiracies to commit racketeering, murder, and drug trafficking.  As indicated, several defendants have also distributed heroin and methamphetamine.

      B.      **Charges**

      In the section below, I have listed each of the counts included in this Criminal Complaint along with the defendants included in each count.  In the next section, I prepared a chart organizing the charges by each defendant.

Count 1  -  Racketeering Conspiracy – 10/7/11 to present – 18 U.S.C. § 1962(d) – **pages 28–129**
Defendants Ronald YANDELL, William SYLVESTER, Danny TROXELL, Travis BURHOP, Brant DANIEL, Donald MAZZA, Pat BRADY, Jason CORBETT, Matthew HALL, Kevin MacNAMARA, and Kristen DEMAR committed the following acts in furtherance of the conspiracy:

-  Act 1 – Murder of Ronald Richardson
-  Act 2 – Murder of Hugo Pinell
-  Act 3 – Possession with intent to distribute methamphetamine (Perez seizure in Missouri)
-  Act 4 – Conspiracy to distribute and possess with intent to distribute heroin and methamphetamine
-  Act 5 – Multiple acts of heroin distribution
-  Act 6 – Conspiracy to murder Kenneth Johnson
-  Act 7 – Methamphetamine distribution (Smuggling drugs into Folsom prison)
-  Act 8 – Conspiracy to murder James Mickey
-  Act 9 – Conspiracy to murder Paul Diaz
-  Act 10 – Conspiracy to distribute and possess with intent to distribute

3

methamphetamine and heroin (Importation of drugs into prison concealed in packages)

- Act 11 – Conspiracy to murder Michael Trippe
- Act 12 – Possession with intent to distribute methamphetamine (Seizure of methamphetamine in Las Vegas from Perez)
- Act 13 – Possession with intent to distribute heroin and methamphetamine (Fontana stash house seizure)
- Act 14 – Murder of Doug Maynard
- Act 15 – Murder of Zachary Scott
- Act 16 – Murder of Donald Pequeen

Count 2 – Conspiracy to distribute and possess with intent to distribute heroin and methamphetamine – 5/27/16 to 12/22/16 – 21 U.S.C. §§ 846, 841(a)(1) – Defendants YANDELL, QUESENBERRY, KEETON, HALL, NOLAN, Perez, BURHOP, and Michael TORRES – **pages 36–50, 72–74, 83–86, 98–101, 119–124, 128–130**

Count 3 – Distribution of heroin – 7/11/16 – 21 U.S.C. § 841(a)(1) – Defendants QUESENBERRY, KEETON, YANDELL, and BURHOP – **pages 40–42**

Count 4 – Distribution of heroin – 7/24/16 – 21 U.S.C. § 841(a)(1) – Defendants QUESENBERRY, HALL, YANDELL, and BURHOP – **pages 42–49**

Count 5 – Conspiracy to murder Kenneth "Kenwood" Johnson – 8/11/16 to 10/1/16 – 18 U.S.C. § 1959(a)(5) – Defendants YANDELL, TROXELL, HALL, and BURHOP – **pages 70–73, 83–86, 105–106**

Count 6 – Distribution of methamphetamine (smuggling drugs into Folsom prison) – 8/11/16 – 21 U.S.C. § 841(a)(1) – Defendants QUESENBERRY, MacNAMARA, DEMAR, YANDELL, and SYLVESTER – **pages 50–63, 69–70, 73–75**

Count 7 – Distribution of heroin – 8/12/16 – 21 U.S.C. § 841(a)(1) – Defendants QUESENBERRY, KEETON, YANDELL, and BURHOP – **pages 68–69**

Count 8 – Conspiracy to murder James Mickey – 8/20/16 to 08/21/16 – 18 U.S.C. § 1959(a)(5) – Defendants YANDELL, TROXELL, and BURHOP – **pages 75–79**

Count 9 – Conspiracy to murder Paul "Dreamer" Diaz – 8/20/16 to 8/21/16 – 18 U.S.C. § 1959(a)(5) – Defendants YANDELL and CORBETT – **pages 79–82**

4

Count 10 -    Conspiracy to distribute and possess with intent to distribute methamphetamine and heroin (Importation of drugs into Folsom and High Desert prison concealed within packages) – 8/11/16 to 9/6/16 – 21 U.S.C. §§ 846, 841(a)(1) – Defendants YANDELL, CORBETT, and PETTY – **pages 86–98**

Count 11 -    Conspiracy to murder Michael "Thumper" Trippe – 8/29/16 to 10/9/16 – 18 U.S.C. § 1959(a)(5) – Defendants YANDELL, MAZZA, and HALL – **pages 106–111**

Count 12 -    Distribution of heroin – 10/18/16 – 21 U.S.C. § 841(a)(1) – Defendants QUESENBERRY, Perez, YANDELL, and BURHOP – **pages 117–119**

Count 13 -    Conspiracy to murder Doug Maynard – 6/1/16 to 10/15/16 – 18 U.S.C. § 1959(a)(5) – Defendants YANDELL and CORBETT – **pages 111–116**

Count 14 -    Conspiracy to murder Zachary Scott – 10/1/16 to 10/29/16 – 18 U.S.C. § 1959(a)(5) – Defendant DANIEL – **pages 124–127**

Count 15 -    Conspiracy to murder Donald Pequeen – 7/1/16 to 7/20/18 – 18 U.S.C. § 1959(a)(5) – Defendants CORBETT and BRADY – **pages 131–132**

The chart on the next page organizes the counts by defendant with corresponding page references where probable cause is found to support each charge.

| Defendant | Counts | Description of Charges | Page Numbers in Affidavit |
|---|---|---|---|
| Ronald YANDELL, aka "Renegade" | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 2 – 5/27/16 to 12/22/16<br><br><br><br><br>Count 10 – 8/11/16 to 9/6/16 | Conspiracy to distribute and possess with intent to distribute heroin and methamphetamine (2 counts) | 36–50, 70–72, 85–88, 98–101, 119–124 72–73, 119–122, 128–130<br><br>86–98 |
| | Count 3 – 7/11/16<br><br>Count 4 – 7/24/16<br><br>Count 7 – 8/12/16 | Distribution of heroin (3 counts) | 40–42<br><br>42–49<br><br>68–69 |
| | Count 6 – 8/11/16 | Distribution of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |
| | Count 5 – 8/11/16 to 10/1/16 – (Kenneth Johnson)<br><br>Count 8 – 8/20/16 to 8/21/16 – (James Mickey)<br><br>Count 9 – 8/20/16 to 8/21/16 – (Paul Diaz)<br><br>Count 11 – 8/29/16 to 10/9/16 – (Michael Trippe)<br><br>Count 13 – 6/1/16 to 10/15/16 – (Doug Maynard) | Conspiracy to Commit Murder in Aid of Racketeering (5 counts) | 70–73, 83–86, 105–106<br><br>75–79<br><br>79–82<br><br>106–111<br><br>111–116 |
| William "Billy" SYLVESTER, aka "Billy from Norco" | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 6 – 8/11/16 | Dist. of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |

| Defendant | Counts | Description of Charges | Page Numbers in Affidavit |
|---|---|---|---|
| **Daniel "Danny" TROXELL** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 5 – 8/11/16 to 10/1/16 | Conspiracy to Commit Murder in Aid of Racketeering (Kenneth Johnson) | 70–73, 83–86, 105–106 |
| | Count 8 – 8/20/16 to 8/21/16 | Conspiracy to Commit Murder in Aid of Racketeering (James Mickey) | 75–79 |
| **Travis BURHOP** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 2 – 5/27/16 to 12/22/16<br><br>Count 10 – 8/11/16 to 9/6/16 | Conspiracy to distribute and possess with intent to distribute heroin and methamphetamine (2 counts) | 36–50, 70–72, 85–88, 98–101, 119–124, 128–130<br><br>86–98 |
| | Count 3 – 7/11/16<br><br>Count 4 – 7/24/16<br><br>Count 7 – 8/12/16 | Distribution of heroin (3 counts) | 40–42<br><br>42–49<br><br>68–69 |
| | Count 8 – 8/20/16 to 8/21/16 | Conspiracy to Commit Murder in Aid of Racketeering (James Mickey) | 75–79 |
| **Brant DANIEL, aka "Two Scoops"** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 14 – 10/1/16 to 10/29/16 | Conspiracy to Commit Murder in Aid of Racketeering (Zachary Scott) | 124–127 |
| **Donald MAZZA, aka "Popeye"** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 11 – 8/29/16 to 10/9/16 | Conspiracy to Commit Murder in Aid of Racketeering (Michael Trippe) | 106–111 |

| Defendant | Counts | Description of Charges | Page Numbers in Affidavit |
|---|---|---|---|
| Pat BRADY, aka "Big Pat" | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 16 – 7/1/18 to 7/20/18 | Conspiracy to Commit Murder in Aid of Racketeering (Donald Pequeen) | 131–132 |
| Jason "Jake" CORBETT | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 9 – 8/20/16 to 8/21/16 | Conspiracy to Commit Murder in Aid of Racketeering (Paul Diaz) | 79–82 |
| | Count 10 – 8/11/16 to 9/6/16 | Conspiracy to distribute and possess with intent to distribute methamphetamine and heroin (Importation of drugs into High Desert prison concealed within packages) | 86–98 |
| | Count 13 – 10/1/15 to 10/15/15 | Conspiracy to Commit Murder in Aid of Racketeering (Doug Maynard) | 111–116 |
| | Count 15 – 7/1/18 to 7/20/18 | Conspiracy to Commit Murder in Aid of Racketeering (Donald Pequeen) | 131–132 |
| Matthew HALL, aka "Psycho" | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 2 – 7/11/16 to 10/24/16 | Conspiracy to distribute and possess with intent to distribute heroin | 36–50, 72–73, 119–122, 128–130 |
| | Count 4 – 7/24/16 | Distribution of heroin | 42–49 |
| | Count 5 – 8/11/16 to 10/1/16 | Conspiracy to Commit Murder in Aid of Racketeering (Kenneth Johnson) | 70–73, 83–86, 105–106 |
| | Count 11 – 8/29/16 to 10/9/16 | Conspiracy to Commit Murder in Aid of Racketeering (Michael Trippe) | 106–111 |

| Defendant | Counts | Description of Charges | Page Numbers in Affidavit |
|---|---|---|---|
| **Samuel KEETON** | Count 2 – 5/27/16 to 12/22/16 | Conspiracy to distribute and possess with intent to distribute heroin and methamphetamine | 36–50, 72–73, 119–122 |
| | Count 3 – 7/11/16<br><br>Count 7 – 8/12/16 | Distribution of heroin (2 counts) | 40–42<br><br>68–69 |
| | Count 6 – 8/11/16 | Dist. of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |
| **Michael TORRES, also known as "Mosca"** | Count 2 – 5/27/16 to 12/22/16 | Conspiracy to distribute and possess with intent to distribute heroin (AB-Mexican Mafia alliance) | 70–72, 85–88, 98–101, 122–124 |
| **Jeanna QUESENBERRY** | Count 2 – 5/27/16 to 12/22/16 | Conspiracy to distribute and possess with intent to distribute heroin | 36–50, 72–73, 119–122, 128–130 |
| | Count 3 – 7/11/16<br><br>Count 4 – 7/24/16<br><br>Count 7 – 8/12/16 | Distribution of heroin (3 counts) | 40–42<br><br>42–49<br><br>68–69 |
| | Count 6 – 8/11/16 | Distribution of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |
| **Kevin MacNAMARA** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 6 – 8/11/16 | Distribution of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |
| **Kristen DEMAR** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 6 – 8/11/16 | Distr. of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |
| **Justin PETTY, also known as "Rune"** | Count 10 – 8/11/16 to 9/6/16 | Conspiracy to distribute and possess with intent to distribute | 86–98 |

| | | methamphetamine and heroin (Importation of drugs into Folsom and High Desert prisons concealed within packages) | |
|---|---|---|---|
| **Kathleen NOLAN** | Count 2 – 5/27/16 to 12/22/16 | Conspiracy to distribute and possess with intent to distribute heroin | 36–50, 72–73, 119–122, 128–130 |

C. **The Defendants**

1. **Ronald YANDELL, also known as "Renegade."** Date of Birth: June 28, 1962. His criminal history includes a 1991 felony conviction for conspiracy to distribute a listed chemical, a 1999 felony conviction for aiding and abetting a prison assault, and a 2004 felony conviction for murder.

2. **William "Billy" SYLVESTER, also known as "Billy from Norco."** Date of Birth: May 7, 1968. His criminal history includes a 1998 felony conviction for first-degree murder. SYLVESTER is also facing a pending murder charge in Sacramento County Superior Court for a prison murder that occurred on or about October 7, 2011.

3. **Daniel "Danny" TROXELL.** Date of Birth: April 12, 1953. His criminal history includes 1979 felony convictions for murder, kidnapping, and shooting at an occupied dwelling.

4. **Travis BURHOP.** Date of Birth: October 6, 1972. His criminal history includes a 1992 felony conviction for receiving stolen property, a 1993 felony conviction for assault with a deadly weapon with great bodily injury, and a 2015 felony conviction for second-degree murder.

10

5.     **Brant DANIEL, also known as "Two Scoops."** Date of Birth: July 16, 1974. BRANT's criminal history includes 1995 felony convictions for attempted murder and assault with a firearm on a person and a 2017 felony conviction for murder.

6.     **Donald MAZZA, also known as "Popeye."** Date of Birth: September 9, 1970. MAZZA's criminal history includes a 1994 felony conviction for assault with a deadly weapon not a firearm with great bodily injury and a 1999 felony conviction for attempted murder with an enhancement for participating in a criminal street gang.

7.     **Pat BRADY, also known as "Big Pat."** Date of Birth: June 12, 1970. BRADY's criminal history includes three 1990 felony convictions for second degree robbery and a 1995 felony conviction for being a felon in possession of a firearm.

8.     **Jason "Jake" CORBETT.** Date of Birth: March 8, 1972. CORBETT's criminal history includes a 1998 felony conviction for first-degree murder.

9.     **Matthew HALL, also known as "Psycho" or "Cyco."** Date of Birth: July 21, 1968. HALL's criminal history includes a 1993 felony conviction for second-degree robbery, a 1999 felony conviction for assault with a deadly weapon not a firearm with great bodily injury, and a 2007 felony conviction for being a felon in possession of a firearm.

10.    **Samuel KEETON.** Date of Birth: January 13, 1979. KEETON's criminal history includes a 1999 felony conviction for vehicle theft; a 2000 felony conviction for second-degree burglary; 2001 felony convictions for evading a peace officer, vehicle theft, and receiving stolen property; and a 2002 felony conviction for second-degree burglary.

11.    **Michael TORRES, also known as "Mosca."** Date of Birth: January 24, 1964. TORRES's criminal history includes a 1982 felony conviction for voluntary manslaughter

11

and a 2007 felony conviction for murder with an enhancement for participating in a criminal street gang.

      12.    **Jeanna QUESENBERRY.**  Date of Birth: July 30, 1966/January 17, 1968.  QUESENBERRY's criminal history includes a 1992 felony conviction for possessing a controlled substance for sale, a 1998 felony conviction for attempted burglary, a 1999 felony conviction for receiving stolen property, a 2003 felony conviction for possessing a controlled substance for sale, and a 2004 felony conviction for second-degree robbery.

      13.    **Kevin MacNAMARA.**  Date of Birth: October 31, 1979.  MacNAMARA has no known criminal history.  He is licensed to practice law in California.

      14.    **Kristen DEMAR.**  Date of Birth: September 30, 1974.  DEMAR's criminal history includes a 2003 misdemeanor conviction for possessing controlled substance paraphernalia.

      15.    **Justin PETTY, also known as "Rune."**  Date of Birth: July 15, 1981.  His criminal history includes a 2002 felony conviction for possessing or manufacturing a dangerous weapon, a 2003 felony conviction for vehicle theft, a 2008 felony conviction for receiving stolen property, a 2011 felony conviction for burglary, and a 2013 felony conviction for vehicle theft.

      16.    **Kathleen NOLAN.**  Date of Birth: July 20, 1954.  Her criminal history includes a 1995 misdemeanor conviction for possessing a controlled substance and a 2013 misdemeanor conviction for petty theft.

D.     **Other People, Groups, and Terminology**

In the chart below, I have listed people, groups, and AB terminology mentioned in the

Affidavit.

| People Mentioned in the Affidavit | Other Groups Mentioned in the Affidavit | AB Terminology |
|---|---|---|
| Todd Ashker | Black Guerilla Family (BGF) | "brother" |
| Tony Barron | Family Affiliated Irish Mafia (FAIM) | "Commission" |
| Nick Bonfiglio | Mexican Mafia | "earning his rock" |
| Malina Carr | Nazi Lowriders (NLR) | "in the hat" |
| David Chance, also known as "Big Country" | Public Enemy Number I (PENI) | "riding 'em to the dirt" |
| Charles Demar, also known as "Boots" | Skinhead Wolf Pack | "Peckerwoods" or "woods" |
| Paul Diaz, also known as "Dreamer" | United Society of Aryan Skinheads (USAS) | "put in work" |
| Leonard Dunning | | |
| Elliott Grizzle, also known as "Rascal" | | |
| Kenneth Johnson, also known as "Kenwood" | | |
| Leslie Jones | | |
| Doug Maynard | | |
| William McGee, also known as "Mouse" | | |
| James Mickey | | |
| Hugo Pinell, also known as "Yogi" | | |
| Waylon Pitchford | | |
| Rena Rice | | |
| Ronald Richardson | | |
| Zachary Scott | | |
| Carrie Sides | | |
| Joseph Simlick | | |
| Bobby Stockton | | |
| Michael Trippe, also known as "Thumper" | | |
| David Wall | | |
| Jayson Weaver, also known as "Beaver" | | |

## IV.    BACKGROUND OF INVESTIGATING AGENT

A.     I am an "investigative or law enforcement officer of the United States" within the

meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and

felony arrests.  I am a special agent of the Drug Enforcement Administration ("DEA"), San

Francisco Field Division, and have been so employed since 1991.  Prior to becoming a DEA

special agent, I graduated from the California State University, Sacramento in 1990 with a

bachelor's degree in Criminal Justice.  I then completed a four-month DEA Basic Agent School

at Quantico, Virginia.  I have had numerous DEA assignments, including to the San Francisco

Division Office from 1991 to 1994, to the Alameda County Narcotics Task Force from 1994 to

1996, to the Clandestine Laboratory Enforcement Team from 1997 to 1999, to the Oakland

Resident Office between 1999 and 2002, and to the Mobile Enforcement Team between 2002

and 2004.  I have been assigned to the Sacramento Division Office Task Force since September

2004.

      B.     I am currently assigned to DEA in Sacramento, California.  My duties as a

special agent involve investigating various criminal activities of narcotics traffickers and their

associates.  In investigating these matters, I have acted as a case agent, an undercover agent, and

a contact agent for confidential sources.  I have previously participated in using wire and

electronic surveillance.  These investigations have resulted in the issuance of federal search

warrants, seizure warrants, and indictments.  They have also resulted in federal narcotics

convictions.  During my narcotics assignments, I have received numerous hours of training in

narcotics enforcement and in investigative techniques.  I have personally participated in several

hundred narcotics investigations.  In addition, I have also spoken on numerous occasions with

informants, suspects, and other experienced narcotics traffickers concerning the methods and

practices of drug traffickers.  I have been involved in various types of electronic surveillance,

including the consensual monitoring of telephone calls.  I have discussed these activities with

other law enforcement agents who know about the distribution and transportation of controlled

substances, the laundering and concealing of proceeds from drug trafficking, and the criminal

gangs who participate in these illegal activities.  Based on my experience and the experience of

other agents and law enforcement officials with whom I have consulted, I know that drug

14

traffickers and money launderers use telephones to facilitate their illegal activities. I have learned through experience and through consulting with other experienced law enforcement officers that court-authorized intercepts of wire communications provide valuable evidence of ongoing narcotics trafficking activities.

      C.     I am familiar with all aspects of this investigation because of my participation in it and because I have reviewed and analyzed information from various sources, including administrative subpoena responses, reports from other law enforcement agencies and investigations, phone records, and pen registers. In addition to my personal knowledge, the statements contained in this Affidavit are based in part on: (1) information provided by the DEA, the CDCR, and other law enforcement agencies, including oral and written investigative and laboratory reports that I have received directly or indirectly from DEA and other law enforcement officials; (2) information provided by gang specialists and narcotics specialists from DEA, CDCR, and other law enforcement agencies; (3) results – reported to me either directly or indirectly – of physical surveillance conducted by DEA and other law enforcement agencies; (4) information provided by confidential sources of information, cooperating defendants, and other people working with DEA and other law enforcement agencies; (5) a review of phone records, pen registers, trap and trace information, and subscriber information; (6) information derived from consensually monitored telephone conversations; (7) a review of driver's license and automobile registration records; (8) records from the National Law Enforcement Telecommunications System and the National Crime Information Center; (9) my training and experience as a special agent with DEA; and (10) the training and experience of other DEA agents and other law enforcement officials with whom I consulted.

## V. PROBABLE CAUSE

### A. Introduction to this investigation.

1. In late 2014, law enforcement officers began investigating a group of northern California drug traffickers who were members or associates of a criminal organization known as Family Affiliated Irish Mafia ("FAIM").[1] As the investigation progressed, agents learned that one important FAIM member, Jeanna QUESENBERRY, was distributing multiple kilograms of methamphetamine and multiple ounces of heroin in the Sacramento area.

2. Federal agents used undercover drug purchases, federal wiretaps, and other investigative techniques to develop evidence that QUESENBERRY worked directly for Ronald YANDELL, an influential and incarcerated member of the Aryan Brotherhood prison gang (the "AB," "Aryan Brotherhood," or the "enterprise"). As discussed in more detail below, wiretaps on YANDELL's contraband prison phone revealed during the fall of 2016 that he was a key organizational leader for multiple racketeering acts committed for the benefit of the Aryan Brotherhood.

3. Intercepts of YANDELL's phone provided critical evidence of the inner workings of the Aryan Brotherhood. His conversations also revealed an ongoing drug trafficking conspiracy. They also revealed an ongoing conspiracy to commit a single racketeering offense on behalf of the Aryan Brotherhood, a violation of 18 U.S.C. § 1962(d). Within that ongoing

---

[1] My personal knowledge and familiarity with YANDELL, QUESENBERRY, and many of their criminal associates dates back much further to my investigations of Bay Area drug traffickers during the 1990's. However, that older background information is not as pertinent to this Complaint as evidence developed from this investigation.

conspiracy, the Investigating Agencies gathered evidence of multiple racketeering offenses,

enumerated in 18 U.S.C. § 1961. These racketeering offenses included murder and attempted

murder. They also included the manufacture, distribution, and possession with intent to

distribute heroin, methamphetamine, and marijuana. Finally, they included the conspiracy and

attempt to commit such violations, all in violation of 21 U.S.C. §§ 841, 843, 846.

## B.     The Aryan Brotherhood's formation, command structure, leadership, rules of conduct, purpose, and symbols.

The Aryan Brotherhood and the individuals, including associates, constitute an

"enterprise" as defined by Title 18, United States Code, Section 1961(4): They are a group of

people associated in fact, who engaged in, and whose activities affected, interstate and foreign

commerce. The enterprise constitutes an ongoing organization whose members function as a

continuing unit for the common purpose of achieving the objectives of the enterprise.

### 1.     Formation

The Aryan Brotherhood is a race-based gang formed in the California prison system in

about 1964 by white inmates who wanted to gain power and authority in prison.

### 2.     Membership

Aryan Brotherhood members are recruited from the prison population. "For new

members, the AB has a policy of 'blood in, blood out': potential members must commit a murder

to gain full membership, and can only leave when they die." *United States v. Bingham*, 653 F.3d

983, 987 (9th Cir. 2011). However, exceptions have been made for new recruits who have

shown a willingness to kill. *Id.* at 987 n.1. To be considered for AB membership, an inmate

must be sponsored by two members, a primary and a secondary sponsor. Generally, the inmate

must also serve a probationary term, when his conduct is observed by Aryan Brotherhood members.  If his conduct is satisfactory, the inmate is admitted to the Aryan Brotherhood.  Once accepted, an Aryan Brotherhood member is required to commit any criminal act that the enterprise asks of him.  An AB member pledges his life to the enterprise.  All AB members are men.

### 3.    Command Structure

The Aryan Brotherhood is governed by a three-man commission with authority over the entire enterprise.  The primary purpose of the commission is to resolve disputes among AB members and, when necessary, to approve the murder or assault of an Aryan Brotherhood member.  In theory, the murder or assault of an Aryan Brotherhood member in California may be executed only if the commission authorizes it.  Murder of a nonmember does not require commission approval.

### 4.    Codes of Conduct

The Aryan Brotherhood does not have a formal, written code of conduct.  Instead, there are unwritten rules of conduct that govern the behavior of its members.  Most recently, three primary rules govern all the behavior of AB members.  They are: 1. Do not cooperate with law enforcement.  2. Keep your word.  3. Never be a coward.

Aside from these rules, AB members are required, when ordered, to kill without hesitation.  Members who do not fulfill their obligations to the Aryan Brotherhood are subject to murder.  AB members are also prohibited from engaging in other conduct, such as being convicted of child molestation, engaging in homosexual behavior, and accruing a drug debt to an inmate of another race while in prison.

In addition to members, the enterprise includes associates, who are people closely affiliated with the Aryan Brotherhood. Associates are required to follow the orders of Aryan Brotherhood members. Associates who do not fulfill their obligations to the enterprise are subject to murder.

The Aryan Brotherhood enforces its rules of conduct and promotes discipline among the enterprise by murdering, attempting to murder, conspiring to murder, assaulting, extorting, and threatening those who either violate the rules or pose a threat to the enterprise. The Aryan Brotherhood also uses murder, the threat of murder, and assault to preserve, protect, and expand its position of power within the California prison system. Specifically, AB members tend to believe that a prison stabbing committed by an AB member should be executed in a bloody and cruel manner so that it leaves a lasting impression on other inmates. This AB belief stems from the reality that white inmates are a minority in every California prison. Therefore, AB-ordered prison attacks, which tend to stand out as particularly gruesome, deter rival inmates from confronting the enterprise's members and associates. In other words, the AB's extreme violence has a purpose: It warns other would-be attackers that they risk severe retaliation. The deliberate message in the AB's violence is, "If you cross the AB, then this is what will happen to you."

Inmates and others who do not follow the orders of the Aryan Brotherhood are subject to murder, as is anyone who uses violence against an Aryan Brotherhood member. As mentioned, inmates who cooperate with law enforcement authorities are instantly "put in the hat" – *i.e.* marked for death.

5.    Purposes

The purposes of the Aryan Brotherhood criminal enterprise include, but are not limited

19

to, the following:

      a.      Controlling illegal activities – such as narcotics trafficking, gambling, and extortion – within the California prison system for the purpose of generating money for Aryan Brotherhood members.

      b.      Enriching the leaders, members, and associates of the enterprise through, among other things, illegal trafficking of controlled substances, often in interstate and foreign commerce.

      c.      Preserving, protecting, and enhancing the power, territory, reputation, and profits of the Aryan Brotherhood through threats, intimidation, and violence, including – but not limited to – murder, assault, and obstruction of justice.

      d.      Using threats and violence to keep victims in fear of the Aryan Brotherhood and in fear of its leaders, members, and associates.

    6.    Methods and Means of the Enterprise

The means and methods by which Aryan Brotherhood leaders, members, and associates conduct and participate in the conduct of the criminal enterprise include the following:

      a.      The leaders and members of the Aryan Brotherhood direct, sanction, approve, and permit other members and associates of the enterprise to carry out acts in furtherance of the enterprise.

      b.      To perpetuate the enterprise and to maintain and extend its power, members and associates of the Aryan Brotherhood commit and conspire to commit murder, attempted murder, intimidation, and

assault against individuals who pose a threat to the enterprise or who jeopardize its operations.  These targets include members of rival organizations, Aryan Brotherhood members, and witnesses to the enterprise's illegal activities.

c.      To generate income, Aryan Brotherhood members and associates – under the protection of the enterprise – engage in illegal activities, including narcotics trafficking, weapons theft, and smuggling contraband into prisons.

d.      Aryan Brotherhood members and associates employ and use gang-related terminology, symbols, phrases, and gestures to demonstrate affiliation with the gang.

During the period of this conspiracy, the Aryan Brotherhood – through its members and associates – engaged in racketeering activity as defined in Title 18, United States Code, Section 1961(1).  Specifically, the members and associates committed multiple acts involving murder, in violation of California Penal Code Sections 182 and 187, and multiple offenses in violation of Title 21, United States Code, Sections 841(a)(l) and 846.

7.      Symbols

Aryan Brotherhood members use various symbols to signal their participation in the Enterprise.  The symbols can appear in tattoos, drawings, and writings.  The shamrock is the most prominent symbol used to signify membership in the AB.  If an incarcerated inmate who is not a member of the enterprise has a shamrock tattoo, members of the Aryan Brotherhood will require that inmate to remove or cover up the tattoo.  Additional symbols demonstrating

enterprise membership include Nazi symbols, the letters "AB," the numbers "I" and "II" (representing the first two letters of the alphabet), the numbers "666," the number "88" (representing the phrase "Heil Hitler" because "H" is the eighth letter in the alphabet), and the number "14" (referring to a 14-word mission statement for white supremacists). Below are some tattoos displaying Aryan Brotherhood symbols.



**C.      Ronald YANDELL is a member of the Aryan Brotherhood's three-man Commission.**

1.       Ronald YANDELL became a federal Aryan Brotherhood member during the 1990's, when he served a 10-year federal prison term. This sentence arose from his 1991 conviction in the District of New Jersey for conspiracy to manufacture methamphetamine. According to online Bureau of Prisons (BOP) inmate records, YANDELL was released from federal prison on March 30, 2001.

2.       After his release, YANDELL quickly committed a double homicide in Contra Costa County. In 2004, YANDELL was convicted of murder and sentenced to life in the California prison system.

3.       During his transition from being a federal AB member to being a

California AB member, YANDELL quickly rose to prominence among California AB members.[2] By 2016, when law enforcement agents executed court-authorized wiretaps on phones used by QUESENBERRY and YANDELL, YANDELL was admitting to other AB members that he was a member of its three-man commission. The wiretaps further revealed that YANDELL counseled, mentored, cajoled, berated, and plotted to kill other members of the Aryan Brotherhood and their associates inside and outside of prison.[3]

4.     To understand how YANDELL and the Aryan Brotherhood became an active and successful criminal enterprise by the fall of 2016, it is important to understand political and legal events that occurred in California between about 2012 and 2015.

## D.     The 2015 *Ashker* settlement changed California's policies on housing dangerous prison gang members.

1.     On December 9, 2009, long-time Aryan Brotherhood members Todd Ashker and Danny TROXELL and other validated prison gang members filed a *pro se* class action lawsuit in the Northern District of California. The suit was captioned *Todd Ashker, et al., v. Governor of California, et al.*, Case No. 4:09−cv−05796−CW. It alleged that CDCR's policies and practices relating to gang validation and using segregated housing at Pelican Bay

---

2     The enterprise only recognizes reciprocity for AB membership from members of the Aryan Brotherhood in the federal prison system. Thus, when YANDELL entered the California prison system, his status as a federal AB member gave him membership in the enterprise. The inverse is also true. If an enterprise member enters the federal prison system, he will be recognized as a member of the federal Aryan Brotherhood prison gang. In contrast, an inmate claiming to be an AB member from any other state will not be recognized as holding status or membership within the enterprise.

3     This summary of the Aryan Brotherhood and YANDELL's role in the enterprise is based on my consultations with CDCR gang experts, who have assisted me extensively in the investigation. It is also based on my personal review of hundreds of intercepted text messages and phone calls involving the defendants. Indeed, for about 91 days during this investigation, law enforcement officers conducted court-authorized wiretaps of many different telephones used by the Target Subjects. The wiretaps resulted in the seizure of more than 1,856 pertinent conversations.

23

state prison were unconstitutional.  Specifically, the plaintiff inmates alleged that CDCR's

policies did not provide sufficient due process and that confinement in Pelican Bay's Security

Housing Unit (SHU) for ten or more years violated the United States Constitution.  In May 2012,

after several years of extensive litigation, a number of private lawyers and law firms began

representing the *pro se* plaintiffs in the lawsuit.

        2.      In July 2014, Ashker and other inmates purportedly began a hunger strike

at the Pelican Bay SHU.  Ashker's hunger strike was designed to draw attention to his lawsuit

and to protest the conditions of his confinement at Pelican Bay.  Ashker and other inmates

conducting the hunger strike garnered significant media attention, which – in turn – created

political pressure.[4]  Both were effective in achieving Ashker's goal of changing the confinement

conditions of extraordinarily dangerous inmates.

        a.      The prisoners' purported hunger strike was mostly an illusion.

According to a cooperating witness ("CW-1"), the AB hunger strike prisoners stocked up on

beans and tortillas in advance and concealed them in prison cells.[5]  Once the protest was

---

[4]     A *New York* magazine profile of Ashker and his plan to use the hunger strike was titled "The Plot from Solitary."  Written by Benjamin Wallace-Wells, the profile was published on February 26, 2014.  It is available here: http://nymag.com/news/features/solitary-secure-housing-units-2014-2/

[5]     CW-1 is a former Aryan Brotherhood member who was incarcerated and actively functioning for the enterprise at Pelican Bay prison between 2002 and 2012.  Between 1994 and 2001, prior to his AB membership, CW-1 was a California prison system inmate who committed multiple acts of violence on behalf of the enterprise. In March 1998, CW-1 increased his status within the enterprise by trying to murder a high-priority target for the Aryan Brotherhood.  Around that time, CW-1 also became a member of the Nazi Lowriders ("NLR") prison gang. As a member of the NLR, CW-1 committed multiple acts of violence to maintain and increase his status with the Aryan Brotherhood.  Based in part on CW-1's reputation for violence and his attempting to kill a high-priority enterprise target, the Aryan Brotherhood made CW-1 a member of the enterprise in 2002.  In May 2004, CW-1 murdered his cellmate at Pelican Bay.  This murder increased CW-1's status within the enterprise because the victim held status within NLR, a subordinate gang.  CW-1's commitment offense was a murder resulting from an effort to collect a drug debt.  CW-1 was provided no promises or assurances by CDCR or the U.S. Attorney's Office.  CW-1 testified that he dropped out of the Aryan Brotherhood after he found himself backing the losing side of an internal

24

underway, the striking prisoners lost weight, and they were careful not to gorge on secreted candy bars or burritos. However, they would also surreptitiously eat a burrito each day. The bottom line, according to CW-1, is that the striking inmates did not risk their own health during their purported hunger strike.

3.     On October 14, 2015, the parties reached a settlement in the *Ashker* case (the "*Ashker* settlement"). Its terms required CDCR to release extraordinarily dangerous prison gang members from the Pelican Bay SHU into less-stringent California prison environments. The practical effect of the *Ashker* settlement has been that the vast majority of the validated gang members within CDCR were transferred out of the SHU and placed in less restrictive custodial environments. These less restrictive environments allow more freedom of movement, communication, and association with other prisoners, including other gang members.

## E.     The 2015 *Ashker* settlement created a growth opportunity for the Aryan Brotherhood.

1.     This investigation revealed that, since the *Ashker* settlement required Aryan Brotherhood members to be released from the Pelican Bay SHU, the enterprise has experienced a significant resurgence within California's state prisons. In particular, Aryan Brotherhood members have recruited new members, indoctrinated new associates, and rapidly

---

AB leadership dispute at Pelican Bay. He described his motivation for cooperating against the Aryan Brotherhood as initially a hatred for the enterprise and a desire to kill Aryan Brotherhood members who he felt were not true to the gang's values. Over time, he described his desire to cooperate as follows: "I've taken two lives, and I don't know how many more people's things I've damaged. And I could help out and stop and prevent some stuff, that's why. It's my way of giving back." CW-1 is further motivated to cooperate by a California law, effective January 1, 2018, that permits inmates, like CW-1, who were under the age of 18 at the time of their crime, tried as an adult, and sentenced to an adult prison sentence to seek parole after serving 25 years of their sentence. Penal Code § 3051. Under the law, CW-1 can attempt to demonstrate remorse and rehabilitation to a parole board in an effort to secure his release. CW-1's cooperation in this case could be used as evidence of his remorse and rehabilitation.

asserted their dominance over the white inmate population throughout California. As a result of this resurgence, Aryan Brotherhood members and associates have also committed a number of murders, assaults, and acts of intimidation that preserve, protect, and further expand the power of the enterprise. Aryan Brotherhood members successfully developed new illicit revenue streams by importing and selling prison contraband, including heroin, methamphetamine, tobacco, and cell phones. These contraband items generate money for enterprise members. They also allow the members to develop and direct criminal activities within and outside of a prison.

        2.      YANDELL was a direct beneficiary of the *Ashker* settlement.

        a.      In 2004, a California Superior Court convicted YANDELL of murder with a firearm and sentenced him to 65 years to life in prison.[6] Upon his entrance to the California prison system, CDCR validated YANDELL as an AB member. As such, he was committed to the Pelican Bay SHU in Del Norte County.

        b.      The Pelican Bay SHU was specifically designed to prevent inmates from facilitating gang activities during their incarceration. It did so by isolating SHU inmates and preventing them from communicating with other people, both inside and outside of the prison. By placing YANDELL and other gang members in the SHU, CDCR hoped to prevent them from communicating openly with other gang members and associates in the general prison population and, thus, furthering organized criminal activities.

---

6      During an intercepted call on August 21, 2016, YANDELL explained to AB member Jake CORBETT that, when he was released from the "feds" in 2001, he was only out for 45 days before being arrested for a double murder. In the call, YANDELL said that, after he was convicted in 2004, he went straight to Pelican Bay. YANDELL also discussed his transition from being an AB member in the federal prison system to becoming a California Aryan Brotherhood member.

26

3.      YANDELL was housed in the Pelican Bay SHU until May 8, 2015.  After the *Ashker* settlement, CDCR transferred YANDELL from the SHU to the California State Prison Sacramento in Folsom, California ("Folsom prison").

4.      At the less restrictive Folsom prison, YANDELL was free to develop, manage, and control multiple criminal activities in furtherance of the enterprise.  These crimes – committed throughout California – included drug trafficking, murders, and assaults.

5.      YANDELL was assigned to a two-man cell with another AB member named William SYLVESTER, also known as "Billy" and as "Billy from Norco."

## VI.    Criminal Activities of the Defendants[7]

The acts detailed below were committed as part of a RICO conspiracy alleging crimes listed as violations of the RICO statute found in 18 U.S.C. § 1962(c).  The conspiracy provision of the RICO statute is found in 18 U.S.C. § 1962(d).  Where appropriate, this Affidavit's table at the beginning and end of the Affidavit list each of the requested charges against each individual defendant for crimes that violate other federal statutes, such as conspiracy to commit murder in violation of 18 U.S.C. § 1959(a)(5), and drug trafficking crimes that violate of 21 U.S.C. § 846, 841(a)(1).

---

7       Unless otherwise noted, the criminal activities occurred in the Eastern District of California or were directed by an individual located in the Eastern District of California.

**A.    October 7, 2011 – Aryan Brotherhood member Billy SYLVESTER murdered
Ronald Richardson at Folsom Prison to gain entrance to, and increase his
position with, the Aryan Brotherhood.**

1.    Before YANDELL and SYLVESTER became cellmates at Folsom prison

in 2015, SYLVESTER earned enterprise membership through the murder of Ronald Richardson.

2.    On October 7, 2011, SYLVESTER and another inmate, Lance Clemens,

stabbed Richardson to death on a yard in Folsom prison.  Richardson had been a member of the

United Society of Aryan Skinheads ("USAS").  SYLVESTER murdered Richardson to gain

admission to the Aryan Brotherhood and to increase his status with the enterprise.[8]

a.    To understand why SYLVESTER's murder was significant to the

enterprise, it is important to understand the Aryan Brotherhood's relationship with the USAS.

AB members target USAS members for murder because the USAS has consistently refused to

subordinate its California prison members to the AB.  According to CW-1, the Aryan

Brotherhood considers itself the only legitimate white prison gang.  As such, it will not allow

another white prison gang to function independently within California prison system.

b.    Contravening the AB's view, the USAS has tried since

approximately 2005 to unite all disparate Skinhead factions under one umbrella prison gang.

According to CW-1, if this effort is successful, it might result in a Skinhead prison gang that

outnumbers the Aryan Brotherhood.

c.    Leaders of the USAS have openly defied the Aryan Brotherhood

and refused to act in a subordinate manner to the enterprise.  Therefore, in about 2005 or 2006,

---

8    On August 14, 2018, a Sacramento County jury found SYLVESTER guilty of Richardson's murder in
violation of California Penal Code § 187.  SYLVESTER was later sentenced to life in prison for this murder.

28

AB members at Pelican Bay decided that every single member of USAS would be targeted for assault unless they came to the AB, denounced the USAS, and revealed to the AB which inmates were still aligned with the USAS.

        d.        After the Aryan Brotherhood announced this edict, enterprise members were expected to kill or to orchestrate the killing of any USAS member with whom they came into contact.  Failure to fulfill this expectation could result in the AB member himself being targeted for murder.

        e.        A call intercepted during the 2016 investigation corroborated the AB's ongoing targeting of USAS and other white prison gang members for murder.  Specifically, during a call intercepted on October 16, 2016, YANDELL told Aryan Brotherhood member Brant DANIEL that members of various skinhead groups were targeted for murder.  YANDELL asked whether DANIEL had any "Skinhead Wolf Pack" gang members at Salinas Valley prison, where DANIEL was housed at the time.  DANIEL said no.  YANDELL then told DANIEL that, if he ran in to any of the "Skinhead Wolf Pack" dudes, DANIEL would have to tell them that they had to denounce the Wolf Pack.  YANDELL instructed DANIEL that he would have to "move on" these other inmates if they didn't agree to denounce the Wolf Pack.

        f.        During the same intercepted call, YANDELL asked his cellmate, SYLVESTER, which skinheads had an alliance against "the Brand."  YANDELL relayed to DANIEL that the skinhead gangs that had joined forces against the Aryan Brotherhood were USAS, Wolf Pack, the Golden State Skins, and the American Front.

        g.        YANDELL added that he and SYLVESTER had "removed" all of the Wolf Pack affiliates from Folsom prison.  YANDELL also said that they disassociated from

them. However, YANDELL added that SYLVESTER was not letting the former members of the skinhead groups off the hook. YANDELL explained that they found out that the four "cliques" of skinhead groups – USAS, Wolf Pack, Golden State Skins, and American Front – had a secret pact to take over all of the main lines, meaning areas, within California prisons.

        h.      YANDELL asked DANIEL to repeat the names that YANDELL had listed. YANDELL told DANIEL that they were going to kill all of them. YANDELL said that information from High Desert prison – where AB members Pat BRADY and Jason "Jake" CORBETT were housed – had apprised them of the secret pact. YANDELL told DANIEL to let all the brothers know that they need to take care of business and that members of these skinhead groups "need to get smashed." DANIEL affirmed his commitment to do so.

        3.      Richardson's murder occurred within a small, concrete yard inside B-3 Security Housing Unit at Folsom prison. It is a yard where inmates in this segregated unit are allowed to exercise. Inmates kept in this part of Folsom prison are separated from other general population inmates.



4.      The attack began shortly before 7:35 a.m. on October 7, 2011. A video surveillance camera positioned above the prison yard captured the murder. In the video, SYLVESTER approaches the victim and surreptitiously removes a prison-made weapon. With the weapon, SYLVESTER violently stabs Richardson repeatedly in the head, neck, and back. Clemens also uses a weapon to stab Richardson in the head, neck, and back.

5.      In order to retrieve Richardson, CDCR officers formed a rescue circle and entered the exercise yard. When they reached Richardson, he was on the ground and unresponsive. Blood flowed profusely from his head and neck. The officers removed Richardson and gave him immediate medical attention.

6.      When CDCR officials entered the exercise yard, the six other inmates present laid prone on the ground. Surveying the yard, CDCR officers found a prison-made weapon about five feet away from SYLVESTER. Below, on the left, is a photograph of SYLVESTER laying on the ground and the prison-made weapon circled in red. On the right is a close up of the weapon that SYLVESTER used to murder Richardson. As officers ordered the inmates to exit the yard, officers found a second prison-made weapon near where Clemens had been laying.



7. When CDCR officers examined SYLVESTER, they discovered blood stains on his hands, shoes, and right sleeve. In the video, SYLVESTER stabs Richardson repeatedly with his right hand.

8. CDCR staff investigated Richardson's murder. According to multiple inmates interviewed during the investigation, Richardson was targeted and killed because he was a USAS member.

9. The Sacramento County Coroner's Office determined that Richardson died of multiple stab wounds to his neck and back. The coroner noted that Richardson's spine was partially severed at the base of his cranium. In addition, Richardson's jugular vein was severed, and his lungs, spleen, kidney, and liver had been punctured.

**B.      August 12, 2015 – Aryan Brotherhood associates murdered Black Guerrilla Family member Hugo Pinell at Folsom Prison to gain entrance to, and increase their position with, the Aryan Brotherhood.**

1.      On August 12, 2015, shortly after 12:55 p.m., Aryan Brotherhood associates Jayson "Beaver" Weaver and Waylon Pitchford slaughtered Hugo "Yogi" Pinell on the B yard at Folsom prison.  They did so to gain admission to the Aryan Brotherhood and to increase their position with the enterprise.  Pinell was a high-value target for the enterprise because he was a long-time member of the rival Black Guerrilla Family prison gang ("BGF").  Also, he had openly provoked AB members and white inmates by expressing opinions that defied the enterprise.

a.      Before Pinell's murder, he spent many years incarcerated at Pelican Bay.  CW-1's incarceration significantly overlapped with Pinell's time there.  According to CW-1, while the two were incarcerated at Pelican Bay, Pinell openly antagonized Aryan Brotherhood members and other white inmates by airing virulently racist opinions and provocative statements. Because of this open disrespect, the enterprise made killing Pinell a high priority.

b.      CDCR transferred Pinell from Pelican Bay to Folsom prison on January 8, 2014.

2.      On the day of Pinell's murder, Weaver approached Pinell on the B yard and pulled a prison-made knife from his waistband.  Weaver used his right hand to raise the weapon above his head, quickly advanced on Pinell, and began forcefully striking Pinell's back and upper torso.

3.      A nearby CDCR officer deployed a grenade to stop the attack, but Weaver continued his assault. Pinell fell face down on the ground near the yard's canteen window. His head faced toward the exercise track. Weaver climbed on top of Pinell and straddled him. He continued to forcefully stab Pinell in the back while Pitchford pinned Pinell's legs.



4.      Another CDCR officer deployed another grenade in an effort to stop the attack. When the grenade went off, Weaver was unfazed. He continued to stab Pinell's back in a forceful, up-and-down motion.

a.      Weaver's persistence in continuing the attack is known within the Aryan Brotherhood as "riding 'em to the dirt." Within the enterprise, this means that the AB member or associate is expected to continue his assault until the victim is no longer breathing, even if doing so risks the attacker being shot or killed by a CDCR official.

b.      This approach ensures that the victim is, in fact, killed. It also signals to other prisoners that Aryan Brotherhood murders will be carried out vigorously and with the goal of successful execution.

34

5.     As Weaver and Pitchford murdered Pinell, black and white inmates on the yard erupted into a riot. The riot lasted about 20 minutes before CDCR was able to restore order.

6.     Medical staff pronounced Pinell dead at 1:22 p.m. He died from the 20 stab wounds to his chest, back, and both hands.

7.     One year after Pinell's murder – at about 6:16 p.m. on August 28, 2016, YANDELL placed an intercepted call to Aryan Brotherhood member Pat BRADY. During the call, YANDELL admitted that Pinell's murder was ordered by the Aryan Brotherhood.

   a.     At the time of this call, BRADY was incarcerated at High Desert prison, and YANDELL was imprisoned at Folsom.

   b.     During their 20-minute conversation, YANDELL and BRADY discussed current events and situations involving the Aryan Brotherhood. This included who wanted to kill whom, who was making money, and who was suggesting new Aryan Brotherhood members, also known as "brothers."

   c.     During the call, YANDELL confirmed that the murder of Pinell was an Aryan Brotherhood hit.

   d.     In particular, YANDELL admitted to BRADY that "they" (the AB) had Jayson "Beaver" Weaver "kill that nigger Yogi."

   e.     In the intercepted call, YANDELL describes "Yogi" as the person that "the brothers had been trying to kill for years."

   f.     This portion of the intercepted call corroborates CW-1's independent description of the Aryan Brotherhood having long viewed Pinell as a high-priority murder target.

g.      As the intercepted call continues, YANDELL explains that

"Beaver" had "earned his rock" because he had "smoked that motherfucker," had been making

money, and had been "putting in work" for the enterprise.

h.      "Earning his rock" is an Aryan Brotherhood phrase short for

earning a "shamrock," the most recognizable and revered symbol of the enterprise. The phrase

refers to the way in which someone has earned his Aryan Brotherhood membership.

i.      In other words, YANDELL confides to BRADY that the Aryan

Brotherhood made Weaver a member of the enterprise (he "earned his rock") because Weaver

successfully killed Pinell, a high-priority target for the enterprise. Weaver also demonstrated his

worthiness by earning criminal proceeds and committing other criminal acts, both for the Aryan

Brotherhood.

j.      The facts of Pinell's murder, coupled with YANDELL's

intercepted admissions to another enterprise member, demonstrate that the Aryan Brotherhood

sanctioned Pinell's murder and encouraged its associates and members to kill him in order to

maintain and enhance the fierce reputation of the enterprise within the California prison system.

Pinell's murder demonstrated that the enterprise was willing and able to commit extreme

violence against their rivals. Moreover, Weaver committed the murder in order to "[earn] his

rock" and did, in fact, become a member of the Aryan Brotherhood largely because of it.

## C.      During 2016, the Investigating Agencies developed evidence of an Aryan Brotherhood-controlled drug trafficking conspiracy operating in Sacramento, Missouri, and elsewhere.

1.      As part of this investigation, the Investigating Agencies developed

substantial evidence of an Aryan Brotherhood drug trafficking conspiracy operating outside of

36

prison in Sacramento, Missouri, and elsewhere. The drug operation was overseen by key incarcerated AB members, including Ronald YANDELL, Billy Sylvester, and Travis BURHOP. As discussed in detail below, the AB's drug trafficking operation was facilitated by key AB members and associates, including Matt HALL, Samuel KEETON, Jeanna QUESENBERRY, Nickolas Perez, and Kathleen NOLAN. Agents developed the evidence of the AB drug trafficking operation through (1) historical seizures of drugs from various participants in the conspiracy, (2) cooperation of a key participant in the drug trafficking operation, and (3) undercover purchases from Jeanna QUESENBERRY in Sacramento during wiretaps on her phone and YANDELL's phone.

2.      A key facilitator of the AB's drug operation was Nickolas Perez. Perez was a courier for incarcerated Aryan Brotherhood member Travis BURHOP. During the wiretaps in this case, at YANDELL's request, BURHOP delivered drugs for the enterprise to Jeanna QUESENBERRY in Sacramento and executed various drug-related tasks for incarcerated AB member Billy SYLVESTER. One of the first significant law enforcement seizures of drugs trafficked from the Aryan Brotherhood drug operation occurred on May 27, 2016, in Washington, Missouri.

**D.      May 27, 2016 – Missouri police seize a pound of methamphetamine from Nickolas Perez; Perez later admits that the drugs belonged to Aryan Brotherhood member Travis BURHOP**

1.      On May 27, 2016, law enforcement stopped a car driven by Nickolas Perez in Eureka, Missouri. Perez's girlfriend, Megan Huff, was the passenger. While Perez provided a statement to law enforcement, a trained narcotics-detection dog alerted to the presence of a controlled substance in two areas: the open right side front door and the area of the

37

trunk. Inside the car, an officer found a purse holding a large amount of cash wrapped in rubber bands. In the car's trunk, officers found a tire that had been broken apart. The tire's condition was consistent with information known to investigators from an informant that methamphetamine was being smuggled from California to Missouri inside tires by Perez and others.

2.      Huff provided a statement that investigators determined contained a number of unconvincing lies. She claimed that the money in her purse belonged to Perez and he had handed her that money and told her to hide when they were being stopped by police.

3.      For his part, Perez admitted that he and Huff had been staying at a Super 8 Motel in Washington, Missouri. He said that police would find a pound of methamphetamine in his motel's room safe.

4.      On Perez's keyring, police noticed a key for a room safe from the Super 8 Motel. Inside his car, officers also found a Super 8 room keycard. Perez agreed to accompany police back to the motel room so they could recover the methamphetamine from the safe.

5.      Perez and the police arrived at Room number 206 at the Super 8 Motel, used his keycard to open the room, and found the room's safe. Using the safe key from Perez's keyring, an officer unlocked the safe and seized approximately one pound of methamphetamine from inside the safe.

6.      Perez and Huff were taken to the Franklin County jail. Perez agreed to continue cooperating with investigators. However, when Perez and Huff were released the next day, they did not remain in contact with investigators.

38

7.     According to Super 8 Motel records, Perez rented rooms on four separate dates in 2016: March 6, April 28, May 4, and May 25.

8.     During a later recorded confession, Perez admitted that, in early 2016, he began to transport drugs to Missouri and South Dakota on Travis BURHOP's behalf and at his direction. Perez admitted that he had delivered methamphetamine at least two or three times to Missouri. This admission was consistent with the motel records from the Super 8 showing that Perez had been to Missouri three times before his arrest on May 27, 2016.

9.     Perez admitted that, when he was arrested on May 27, 2016, he had taken two pounds of methamphetamine to Missouri from California at BURHOP's direction. Perez delivered the first pound to a customer; the other was the pound seized by police from his motel room.

10.     Perez explained in his later confession that he did not tell BURHOP about police seizing the pound of methamphetamine in Missouri. Instead, Perez concocted a story. He told BURHOP that he had seen police and he buried the methamphetamine by a river in Missouri. Relying on Perez's story, BURHOP later directed Perez to return to Missouri and recover the supposedly-buried pound of methamphetamine. BURHOP arranged for AB associate Samuel KEETON to accompany Perez to find the missing pound. With KEETON by his side, Perez pretended to look for the methamphetamine but, ultimately, they returned to California without the "missing" pound of methamphetamine.

**E.    July 11, 2016 – As part of an ongoing DEA investigation of the Aryan Brotherhood's drug operation, DEA undercover agent purchased heroin from QUESENBERRY; Its delivery had been orchestrated by YANDELL and executed by Aryan Brotherhood associate Samuel KEETON.**

1.    During the first half of 2016, DEA targeted the Aryan Brotherhood drug trafficking conspiracy operating in Sacramento through a series of undercover purchases with AB associate Jeanna QUESENBERRY.[9] The undercover purchases revealed how the AB drug operation worked. Specifically, that AB member Ronald YANDELL received drug orders from QUESENBERRY by using a contraband cellphone. YANDELL filled QUESENBERRY's drug orders by contacting AB member Travis BURHOP. BURHOP, in turn, tapped into a network of drug dealers to fulfill the drug orders placed by YANDELL for QUESENBERRY. Ultimately, the undercover purchases with QUESENBERRY led to a series of wiretaps that uncovered substantial evidence of the ongoing racketeering activities conducted by the Aryan Brotherhood.

2.    In early July and in the days leading up to July 11, 2016, I exchanged and recorded drug-related calls and text messages with QUESENBERRY. During these exchanges, I arranged to pay her $5,100 for about five ounces of heroin. QUESENBERRY told me that she was communicating with her supplier. She said that her source had a southern California courier who would bring her a large amount of heroin on the source's behalf. Phone records showed that QUESENBERRY's phone was in regular contact at this time with the contraband cell phone YANDELL was using inside Folsom prison.

---

9    I use the term "undercover purchase" to describe an occasion when I bought drugs from Jeanna QUESENBERRY without her knowing that I was a DEA special agent. Unless otherwise noted, during each of the undercover purchases described in this Affidavit, I was equipped with a concealed recording device, had a cover team monitoring the deal, and gave the drugs to another agent after the deal was finished.

3.      Phone records indicated that, when QUESENBERRY said she was speaking to the "runner" (*i.e.* the courier from southern California), her phone was in contact with a phone used by Samuel KEETON. I believed that KEETON used this telephone because it was linked to his Facebook account. At this time, KEETON had recently been released from California state prison and was on parole.

a.      CDCR records described KEETON as an Aryan Brotherhood associate. At the time of my July 2016 communications with QUESENBERRY, KEETON listed a parole address of 27757 Aspel Road, number 2102, in Menifee, California. Menifee is a city in southern California.

b.      Later in the investigation, agents confirmed that KEETON worked and resided in southern California. In particular, on August 23, 2016, surveillance agents saw KEETON leave the office of his purported employer, Smarthome Energy Solutions, located at 5235 E. Hunter Avenue in Anaheim, a city in southern California. During the same surveillance, agents saw KEETON and his girlfriend travel to two apartment complexes in Garden Grove and in Fullerton, two nearby cities in southern California.

4.      On July 11, 2016, at about 5:30 p.m., QUESENBERRY told me that the southern California courier was about to "pull up." Before the call, surveillance agents followed QUESENBERRY to her stash pad, located at 1084 Millet Way in northern Sacramento.

a.      A few minutes later, agents saw KEETON arrive in a silver truck at QUESENBERRY's stash pad. Agents saw KEETON remove an orange bag from the truck and meet QUESENBERRY in front of her stash pad. KEETON carried the orange bag as he and QUESENBERRY entered her stash pad together.

41

5.      A short time later, QUESENBERRY called me and said the courier had arrived and delivered the heroin. QUESENBERRY told me that the courier had brought more heroin than she had anticipated. Surveillance then saw QUESENBERRY leave the stash pad and drive a short distance to meet with me for our planned drug deal.

6.      During this undercover purchase, QUESENBERRY sold me about five ounces of heroin in exchange for $5,100. The DEA Western Regional Lab subsequently confirmed that I had purchased 124.7 grams of heroin from QUESENBERRY.

7.      Surveillance agents then followed QUESENBERRY directly back to the stash pad. Agents believed they saw QUESENBERRY hand some money to KEETON in front of the stash pad before they went back inside the residence.

## F.      July 24, 2016 – DEA undercover agent purchased heroin from QUESENBERRY; Its delivery had been orchestrated by YANDELL and executed by Aryan Brotherhood associate Matt HALL.

1.      On July 18, 2016, QUESENBERRY began calling to tell me that a runner for her source was going to deliver another load of heroin to the Sacramento area. During a series of recorded calls, QUESENBERRY asked whether I was interested in buying additional heroin. If so, she would make sure the courier brought some specifically for me. I told her that I was interested in getting at least five ounces.[10] During an undercover purchase on July 24, 2016,

---

10      On July 20, 2016, the Honorable Kimberley J. Mueller, Eastern District of California, authorized wiretap intercepts of QUESENBERRY's telephone and of telephone number 916-805-3817. As explained elsewhere in this Affidavit, agents confirmed that the latter number belonged to YANDELL's contraband prison cell phone. Specifically, on October 25, 2016, CDCR officers seized a cell phone from YANDELL's cell in Folsom prison. Subsequent forensic examination confirmed that this phone used number 916-836-6149. Investigation showed that, on August 25, 2016, YANDELL had asked Verizon to change this device's number from 916-805-3817, the number on which Judge Mueller had originally authorized interception. In addition, YANDELL's wife, Rena Rice, QUESENBERRY, and others were intercepted addressing the user of this phone as "Ronnie."

I ultimately bought some of the heroin that YANDELL arranged for delivery to QUESENBERRY.

2.     During an intercepted call on July 21, at 4:42 p.m., QUESENBERRY told YANDELL that she had called "Sammy" because she had been unable to contact YANDELL. I took this to be a reference to Samuel KEETON, the runner YANDELL had used on July 11, because pen data demonstrated that before this intercepted reference to "Sammy," at approximately 4:00 p.m., QUESENBERRY attempted to contact a known number for KEETON.

3.     As the intercepted call from July 21 continued, QUESENBERRY asked YANDELL, "Is he still coming up tomorrow?" YANDELL said, "We'll have someone coming up if you still need that . . . call me back so . . . I can call my partner and have it ready." QUESENBERRY said she was going to "get a final count but probably the same thing." YANDELL said they needed to know as soon as possible "so they can load him up." YANDELL told QUESENBERRY that he would wait for her call and then "call homeboy."

4.     At about 4:59 p.m. on July 21, YANDELL made an intercepted call to QUESENBERRY. During the intercepted call, YANDELL said, "We are having our partner pick up some shit on a whole other trip . . . you talking about 4 and a half?" QUESENBERRY said, "I haven't been able to get hold of both of them." YANDELL told her, "We need to do this quick because we already had our boy line it up so we can have this shit . . . He has to drive down south to pick it up, then drive back and keep it at his house . . . We don't want him to drive back and forth." QUESENBERRY said that she would keep calling her "guys." I believe she meant that she would contact her main customers to determine how much heroin they would buy. That way, QUESENBERRY could relay this total order to YANDELL.

43

5.      Shortly after the intercepted call with YANDELL detailed above, pen data showed that QUESENBERRY tried to contact one of her known heroin customers. She also sent me an intercepted text message that read, "Ok but I need a count on the lunches I need from the caterer within a half hour if possible. And it will be tomorrow afternoon." I understood this text message to be QUESENBERRY asking what amount of heroin I would need. I later received an intercepted call from QUESENBERRY. During the call, she said that she wanted to confirm that we would be able to meet the following day and that I still wanted "five," meaning five ounces of heroin. I confirmed. She agreed to update me if our meeting time changed.

6.      At about 5:42 p.m. on July 21, QUESENBERRY made an intercepted call to YANDELL. During the call, QUESENBERRY said, "Talked to him, he said five, five and a half." I believe she was referring to me. She also told YANDELL that she was "waiting to hear from the other one," which I took to refer to her effort to reach her other identified heroin customer. YANDELL said, "Dude is out picking up… He is getting some shit for me and Billy anyway. . . This will be another one of our little partners." QUESENBERRY asked, "So he is gonna drive up here? He knows to wait for me while I meet dude?" YANDELL confirmed and said, "He is leaving in the morning to go pick all that shit up." YANDELL told QUESENBERRY that he would wait to call his "partner." He added that, if anything changed in the next couple of hours, she should call him. He said that he could "change the number before midnight."

7.      On July 22, 2016, pen register data recorded YANDELL's phone in contact with (213) 915-1044. Phone records showed that Travis BURHOP also attempted to contact this number during the same time period.

    a.        I believe that both YANDELL and BURHOP were calling this number because they wanted to confirm that the courier using this phone would be available to deliver the load of heroin to QUESENBERRY.  However, YANDELL's and BURHOP's calls were not answered.

    b.        At about 4:15 p.m. on July 22, YANDELL called QUESENBERRY and said, "My partner, we sent him over to get all that shit from Travis, and we ain't heard from him since."

    c.        During another intercepted call on July 22, at about 5:59 p.m., YANDELL told QUESENBERRY that he had attempted to call the courier for the drug load but had been unable to reach him.  YANDELL said he was "starting to worry since he was driving with all that shit on the freeway."  During the call, YANDELL asked QUESENBERRY to make sure the driver had not been arrested.  YANDELL said the driver was named "Matt HALL" and that she should check Los Angeles, Orange, and surrounding counties to make sure he was not in custody.

    d.        YANDELL also sent text messages to this effect.  For example, at 7:05 p.m., he wrote: "Check orange county."

    e.        At about 10:06 p.m. on July 22, YANDELL sent QUESENBERRY a text message that read, "Got ahold of our boy and his driving up tomorrow. Matt-Psycho-Hall 315/915-1044."  The phone number in this intercepted text message provided the incorrect area code.  It should have been area code "213," not "315."  Indeed, in an intercepted text sent the next morning, YANDELL clarified HALL's correct phone number.  He wrote to QUESENBERRY, "Sorry sister I was tired. Its 213/915-1044."

f.     At about 10:12 p.m. on July 22, YANDELL called

QUESENBERRY and said, "We're on." He also said that he had just texted her. In the middle

of their conversation, YANDELL said, "He's calling me right now, I'll call you right back."

g.     The pen register on YANDELL's phone showed that, at 10:13

p.m., YANDELL received an incoming call from (213) 915-1044. The pen register also showed

that YANDELL's phone had completed calls with this number earlier that evening at 9:12 p.m.

and at 10:02 p.m.

8.     The next day, on July 23, 2016, at about 10:56 a.m., QUESENBERRY

made an intercepted call to HALL at (213) 915-1044. During the call, HALL told

QUESENBERRY that he would not be able to come up from southern California until the

following day because he had to rent a vehicle. HALL said he would leave by 11 a.m. the

following morning.

9.     At about 6:28 p.m. on July 23, QUESENBERRY made an intercepted call

to YANDELL. During this intercepted call, QUESENBERRY asked YANDELL, "What do you

want me to do with the money?" YANDELL told QUESENBERRY, "We still owe Travis. We

gotta send that shit down and pay Travis." YANDELL said they needed to "send the money

down for other things we are doing."

a.     With the benefit of information gained later in the investigation, I

believe YANDELL was telling QUESENBERRY to provide drug proceeds to BURHOP, who

would use the money to fund additional drug loads.

b.     In particular, I believe that YANDELL's reference to "money" was

a description of drug proceeds. I also believe his description of "other things we are doing"

46

referred to additional drug loads that BURHOP had or would obtain on behalf of the enterprise.

10.     At about 9:15 p.m. on July 23, YANDELL sent QUESENBERRY an intercepted text message, which read: "Hi sister.  Hope all is good with u.  Thank u for taking care of business with the equipment.  All is set for tomorrow with Psycho coming up.  Love ya and i."

11.     At this time, HALL was a member of Public Enemy Number One (PENI), hoping to become a member of the Aryan Brotherhood.  PENI is a white supremacist gang that works inside and outside of prison at the direction of the Aryan Brotherhood.  As discussed below, during later intercepted calls, YANDELL directed HALL – who hoped to join the enterprise – to commit many crimes.

a.     I verified through CDCR documentation that HALL had used the moniker "Psycho" while he was incarcerated.  A subsequent review of materials seized from HALL's residence in October 2016 revealed that he spells the nickname as "Cyco."

12.     On July 24, 2016, agents intercepted QUESENBERRY talking to HALL multiple times.  In their conversations, they coordinated the Sacramento heroin delivery that HALL was making from southern California.  Examples are detailed below.

a.     During an intercepted call on July 24, at about 11:02 a.m., HALL told QUESENBERRY that he had been "given the green light," was obtaining the rental vehicle, and would be on his way up to Sacramento.

b.     During an intercepted call at 11:53 a.m., HALL said he had obtained a Dodge Hemi rental vehicle.  QUESENBERRY gave him directions to the intersection just around the corner from her stash house off Northgate Avenue in Sacramento.

c.     During an intercepted call at 1:03 p.m. on July 24, HALL detailed

his relationship with YANDELL. Specifically, HALL told QUESENBERRY that he and

YANDELL had been incarcerated together in the Pelican Bay SHU. HALL described how they

had participated in a hunger strike at Pelican Bay. HALL said he was not a "driver" but a "shot

caller." HALL admitted that he had put in "work" for the "brothers" and would do whatever

YANDELL asked of him, including murder. HALL told QUESENBERRY that he was, at that

moment "strapped," meaning that he possessed a firearm. HALL said that he was a true racist

and a true "gangster." HALL said he was willing to commit acts of violence from which others

shied away.

d.     When HALL admitted that he had "put in work" for the "brothers,"

I believe that HALL meant he had committed violent acts ("work") while in prison to increase

his reputation and position with the Aryan Brotherhood ("the brothers").

13.     At about 8:00 p.m. on July 24, surveillance agents saw HALL meet with

QUESENBERRY at an AM/PM gas station on Northgate Avenue in Sacramento. HALL was

driving a rental vehicle. During the meeting, agents saw QUESENBERRY lead HALL to her

nearby stash pad at 1084 Millet Way. Agents saw HALL remove a bag from the vehicle and

accompany QUESENBERRY inside the house.

14.     At about 8:46 p.m., while QUESENBERRY was with HALL at her stash

house, I made a recorded and intercepted call to QUESENBERRY. During the call,

QUESENBERRY told me that the heroin had arrived and that we could meet shortly at the

AM/PM.

15.     A short time later, I went to the AM/PM to conduct the undercover

48

purchase.  Surveillance agents saw QUESENBERRY travel from the stash house at 1084 Millet Way to the AM/PM.  QUESENBERRY then met with me, and I paid her $5,200 for about five ounces of heroin.

        a.      During the exchange, QUESENBERRY told me the courier who had brought this heroin was not their normal courier.  She added that the substitute courier had rented a vehicle and was waiting for her.

        b.      The DEA Western Regional Lab subsequently confirmed that I had purchased 133.7 grams of heroin from QUESENBERRY on July 24, 2016.

        16.      Surveillance agents followed QUESENBERRY back to her stash house. A short time after she arrived, agents saw HALL leaving the stash house in his rental vehicle.  At about 10:01 p.m., HALL called QUESENBERRY, asked for directions out of town, and thanked her.

**G.     July 27, 2016 – YANDELL and QUESENBERRY discussed getting a half-kilogram of heroin.**

        1.      On July 27, 2016, between about 2:33 p.m. and 3:55 p.m., QUESENBERRY and YANDELL exchanged ten drug-related text messages.  At one point, QUESENBERRY sent a message that included the language, "And asked if could be started with half a key."  YANDELL responded, "Or both??"  At 3:55 p.m., YANDELL subsequently sent QUESENBERRY a text message stating, "So what is look like? Sammy and Kevin r coming up next Wednesday so let me know what u think."

        a.      I believe that the intercepted text messages between YANDELL and QUESENBERRY demonstrated that the two were coordinating the amount of heroin she

anticipated needing.  For example, "half a key" is often street slang for half of a kilogram.  I believe YANDELL and QUESENBERRY were discussing this so that YANDELL could have KEETON ("Sammy") deliver an appropriate amount during an upcoming trip.

b.      I further believe that YANDELL's mention of "Kevin" was a reference to attorney Kevin MACNAMARA.  Subsequent events demonstrated that YANDELL and SYLVESTER were using MACNAMARA's status as a lawyer to have lawyer visits at Folsom prison.  These lawyer visits present an advantage because, in an effort to avoid infringing on the attorney-client privilege, California prisons do not typically monitor them.  In contrast, California prisons make audio recordings of the conversations that inmates have with other visitors.  YANDELL and SYLVESTER exploited this practice to benefit their ongoing racketeering activity.  Specifically, during these lawyer visits, MACNAMARA would secretly pass the inmates various kinds of contraband, including cell phones, controlled substances, and tobacco.

2.      Pen data revealed that, between 4:19 p.m. and 7:39 p.m., YANDELL's phone had about eight contacts with BURHOP's phone.  They apparently spoke for more than 30 minutes.

a.      I believe that, during these contacts, YANDELL was working with BURHOP to make the appropriate amount of heroin available to QUESENBERRY.

**H.      August 11, 2016 – YANDELL intercepts uncovered a plot to use MACNAMARA and DEMAR to smuggle methamphetamine, cell phones, and tobacco into Folsom Prison.**

1.      Prior to August 11, 2016, QUESENBERRY and I exchanged recorded calls in which I arranged to purchase about nine and a half ounces of heroin from her on August

12, 2016. During the recorded calls, QUESENBERRY indicated that the courier bringing the heroin would travel from southern California on about August 10, 2016.

  2.  During the week prior to August 11, 2016, agents intercepted calls in which QUESENBERRY discussed a plot to have KEETON transport MACNAMARA to the Sacramento area. I speculated that MACNAMARA may have required assistance in his travel because he uses a wheelchair. In any case, the intercepts indicated that, once he was in the Sacramento area, MACNAMARA would visit SYLVESTER, an AB member and YANDELL's Folsom prison cellmate.

    a.  Agents subsequently confirmed that SYLVESTER was scheduled to have a lawyer visit him at Folsom prison on August 11, 2016.

    b.  Intelligence gathered in these, and later, intercepted calls allowed law enforcement officers to disrupt a plot to smuggle contraband to SYLVESTER. SYLVESTER seemed to have planned to receive the contraband from MACNAMARA and a woman named Kristen DEMAR.[11]

  3.  On August 11, 2016, during the early morning hours, DEMAR sent YANDELL intercepted text messages at about 7:17 a.m. They read, "Oh my god wtf I haven't heard from anybody about time game plan meeting place NOTHING if they here NOTHING I just know they hotel in complete opposite direction I though this supposed to not be like this agin this shit not knowing where to go when to go or what time apt. At has me stressed out I got 2

---

11  DEMAR is the wife of Charles Demar, also known as "Boots," an inmate functioning for the enterprise in Calipatria state prison at the time. Charles Demar fell under the authority of AB member Travis BURHOP.

kids here that I have to wake up get to dad and nobody wants to let me plan my shit that's how shit get fucker up."

4.      YANDELL responded to DEMAR at 8:04 a.m.: "Sister call our boy Sammy 951/595-9294. Algo call Gina 740-213-3509."

a.      In this intercepted text, I believe that YANDELL told DEMAR to call Samuel KEETON ("Sammy") and Jeanna QUESENBERRY ("Gina") because the phone numbers listed by YANDELL match the numbers used by KEETON and QUESENBERRY at this time in the investigation. Also, intercepted calls on QUESENBERRY's phone indicated that KEETON and QUESENBERRY were also involved in the plot to smuggle contraband into Folsom prison.

5.      At about 8:16 a.m. on August 11, agents intercepted YANDELL calling KEETON at (951) 595-9294. This phone number matched the number that YANDELL's text had provided for "Sammy" earlier that morning. During the intercepted call, YANDELL gave KEETON Kristin DEMAR's phone number. YANDELL told him to call "Kristin" and to let her know the plan for that day. KEETON said he was at a hotel waiting for QUESENBERRY to arrive with a vacuum-seal machine. KEETON said that it would be "5 today and 5 tomorrow."

6.      After this call, GPS locator information showed QUESENBERRY's telephone travelling from her Sacramento home to the Red Lion Inn in Sacramento, located at 500 Leisure Lane. Surveillance agents also traveled to this location and saw QUESENBERRY, KEETON, DEMAR, and MacNAMARA meeting together in the rear parking lot of the hotel. Agents then saw DEMAR and MacNAMARA leave in a black Toyota Sienna van registered to the MacNAMARA Trust.

52

7.     Agents followed the Toyota Sienna to Folsom prison. Agents saw DEMAR and MacNAMARA park in the parking lot and enter the prison.

a.     For the prison visit, DEMAR listed herself as a paralegal.

b.     Although SYLVESTER had a criminal case pending against him at the time, he was representing himself in that case. Therefore, during this meeting, I believe that it is unlikely that MacNAMARA was acting as a lawyer representing SYLVESTER on that case. Such representation would be inconsistent with SYLVESTER's *pro se* status.

8.     CDCR Investigative Services Unit Sergeant Simon Ramirez said DEMAR and MacNAMARA were allowed to meet with SYLVESTER for a legal visit. However, CDCR investigators outfitted the meeting room with a video camera. They recorded and monitored a visual feed of the meeting. The room did not provide the ability to capture sound, so no audio was heard or recorded.

9.     I have reviewed the video recording of the interaction. During the meeting, DEMAR reached into a bag on MacNAMARA's wheelchair and produced items. MacNAMARA was off screen for most of the video. However, the bags on one side of his wheelchair were visible when DEMAR reached into them. During the course of about 20 minutes, I could see DEMAR quickly hand SYLVESTER several items, including what appeared to be a cell phone. DEMAR obscured her passing the contraband by holding a notepad on top of the items. Two stills from the surveillance video are below.



10.     When the visit concluded, CDCR officers searched SYLVESTER. They found a new iPhone in a hand-sewn pocket on the right side of SYLVESTER's waistband. In the same waistband, officers discovered three other iPhones and three vacuum-sealed baggies of tobacco. The tobacco weighed about 174 grams. Upon further search, officers discovered about 20 grams of suspected methamphetamine in SYLVESTER's rectum. A field test returned a positive result for the presence of methamphetamine. Below is a photograph of some of the evidence collected.



11.     During the search, SYLVESTER asked whether DEMAR was going to get in trouble. He made a number of incriminating statements demonstrating that this smuggling operation was an Aryan Brotherhood plot designed to benefit the enterprise.

a.      As officers searched SYLVESTER, he spontaneously told CDCR Sergeant Nicholas Stake, "She had to do this. We made her." SYLVESTER asked Sergeant Stake if he knew who DEMAR's "old man" was. SYLVESTER then identified DEMAR's spouse as "Boots."

b.      SYLVESTER claimed that DEMAR had been manipulated into bringing him contraband because she believed that the Aryan Brotherhood had targeted her husband for death. SYLVESTER further claimed that DEMAR had been manipulated into believing that her husband's life would be spared if she brought contraband into the facility.

c.      Sergeant Stake identified "Boots" as inmate Charles Demar, a validated Skinhead gang member housed in Calipatria prison.

12.     CDCR officials also searched MacNAMARA and DEMAR before they left the prison grounds. In the seat cushion of MacNAMARA's wheelchair, the officials found

three new phones, plastic wrappers, and cell phone power cables.

        a.       Investigators approached DEMAR and read her *Miranda* warnings. She said she understood her rights and agreed to make a statement. According to DEMAR, she was assisting MacNAMARA on a case involving SYLVESTER.

        b.       Investigators confronted DEMAR with the finding of contraband on SYLVESTER. DEMAR dropped her head and said, "I need to think about my husband before I say anything." DEMAR said she wanted to cooperate but she didn't want to get herself or her husband "Charlie" into more trouble. DEMAR claimed that she could die if she cooperated or said something that she wasn't supposed to say.

        c.       DEMAR explained that her husband was incarcerated at Calipatria prison and had been put "in the hat," meaning the Aryan Brotherhood had marked him for death. DEMAR admitted that she and MacNAMARA had visited SYLVESTER at Folsom prison on five occasions. According to DEMAR, the first visit was just a meeting, but on a few occasions, MacNAMARA brought contraband for SYLVESTER.[12] At one point in the interview, DEMAR lowered her head and said, "Know this: I wasn't a willing participant." Then, she said, "Just take me to jail." Eventually, DEMAR requested a lawyer, and questioning ceased.

        d.       Officers released DEMAR and MacNAMARA later that afternoon. DEA surveillance saw DEMAR and MacNAMARA leave Folsom prison together in a black Toyota Sienna van at about 2:50 p.m.

---

12     During an August 12 intercepted call between YANDELL and Rice, YANDELL implied that MacNAMARA had smuggled items into prison for SYLVESTER on three prior occasions.

13. A review of CDCR visiting records revealed that MACNAMARA and DEMAR had visited SYLVESTER together on seven previous occasions in 2016. Specifically, MACNAMARA and DEMAR visited SYLVESTER on February 11 and 12, March 10 and 11, April 1, and May 12 and 13.

14. At about 5:04 p.m. on August 11, YANDELL made an intercepted call to his wife, Rena Rice. YANDELL told Rice that SYLVESTER had been arrested. Rice confirmed that MACNAMARA had been "busted." However, she did not know if they had found anything on SYLVESTER's body. Rice said that, if they figured out MACNAMARA had given the stuff to SYLVESTER, MACNAMARA would get charged.

15. At about 5:29 p.m. on August 11, YANDELL made an intercepted call to KEETON. YANDELL instructed KEETON to tell MACNAMARA that the police didn't know anything. YANDELL told KEETON to tell MACNAMARA that, if the police had known about MACNAMARA, they would have searched him coming in and he "would have been busted up front." KEETON said MACNAMARA was distraught. KEETON explained that he had just put him on a plane back to southern California. YANDELL told KEETON that he and SYLVESTER had "never told anyone about the lawyer."

a. YANDELL surmised that the only way law enforcement could prove the stuff had come from MACNAMARA was if SYLVESTER confessed. YANDELL and KEETON agreed that they would be okay as long as the police didn't put SYLVESTER "on potty watch," which would prevent SYLVESTER from passing the drugs secreted in his rectum.

b. YANDELL and KEETON both agreed that the police locating the additional phones in MACNAMARA's chair still wasn't enough proof to implicate him.

57

16.     At about 5:41 p.m., KEETON called YANDELL and said he was going to meet QUESENBERRY in the morning. KEETON wanted to know if he needed to take the money to "the Mexicans." YANDELL asked whether KEETON "still had the black," meaning still possessed the heroin. KEETON said no, that he had given it to QUESENBERRY the previous evening and that QUESENBERRY was supposed to give him the money the following day, which would be August 12, 2016. YANDELL told KEETON that he would call QUESENBERRY and get her to lock in a time to conduct the drug deal so that she could get KEETON the money the following morning. YANDELL said that he wanted KEETON to give some of the money to YANDELL's wife and to SYLVESTER's wife the following morning, before KEETON left town. KEETON said MACNAMARA was "weirded out. He requested that YANDELL call MACNAMARA and calm him down.

17.     At about 5:50 p.m., YANDELL called DEMAR. She described what had occurred at the prison. DEMAR said she believed that MACNAMARA either had previously worked with law enforcement or was now working with law enforcement. She thought that MACNAMARA had "ratted" them out.

a.     DEMAR said several times that she wouldn't "rat" or "talk" and that she would just do her time. She said that she knew that someone had told on them and that they had been set up. She believed the police had been waiting to "ambush" them when they left.

b.     YANDELL said that, as long as everyone kept their mouths shut, there was no way law enforcement could know or prove that DEMAR and MACNAMARA had brought the contraband in MACNAMARA's chair.

18.     At about 6:43 p.m., YANDELL called KEETON and informed him that he should collect about $9,000 from QUESENBERRY in the morning.  YANDELL further instructed KEETON that QUESENBERRY should be allowed to keep $1,500 and that KEETON should keep $400 for his driving expenses.  YANDELL said, "It should be 950 times nine and a half."

a.     I had arranged to pay QUESENBERRY $950 per ounce of heroin and to buy between nine and nine and a half ounces.  Thus, YANDELL's quoted price matched my order with QUESENBERRY.

b.     YANDELL told KEETON to call QUESENBERRY to have her pinpoint a time for the following day.

c.     A short time after YANDELL spoke with KEETON, QUESENBERRY called me.  She said her people had a "family emergency" and needed to get out of town.  Therefore, she needed to execute the heroin deal as early as possible the following morning.

d.     I believe the alleged "family emergency" to which QUESENBERRY referred was MacNAMARA and KEETON now wanting to leave the Sacramento area as quickly as possible.  Therefore, QUESENBERRY was trying to move up the time for our drug deal.

I.     **YANDELL intercepts confirmed that DEMAR and MacNAMARA were told to blame their contraband smuggling on Billy SYLVESTER and the Aryan Brotherhood.**

1.     During an intercepted call between YANDELL and Rice, YANDELL confirmed that SYLVESTER had told DEMAR and MacNAMARA to blame the Aryan

59

Brotherhood for their smuggling contraband into Folsom prison on August 11.

        a.      In particular, on August 12, 2016, at about 8:12 p.m., YANDELL spoke with Rice. YANDELL said that he had instructed "Billy" (SYLVESTER) to tell DEMAR and MACNAMARA that, if anything ever happened, they should tell law enforcement that the Aryan Brotherhood had threatened them. YANDELL added that DEMAR and MACNAMARA should say that they were scared and had smuggled the contraband because they feared for their lives.

        b.      During the intercepted call, YANDELL said that SYLVESTER had told DEMAR and MACNAMARA that SYLVESTER would admit to any statements they made implicating him. In this way, SYLVESTER would make sure that nothing happened to DEMAR and MACNAMARA.

        2.      In intercepted text messages sent on August 13, DEMAR and YANDELL confirmed that DEMAR should blame SYLVESTER and the Aryan Brotherhood for her smuggling contraband into Folsom prison. They agreed that she should do this in order to protect DEMAR and MACNAMARA from prosecution.

        3.      In particular, the following text exchange occurred in the early morning hours of August 13:

> DEMAR:      Good morning hope all is well I just want to express my gratitude for billy and you having my back as well as husbands and I hope you know we will not diasapoint you or ever go out like cowards and I am here if there anything u guys need I'm glad I have had the opportunity to meet u guys r have learned a lot and understand a lot better

> YANDELL:    Thank u sister. It's all good. Got word from B. He said remember what he said if they threaten to charge u. Put it all on him and we

> will always say he told u guys to do that because they can't do
> anything to him. He wants to protect u and Kevin. No worries. I'll
> keep u posted on any updates. R.

4.      In this text exchange, I believe that YANDELL reminded DEMAR that "Billy" SYLVESTER ("B") had told her to blame SYLVESTER for DEMAR's smuggling contraband into the prison on August 11. I believe that is what YANDELL meant when he wrote that "B" said, "Put it all on him." Confirming that SYLVESTER and the AB would back the story, YANDELL then wrote "we will always say he told u guys to do that." The advantage to this approach was that, as YANDELL pointed out, "they can't do anything to" SYLVESTER, who was already serving a lengthy prison term. YANDELL then made clear that the point of this cover story is to "protect" DEMAR and "Kevin" MACNAMARA.

5.      On October 7, 2016, SYLVESTER returned to the cell that he shared with YANDELL. Because of the contraband seizure on August 11, 2016, he had spent nearly all of the previous two months in Administrative Segregation at Folsom prison. Upon returning to the cell, SYLVESTER used YANDELL's wiretapped phone to make several calls.

    a.      During two intercepted calls on October 7, SYLVESTER made a number of admissions about criminal activities to Carrie Sides, a woman whom law enforcement officers believed to be his girlfriend. Specifically, SYLVESTER gave details about moving money earned from committing crimes through his daughter and about using MACNAMARA to smuggle contraband into the prison.

    b.      The first call began at about 6:37 p.m. on October 7. During the call, SYLVESTER confirmed that Sides had the money. He then instructed her to use Western Union to send it to SYLVESTER's daughter, Tuesday, who lived in Redding. Sides told

61

SYLVESTER that she loved him.

        c.      At about 8:39 p.m. on October 7, SYLVESTER called Sides again. During this intercepted call, SYLVESTER told Sides that "the Feds" had a warrant to put a camera in the room with him and his attorney. SYLVESTER said he was worried because a brother on the streets had been busted. In addition, the brother's girl had been busted with drugs and guns and was looking at 15 years in custody. They believed she was telling on them.

        d.      Sides also confirmed that she spoke almost every day with QUESENBERRY via FaceTime. SYLVESTER asked if Sides would marry him, and she said yes. SYLVESTER asked if his mom had told Sides about his involvement with "organized crime," and Sides said yes.

        e.      SYLVESTER said that nobody had known that he was bringing in everything – phones and dope – through his attorney but that they would have a new way soon. SYLVESTER said that YANDELL had been holding some of SYLVESTER's money for him and that he was going to have YANDELL bring some of the money to Sides. SYLVESTER went on at length about how they were making money and how their people did not have to know all the details, including the fact that Sides had been involved.

        f.      SYLVESTER said that, now, everyone would know that, in order to talk to SYLVESTER, they would have to go through his daughter, Tuesday. She would not say a word if anything happened. SYLVESTER said that a lot of people knew who Tuesday was.

        g.      SYLVESTER said that Rice was going to visit YANDELL this weekend and would bring Sides several thousand dollars on SYLVESTER's behalf.

SYLVESTER said that Rice had a lot of their money, which they would invest in an upcoming

venture.

**J.     August 11, 2016 - YANDELL and BURHOP discuss Aryan Brotherhood business and distribution of the enterprise's drug proceeds.**

1.      On August 11, 2016, at about 7:55 p.m., YANDELL received an

intercepted call from BURHOP, who was incarcerated in Calipatria prison.  During the 20-

minute conversation, YANDELL gave extensive advice and guidance about how BURHOP

should run the enterprise's operation in Calipatria prison.

a.      During the call, BURHOP said that he had just spoken with

Charles Demar, aka "Boots," the husband of DEMAR.  YANDELL explained that BURHOP

needed to "close ranks" down there, keep Charles Demar close, and set rules to establish order

among the white inmates at Calipatria prison.

b.      YANDELL explained that, in the past, he told white inmates that

he would kill them if they bought drugs from someone of another race.  YANDELL said it was

easier to kill the non-conforming white inmates than to start fights over the yard.  YANDELL

said that, if any of the inmates didn't follow BURHOP's rules, he should "make one drop,"

meaning kill him.  YANDELL said BURHOP should not do the killing himself.

c.      BURHOP said that his distribution organization was doing well

even though he had "made amends with" another group within Calipatria prison.  BURHOP said

the Mexicans' distribution was doing poorly and that they were mad about the state of their drug

business.  BURHOP said that the "Mexican" inmates owed him money.

d.      YANDELL said that, because SYLVESTER had been caught with contraband earlier that day, YANDELL was afraid to use PayPal to move money. Instead, he was going to send KEETON down to southern California and have KEETON give BURHOP $7,000. This way, BURHOP could hold the money for SYLVESTER. YANDELL said he would send more money in the future. Then, YANDELL would instruct BURHOP to send postal money orders to various people connected to SYLVESTER.

2.      On August 11, 2016, at about 8:24 p.m., YANDELL made an intercepted call to an unknown man using telephone number (747) 256-5983. YANDELL told this man that he had just spoken to BURHOP. YANDELL described what had happened to SYLVESTER and what had been seized. He said that he did not want to say anything over the telephone and that he would talk to the unknown man the following day. YANDELL said he was going to "take it up a notch" even though everyone knew that they were the inmates responsible for bringing phones into the prison. YANDELL reiterated that he would speak to the unknown man in person the following day.

a.      Based upon subsequent intercepts and investigation, I believe that Michael "Mosca" TORRES was the male user of telephone number (747) 256-5983.

b.      At the time of this intercepted call, TORRES was a member of the Mexican Mafia prison gang. He was also incarcerated at Folsom prison.

c.      Given their incarceration in the same prison, it makes sense that YANDELL would speak with TORRES in person rather than over the phone. It also makes sense given that YANDELL was concerned about SYLVESTER's having been caught with contraband.

d.  Phone records showed that the number (747) 256-5983 was in

contact with BURHOP's phone number at about this time.

**K.  August 11, 2016 – YANDELL and HALL discuss connecting Matt HALL to BURHOP's heroin supply and a plot to kill Aryan Brotherhood member Kenneth Johnson.**

1.  At about 11:51 p.m. on August 11, 2016, YANDELL made an intercepted call to HALL. The call lasted about one hour and 19 minutes. During the call, YANDELL and HALL discussed issues within the Aryan Brotherhood. In addition, YANDELL said that he was getting heroin for $750 an ounce. HALL asked to purchase some heroin. YANDELL said he would contact BURHOP on HALL's behalf. HALL indicated that he also wanted to purchase several ounces of methamphetamine because he was expected to deliver it to AB commission Member Daniel "Danny" TROXELL. HALL said he was doing work for TROXELL and being harassed by AB member "Kenwood," whom agents subsequently identified as Kenneth Johnson.

2.  YANDELL explained how the enterprise was functioning at that time. Specifically, YANDELL said that he and SYLVESTER were drug distribution partners. YANDELL also said that he and TROXELL were attempting to "build an army." YANDELL said that HALL was nearly a full Aryan Brotherhood member. Making him an official member was just a "formality."

3.  During the intercepted call, YANDELL identified himself as being one of the AB's three commission members. YANDELL boasted that everything was run through him. YANDELL identified TROXELL and David "Big Country" Chance as the other two commission members.

65

4.      HALL said that he had done a "hot" "lick at the hotel" and that, "if you don't get caught in 72 hours, you are good." HALL explained that Johnson had violated this rule because he wanted proceeds from the robbery within the first 48 hours. HALL thought this was very foolish.

a.      As explained below, I believe that HALL's reference to the "hot" "lick at the hotel" referred to a robbery/homicide in Anaheim on July 13, 2016, in which a crew of three men attempted to rob another drug dealer and one of the crew members was shot and killed.

b.      I also believe that, based on his statements, HALL intended to funnel money from this robbery to Johnson.

5.      YANDELL said that he had spoken to TROXELL extensively about how he wanted Johnson "put on the shelf," meaning killed. YANDELL instructed HALL not to answer to Johnson or to give him money. Several times, YANDELL said that he was going to have Johnson killed and had issued "a murder order."

6.      An Orange County Sheriff's Homicide Special Investigations detective subsequently verified that two people had been arrested in July 2016 after they accidentally shot and killed one of their own accomplices during a hotel robbery. Specifically, on July 13, 2016, that extortion scheme resulted in the murder of Daniel Richardson in Anaheim, California. The individuals involved in the robbery attempt were known subordinates of HALL.

a.      Orange County homicide investigators believed that HALL and Johnson were directing the hotel robbery crew. In particular, I learned from the detective that between June–July 2016, HALL and Aryan Brotherhood member Kenneth Johnson conspired to

extort, and aided and abetted the extortion of $2,500 from associates of the Aryan Brotherhood based upon a belief that the associates had violated Aryan Brotherhood's code of conduct. Information on a phone recovered from one of the robbers linked the crew directly to Johnson. The phone information gave specifics about the plot to get money from the robbery and from ongoing drug sales.

                        b.        In particular, the robbery crew set up the "lick" in order to obtain money they would use to pay off Johnson. They owed a debt to Johnson because the crew members had formed a white supremacist gang without receiving the Aryan Brotherhood's prior approval thus running afoul of the enterprise's code of conduct. Johnson had imposed a tax on the crew members for this unauthorized behavior.

                        c.        Multiple intercepted calls between YANDELL and others about this topic made clear that YANDELL and other Aryan Brotherhood members were not aware of Johnson's extortion scheme. YANDELL was very upset with Johnson because the extortion scheme ultimately led to a botched robbery/murder which, in turn, would increase law enforcement scrutiny of the Aryan Brotherhood and its associates, especially Matt HALL. YANDELL viewed HALL as a valuable out-of-custody resource who had been compromised by Johnson's behavior. Moreover, Johnson had acted without informing YANDELL, TROXELL, or any other Aryan Brotherhood member about his extortion scheme and YANDELL therefore considered Johnson to be in violation of the gang's code because he was seeking to enrich himself and not acting to benefit the enterprise.

                        d.        Because YANDELL claimed in this intercepted call that he had issued a kill order for Johnson, agents consulted with authorities at Kern Valley prison, where

Johnson was housed.  Authorities placed him in protective custody to prevent his potential

murder.

                e.       On April 4, 2018, an Orange County Superior Court jury found

Johnson guilty of three counts of conspiracy to commit a crime, violations of California Penal

Code § 182(a)(1).  The jury also returned a gang enhancement for each crime.  The verdicts

related to the July 13, 2016 robbery that resulted in a homicide.  On May 4, 2018, an Orange

County Superior Court judge sentenced Johnson to 25 years to life in prison for these crimes.

                f.       HALL was initially charged in this prosecution but was later

dismissed from the case by the Superior Court judge.  The Orange County District Attorney's

Office appealed that determination and it was later overturned on appeal in November 2018.

Since that time, HALL has not been located to face the reinstated charges in Orange County.

**L.**      **August 12, 2016 – DEA undercover agent purchased heroin from
QUESENBERRY; Its delivery had been orchestrated by YANDELL and
executed by KEETON, who delivered proceeds to BURHOP.**

                1.       After a series of recorded calls and texts, I met with QUESENBERRY on

August 12, 2016, at about 11:00 a.m., in the parking lot of a Smart and Final store located at

3315 Northgate Boulevard in Sacramento.  During our meeting, I paid QUESENBERRY $8,800

for about nine and a half ounces of heroin.

                a.       The DEA Western Regional Lab subsequently confirmed that I had

purchased 231.7 grams of heroin from QUESENBERRY.

                2.       After the drug deal, surveillance agents followed QUESENBERRY

directly back to her stash pad.  Moments later, agents saw KEETON drive away from the stash

pad in MacNAMARA's van.

3.      At about 2:06 p.m. on August 12, YANDELL placed an intercepted call to KEETON.  During the call, KEETON said that he had met QUESENBERRY and received $8,800 from her.  KEETON explained that he had given $1,275 back to QUESENBERRY and kept $400 for his trouble and expense.  YANDELL approved this allocation of the drug money.

a.      YANDELL told KEETON to take all of the remaining drug money – about $7,125 – to BURHOP.  YANDELL explained that BURHOP would send YANDELL money orders whenever they needed money.  KEETON said he would be meeting BURHOP's sister the following day after work.

4.      The following day, August 13, 2016, agents intercepted calls and texts between YANDELL and KEETON.  During their communication, KEETON indicated that he had met with BURHOP's sister and successfully turned over the money.

**M.      August 14, 2016 – YANDELL, Rice, and QUESENBERRY discussed Folsom Prison interdiction and the Aryan Brotherhood's heroin business.**

1.      On August 14, 2016, at about 4:57 p.m., YANDELL received an intercepted call from Rice.  Rice said that she was with QUESENBERRY.  She also said that QUESENBERRY had some additional phones that had not been seized during the August 11 attempt to smuggle contraband to SYLVESTER at Folsom prison.

2.      During the intercepted call, QUESENBERRY began speaking to YANDELL over Rice's phone.  QUESENBERRY explained that she had purchased all of the telephones – both those seized and those still in her possession – at Walmart.

3.      As the call progressed, YANDELL told QUESENBERRY that his drug suppliers would drop the price of heroin by $100 per ounce if her customer could buy nine and a

69

half ounces twice a month. I believed YANDELL was referring to me and my undercover

heroin purchases from QUESENBERRY.

> 4.     YANDELL also said that he would gather everyone's phone numbers and

provide them to QUESENBERRY. This way, if YANDELL were "rolled up" by prison

authorities, QUESENBERRY could continue to obtain BURHOP's heroin through KEETON.

YANDELL reiterated to QUESENBERRY that, as long as they kept distributing heroin and

saving their money, eventually they would be "the cartel."

> **N.     August 16, 2016 – YANDELL and BURHOP discussed Mexican Mafia Member Michael TORRES connecting them to a high-quality heroin supplier.**

> 1.     On August 16, 2016, at about 5:29 p.m., YANDELL made an intercepted

call to BURHOP. During the call, YANDELL asked BURHOP if there was any way that they

could be connected to organized crime without any drugs. YANDELL then described in detail

the circumstances leading to SYLVESTER's being caught on August 11 with contraband at

Folsom prison.

> 2.     YANDELL expressed his belief that the authorities couldn't prove that

MACNAMARA and DEMAR had been the source of the contraband found on SYLVESTER's

person. YANDELL said he expected to receive new phones shortly and would then sell his

current phone for $1,500 within the prison.

> 3.     Regarding their ongoing heroin-trafficking business, YANDELL asked

how much money BURHOP had received. YANDELL also asked BURHOP how much money

was still owed for the heroin distributed by QUESENBERRY on August 12, 2016. BURHOP

said he wasn't too concerned about the money owed. YANDELL said that they owed BURHOP

"3 grand for the elbow," that is, $3,000 for a pound of heroin.  YANDELL said "homegirl" (a

term used for QUESENBERRY) owed them a lot of money and that she had given them a

$38,000 Jeep that she had purchased using a stolen identity.

        a.       At the time of this intercepted call, I was aware that YANDELL

was referring to QUESENBERRY based upon prior intercepted calls between YANDELL and

QUESENBERRY.

        4.      As the intercepted call progressed, YANDELL discussed the heroin that I

purchased from QUESENBERRY on August 12, 2016.  YANDELL said that he understood

from QUESENBERRY that the heroin obtained from "Mosca for 600" was "the shit."  I took

this to mean that TORRES had sold the enterprise high quality heroin for $600 an ounce.

YANDELL said that Mosca had "an unlimited supply" of heroin, and YANDELL was going to

try and get it for "500 a piece for all of them."  I took this to mean that YANDELL would try to

negotiate a price of $500 per ounce of heroin.  BURHOP said, "With 40, that's 20 thousand."  I

took this to mean that, if each kilogram of tar heroin contained 40 ounces, then a kilogram would

cost $20,000.  YANDELL said BURHOP had Mosca's number.  Then, if anything happened to

YANDELL, Mosca would know that BURHOP was part of it all.  YANDELL also said that

Mosca trusted BURHOP.  YANDELL said that he would make sure that BURHOP and Mosca

were dealing directly with one another.

        5.      YANDELL went on to mention that he soon hoped to obtain three phones,

a piece of black (meaning an ounce of heroin), half of white (meaning a half ounce of

methamphetamine), a set of tools, glue, a cutter, and a drill bit.  He said these items would be

hidden in a package delivered to another Folsom prison inmate.

6.      On August 16, 2016, at 5:59 p.m., YANDELL made an intercepted call to BURHOP.  YANDELL asked BURHOP to send his girl a money order and to send it to a P.O. Box address that YANDELL was going to text.  YANDELL told BURHOP to send seven $1,000 money orders.  YANDELL asked whether BURHOP wanted in on the next trip and to "have it parked somewhere for him."  BURHOP said that he did.  YANDELL said he didn't trust anyone except BURHOP to "buy a pile of that shit and have it stockpiled somewhere."  YANDELL said that he was going to try to make the most money on this next trip and see what they could get from Mosca.  BURHOP agreed.

7.      As discussed below, agents confirmed the drug trafficking partnership between the Aryan Brotherhood and TORRES by intercepting subsequent calls between YANDELL and BURHOP and, on October 24, 2016, by seizing TORRES's heroin from BURHOP's Fontana stash pad.  That seizure is discussed in detailed below.

**O.      August 19, 2016 – YANDELL and BURHOP agreed that BURHOP would supply heroin to HALL.**

1.      On August 19, 2016, at about 4:59 p.m., YANDELL made an intercepted call to BURHOP.  During this call, YANDELL said that he had just spoken to HALL and that "they just got 2,500 in their P.O. Box."  YANDELL emphasized again that they got the money and that HALL had money on him right then.  YANDELL said HALL wanted to know if BURHOP had a "piece of black," meaning an ounce of heroin, for him.  BURHOP said that he had one if HALL wanted to "drive up to mitch."

2.      YANDELL said that HALL would have to drive "his ass off" to get heroin from BURHOP's network.  HALL was amenable to driving to get the heroin.

3.     During a truncated follow-up call at about 5:03 p.m., YANDELL told BURHOP that HALL had $350 on him and would give BURHOP another $400 in a day. BURHOP told YANDELL that HALL had just called him. Therefore, it was okay for HALL to go to BURHOP's homeboy's house.

4.     BURHOP complained about the quality of his new phone. YANDELL confirmed that he would be receiving a new phone shipment shortly and would hook BURHOP up.

5.     During the same day, August 19, starting at about 9:09 p.m., YANDELL and BURHOP exchanged the following intercepted text messages:

| | |
|---|---|
| YANDELL: | Did u ever tell Boots to have Kristen chill out? That attorney |
| BURHOP: | I talked to him...So...U know she wears the pants in there relationship tho... |
| YANDELL: | Shits got me tripping |
| BURHOP: | That's one of the reasons I changed my number |
| YANDELL: | I'm changing mine when I renew my plan on the 24th |
| BURHOP: | Its like us said...Whats there to talk about now I would ... Is she getting at u still too? |
| YANDELL: | Yeah I truly believe they're trying to set me up. That attorney left me a weird message. All he said is, if it's so important to me? Huh? |
| BURHOP: | does that mean? |
| YANDELL: | Yes she just left me a text to call her |
| BURHOP: | Sammy should go talk to him in person . . . I think |
| YANDELL: | Yes |

73

BURHOP:    I'm talking to Sammy

6.      In this text message exchange, I believe that YANDELL told BURHOP that DEMAR and MacNAMARA were continuing to contact him about the August 11 seizure of contraband from SYLVESTER at Folsom prison.

    a.      YANDELL confided in BURHOP that DEMAR's and MacNAMARA's efforts to contact him made him uncomfortable: He was starting to think that they were cooperating with law enforcement. YANDELL said that DEMAR, in particular, had attempted to contact him on other occasions.

    b.      In the exchange, I believe BURHOP told YANDELL that DEMAR and MacNAMARA were bothering him as well.  BURHOP explains that DEMAR's contacts were one reason that he changed his telephone number.

    c.      YANDELL also said that MacNAMARA ("that attorney") had left him a strange voicemail message.

    d.      Toward the end of the exchange, I believe that BURHOP suggested that KEETON ("Sammy") should speak with MacNAMARA in person and figure out whether MacNAMARA was cooperating with law enforcement.

    e.      BURHOP texted "I'm talking to Sammy" at 9:24 p.m. on August 19, 2016. Toll data shows that, beginning at 9:22 p.m. that night, BURHOP's number had an 11-minute call with KEETON's number.

7.      At about 9:35 p.m. on August 19, YANDELL received an intercepted call from KEETON.

8.      During the call, KEETON said that "DOJ out of LA County" had stopped a car in which he was riding.  KEETON said officers had arrested his friend, a gang member, on an outstanding warrant.  KEETON said that his parole officer had come over today and that she was cool.  KEETON said that he was worried because nobody had been arrested after the SYLVESTER incident.  KEETON said that was how the feds worked: They waited several years watching you and everyone else.  This was why KEETON wasn't talking to MacNAMARA.

9.      YANDELL explained that he was in a federal indictment and knew how that worked.  YANDELL said that the only way they could roll them all up is if the feds got them talking on the phones about DEMAR, MacNAMARA, SYLVESTER, the dope, the phones, etc., and got them to admit that they were part of a conspiracy.

10.      YANDELL explained that he was busted on a federal wiretap in 1990. YANDELL said he admitted his guilt by saying to a guy on the East Coast, "Where is my 650 pounds?"  The DEA had then come and arrested him.  YANDELL told KEETON to be careful and that, if the feds came for them, then it would be a RICO case.

**P.      August 20–21, 2016 – YANDELL, BURHOP, and TROXELL discussed plot to murder Aryan Brotherhood member James Mickey at Calipatria Prison.**

1.      On August 20, 2016, at about 10:03 p.m., YANDELL made an intercepted call to BURHOP.  During their 25-minute conversation, YANDELL and BURHOP discussed the situation with MacNAMARA and DEMAR.  YANDELL said that "the Mobster, Mosca," "has dudes on the line" in "Old" Folsom State Prison.  I took this to mean that TORRES had contacts in the administrative segregation portion of Folsom prison, where SYLVESTER was housed

after the August 11 contraband seizure.   YANDELL explained that "Mosca" was going to have a phone delivered to SYLVESTER so that he could communicate from Old Folsom.

2.      During the intercepted call, BURHOP said that "Mickey" had "hit A yard" in Calipatria prison, where BURHOP was incarcerated at the time.

a.      "Mickey" was subsequently identified as Aryan Brotherhood member James Mickey.

b.      BURHOP said that someone named "Sam" had authority on the A yard where Mickey was located.  Sam had relayed that Mickey claimed someone named "John" had told him to lay low, step down, and not be in politics.  YANDELL said that he was "going to have that dude (Mickey) hit."  YANDELL said he had attempted to contact the other AB commissioner Daniel "Danny" TROXELL the previous night but had been unsuccessful. However, YANDELL told BURHOP that TROXELL had previously agreed that Mickey should be killed.  BURHOP confirmed this understanding and said he had spoken to TROXELL that morning and TROXELL had agreed with this and TROXELL thought that Mickey should be "whacked," meaning killed, as soon as possible .

c.      YANDELL reiterated that BURHOP needed to "have dude hit" and asked whether BURHOP had somebody to do it.  BURHOP discussed AB associates that he could have commit the murder.  These people included "Jason from Modesto" and "Ripper," a member of the PENI gang.

d.      YANDELL said that they would be hesitant to do it because Mickey was a full Aryan Brotherhood member.  AB associates would expect to get in trouble for killing an enterprise member.

76

e.      BURHOP said that the AB associates already knew Mickey was in trouble. YANDELL said they needed to get somebody to "kill his ass," not just stab him a couple of times, because they needed to send a message. BURHOP said he had spoken to TROXELL about this. According to BURHOP, TROXELL agreed that Mickey had to be killed, the sooner, the better.

f.      YANDELL made clear that he wanted to "have his ass killed." YANDELL counseled BURHOP that there would be a lot of law enforcement scrutiny when an AB member was killed. YANDELL said the assassins should take precautions, including cleaning out their cells in advance of the killing.

g.      BURHOP and YANDELL then discussed various ways to kill Mickey. For example, YANDELL said that Mickey could be "choked out" and then stabbed through the eye socket. YANDELL lamented that few people knew how to stab anyone to death anymore.

h.      YANDELL said that BURHOP's handling this killing would "go a long way" and would "be a nice feather in your cap." I interpreted this as YANDELL saying that Mickey's killing would strengthen BURHOP's attempt to become a full member of the Aryan Brotherhood.

i.      YANDELL and BURHOP agreed that it was important that no one find out ahead of time that Mickey was going to get hit. If others learned of their plan, law enforcement officers would just "roll him up" into protective custody.

j.      BURHOP asked whether Mickey had been stealing money. YANDELL confirmed that Mickey had stolen money from the AB. YANDELL said that, in

addition, Mickey had not immediately retaliated against someone who was on Mickey's yard and who had harmed an AB member in the past. I interpreted this to mean that Mickey's failure to immediately retaliate against an enemy of the Aryan Brotherhood was a reason for Mickey to be killed.

    k.  Later in the call, YANDELL said that BURHOP should make it clear to the would-be killers that the murder was "top secret." YANDELL told BURHOP to emphasize that, if the assassins told anyone, they would be "put in the hat," meaning marked for their own death. YANDELL said killing "a brother" was serious business.

    l.  Based on this call, DEA and CDCR investigators alerted Calipatria prison authorities that Mickey's life was in danger. CDCR officials promptly placed Mickey into protective custody.

    3.  On August 21, 2016, at about 8:30 p.m., YANDELL received an intercepted call from BURHOP. During the call, BURHOP told YANDELL that he had bad news: Prison authorities had taken Mickey into protective custody. Mickey had only been out on the yard for three days.

    4.  During the call, YANDELL said Mickey might come back out, but BURHOP said he didn't know. YANDELL said he talked to TROXELL last night about what they wanted to do. YANDELL relayed to TROXELL that he had told BURHOP to handle that the best way BURHOP could, because even though Mickey was an AB brother, BURHOP was "up for the chip," meaning eligible for membership in the Aryan Brotherhood.

5.      BURHOP said he was going to get the lockup order tomorrow, so he

would find out in a couple days why Mickey was locked up.[13]  YANDELL told BURHOP not to

worry about Mickey as long as he wasn't still out there.  BURHOP said Mickey was put on that

yard for a reason.  BURHOP said that, if Mickey had been put on either of the other two yards,

he would have been done that same day.  YANDELL said it was all good: The main thing was to

establish that foundation.  YANDELL said they needed to do shit right and be disciplined.

**Q.      August 21, 2016 – YANDELL promised CORBETT admission to the Aryan
Brotherhood if he murdered AB associate Paul Diaz.**

1.      On August 21, 2016, at about 9:02 p.m., YANDELL made an intercepted

call to Jason "Jake" CORBETT, an Aryan Brotherhood associate incarcerated at High Desert

prison.  During this 13-minute call, YANDELL confirmed that CORBETT would become a

member of the Aryan Brotherhood if CORBETT murdered Paul "Dreamer" Diaz.[14]  Diaz was an

Aryan Brotherhood associate also incarcerated at High Desert.  YANDELL and CORBETT also

---

13      A "lock up order" is a CDCR form 114D that is used as an initial basis to justify putting an inmate into
Administrative Segregation (commonly referred to as "lock up").  An inmate can be locked up based upon a need to
protect the inmate from assault or to remove an inmate who poses a security threat to other inmates.  As part of the
due process afforded California inmates, the CDCR form 114D is prepared by a lieutenant.  The form is then
reviewed by a captain.  If the captain agrees with the proposed course of action in the form 114D, then the case is
sent to an Institutional Classification Committee for a final decision.  The Committee is usually made up of the
warden, chief deputy warden, associate warden and captain.

14      During an August 21, 2016, intercepted call between YANDELL and TROXELL, YANDELL confirmed
that he and SYLVESTER were sponsoring CORBETT for Aryan Brotherhood membership.  YANDELL explained
that, during the previous four years, CORBETT had run High Desert effectively.  YANDELL told TROXELL that
SYLVESTER had known CORBETT for a long time and that CORBETT was loyal.  YANDELL explained that
CORBETT had offered to kill an AB member named "K-Bob."  Moreover, CORBETT had offered commit the
murder while CORBETT held a phone nearby, thereby allowing YANDELL to listen to K-Bob's murder.  Later
intercepted calls revealed that this murder was called off by YANDELL.  In fact, during one intercepted call,
YANDELL spoke to K-Bob and K-Bob expressed relief that they had cleared up confusion about K-Bob's alleged
bad standing with the Aryan Brotherhood.

79

discussed YANDELL's vision for the Aryan Brotherhood moving forward and a past murder that YANDELL committed on behalf of the enterprise.

2.      CORBETT told YANDELL that CORBETT had tried to reason with Diaz but that Diaz had a death wish. Therefore, CORBETT planned to "smoke his ass." Later in the call, YANDELL told CORBETT that he should "smoke his ass" if "Dreamer" ended up on CORBETT's yard. Then, YANDELL said, CORBETT "would have his motherfucking rock." CORBETT said he hoped that Diaz did end up on CORBETT's yard at High Desert. CORBETT also said that he talked to "Bobby."[15] CORBETT said that, if needed, "Bobby" and four other inmates functioning for the enterprise had a plan to kill Diaz if he remained on his current yard.

a.      During this investigation, YANDELL used phrases like "earn your rock," "earned his rock," and "making the rock shine" to convey to CORBETT, BURHOP, and HALL that they were in line to earn membership in the Aryan Brotherhood. YANDELL said that they were in such a position because they had completed various criminal projects, typically involving the murder of a high-value target.

3.      YANDELL told CORBETT that CORBETT was going to be a part of "the new Aryan Brotherhood," that they were "going to shine the rock and move." YANDELL explained that they had connections that would make pounds and kilograms of drugs available to members and associates when they were released from prison. YANDELL's language implied that the enterprise would provide its newly-released members and associates with ready sources

---

15      Investigators believe CORBETT was referring to Bobby Stockton, an inmate who eventually murdered two people at High Desert prison.

of drug-dealing income. YANDELL said that the Aryan Brotherhood wanted members they could trust, not drug addicts.

4.     During the conversation, YANDELL boasted that he had killed for the Aryan Brotherhood in 1986. He said that he had killed in the Tracy Prison for an AB member named Bobby Wayne Smith. YANDELL told CORBETT that he was under the impression that all AB members had killed. However, he learned that not all members had committed a murder specifically for the enterprise.

a.     CDCR investigators subsequently corroborated the murder to which YANDELL referred. They found that, on November 26, 1986, inmate Leslie Jones was murdered at the CDCR facility in Tracy, California. This facility is known as Deuel Vocational Institute.

b.     On January 16, 1987, YANDELL and two others were charged in San Joaquin County Superior Court with murdering Jones. According to San Joaquin County Sheriff's Department Detective Bassett, YANDELL was tried and acquitted of Jones's murder. Another defendant was tried separately and also found not guilty.

5.     On August 22, 2016, between about 7:30 p.m. and 8:30 p.m., YANDELL exchanged numerous text messages with CORBETT about the plot to kill Diaz.

a.     During the exchange, YANDELL said that he had discussed killing Dreamer with TROXELL and DANIEL. In the texts, YANDELL confirmed that DANIEL had put Diaz "in the hat," meaning DANIEL had marked Diaz for death. YANDELL also confirmed that TROXELL had agreed that Diaz should be killed. In the text message printed below,

81

YANDELL further confirmed that, after discussing it with TROXELL ("DT"), he had sponsored

CORBETT for Aryan Brotherhood membership.

> YANDELL: What's up brother? Hope ur doing okay. Just wanted u to know I just got done talking to DT. Told him I put u up so it's official. I know you'll make the Rock shine. Take care. Brotherly love.

> CORBETT: All my love and respects to you! Best news i ever got, please know my appreciaton [sic] is huge. My heart is swelled up right now. Thank you brother, yes i will make it shine! All good here and hope you are good as well. Talk to ya soon. Love and respect as always.

> b. Because YANDELL claimed that the Aryan Brotherhood had

issued an order to kill Diaz, agents consulted with authorities at High Desert prison. As a result,

Diaz was placed in protective custody.

**R. August 26, 2016 – YANDELL and Aryan Brotherhood member Brant DANIEL discussed evidence of an ongoing criminal enterprise that would be gathered by wiretapping their contraband cellphones.**

> 1. On August 26, 2016, at about 5:54 p.m., YANDELL and Aryan

Brotherhood member Brant DANIEL began an intercepted call in which they discussed their

belief that phones were being tapped. [16]  However, they didn't believe that they were being

tapped right then. YANDELL said that signs on his contraband prison phone had led him to

believe that data was being secretly stolen. YANDELL believed that the authorities were trying

to put the pieces of the puzzle together. However, YANDELL didn't think it mattered what any

---

16     Brant DANIEL's status as an Aryan Brotherhood member was apparent during the intercepted calls with YANDELL because the two frequently discussed enterprise business at various prisons and YANDELL addressed DANIEL with a level of respect consistent with him addressing another member. Independently, CW-1 admitted that he and YANDELL sponsored Brant DANIEL for membership in the Aryan Brotherhood while all three were incarcerated at Pelican Bay.

informant told them: If the authorities didn't have him "ordering shit," then they couldn't do anything.

a. YANDELL said that the authorities knew he was a shot-caller, meaning an influential leader, in "the Brand." YANDELL said that the only way "the feds" could get them was on a conspiracy.

b. YANDELL and DANIEL discussed the situation with Kenneth "Kenwood" Johnson, HALL, and the July 2016 murder in Anaheim. They discussed how the murder had occurred and how they had used their respective phones, which could now be linked to the phones seized from the guys on the street.

c. YANDELL said that, despite the law enforcement scrutiny caused by the Anaheim murder, "we still have to commit crimes." YANDELL said that law enforcement would have arrested him by now if they knew YANDELL "had moved on dude. Already it's a conspiracy, RICO, organized crime, ordered a hit on another prisoner."

**S.    August 27 and 28, 2016 - YANDELL and BURHOP discussed Aryan Brotherhood business including drug trafficking with Mexican Mafia Member Michael TORRES.**

1. On August 27, 2016, at about 7:16 p.m., YANDELL placed an intercepted call to BURHOP. During the call, BURHOP said he had received a Facebook message stating that someone at his prison was cooperating with law enforcement and providing information about BURHOP. YANDELL said he had spoken to HALL and Donald "Popeye" MAZZA. YANDELL said there was an incarcerated Skinhead named "Knuckles" who had "a pipeline" for getting phones and heroin into the prisons. YANDELL said that he was going to tell HALL and MAZZA that BURHOP was about to become a full AB member. Therefore, in matters

83

regarding Knuckles, they should go through BURHOP. That would be the proper "chain of command."

2.     YANDELL counseled BURHOP about how to control the inmates at his prison. Specifically, YANDELL said that BURHOP needed to "micromanage" his people so that they did not get out of hand. YANDELL said that he told the white inmates at his prison that they would be stabbed and killed if they owed more than $200. YANDELL said he had people ready to commit violence. He had told specific people that they were going to get killed if they were disrespectful. YANDELL explained that he didn't care if he went back to the SHU, meaning the Security Housing Unit.

3.     BURHOP discussed problems he had with underlings who were handing out dope but not collecting money. BURHOP said he needed to put them in their place. YANDELL said that he and SYLVESTER had faith in BURHOP's abilities. YANDELL asked when they had last "butchered" anyone on BURHOP's "line." BURHOP said that it had been several weeks.

4.     BURHOP said that he had unsuccessfully attempted to contact Mosca. YANDELL said that they had promoted BURHOP to the Mexican Mafia, who had told their people, and this word had spread. Therefore, the authorities knew that they were all in contact.

5.     YANDELL said he had spoken to TROXELL about BURHOP and vouched for his qualities, including BURHOP's willingness to kill if needed. According to YANDELL, TROXELL agreed that they should change the enterprise's policy about having to kill someone to become an AB member. TROXELL said that, if a candidate had already killed someone, it was stupid to waste somebody they already knew was good to do it. YANDELL

84

said that SYLVESTER agreed as well. YANDELL explained that just killing someone didn't make the person a viable AB member.

6.      YANDELL believed that they were going to have to kill Johnson because he was in trouble and could not be trusted.

7.      On August 28, 2016, at about 6:59 p.m., YANDELL received an intercepted call from BURHOP. During the call, YANDELL asked whether BURHOP had spoken to Mosca. BURHOP said he was trying. BURHOP asked YANDELL if he should call Mosca. YANDELL said it was up to BURHOP. YANDELL was just curious. BURHOP said he would "hit Mosca up when it is time to do something on the shit." YANDELL told BURHOP he should speak to Mosca "and tell him that things are the same." YANDELL then told BURHOP that "it would best if you call him" so that BURHOP could "cover yourself. Because listen bro: You know, you're there for us, and they're there for him. So we're gonna take your word for it, and I'm sure he's gonna take his people's word for it, you know. Even though he trusts us, he knows we're trusting you so . . ."

8.      BURHOP then asked YANDELL for Mosca's number because, BURHOP explained, Mosca's number was in BURHOP's other phone. YANDELL said he would get Mosca's number out of his phone and send it to BURHOP.

9.      In this call, I believe YANDELL told BURHOP that BURHOP should communicate directly with TORRES and not rely on YANDELL to speak for BURHOP. Based on the context of this and other calls, I believe YANDELL and BURHOP were discussing issues over drug debts allegedly owed by white and southern Hispanic inmates in Calipatria prison. I believe YANDELL suggested that BURHOP talk directly to TORRES about the issues.

YANDELL seemed to think that, because TORRES had authority over the southern Hispanic inmates at BURHOP's prison, their direct conversation would resolve the disputes more easily.

10. At about 7:29 p.m., on August 28, 2016, BURHOP sent an intercepted text to YANDELL. It read, "Please send mosca's number bro".

11. At about 7:53 p.m. on August 28, YANDELL sent an intercepted text to BURHOP. It read, "Damn I was just going to ask u for it. Let me get someone to run to his cell".

12. At about 8:22 p.m. on August 28, YANDELL made an intercepted call to BURHOP. During the call, YANDELL said, "Yeah man. Fucking, uh, I sent word down to Mosca. I said, 'Hey man. Uh, I got somethin' important to tell you, man, that you been askin' about.' I called, sent him a text. He's on the line, so. . ." YANDELL says that Mosca had a business proposition because he was "pushing that shit." YANDELL said he would send BURHOP the number.

    a. I believe that this call revealed YANDELL and BURHOP's ongoing efforts to establish "Mosca" TORRES as a significant heroin supplier for their distribution network. YANDELL described his efforts to communicate with TORRES so that TORRES's heroin supplier could work with BURHOP.

### T. August 2016 - YANDELL and California prison contractor employee Justin PETTY plotted to send contraband into Folsom and High Desert Prisons.

1. On August 11, 2016, at about 9:43 p.m., YANDELL received an intercepted call from Justin PETTY, also known as "Rune." During this call, YANDELL discussed the August 11 contraband seizure from SYLVESTER. YANDELL also discussed his

plot to have PETTY's employer, Golden State Overnight, smuggle additional contraband into Folsom prison.

         a.        During the call, YANDELL admitted to PETTY that he and SYLVESTER were the only ones getting phones into Folsom prison. YANDELL said that he had only been dealing with the "top two black dudes on the line" and "the top two mobsters." YANDELL believed that one of these people had sold them out to the police. YANDELL said that, after "Billy got the shit from his attorney," the police had "ambushed him." This had cost YANDELL $7,000.

         b.        YANDELL told PETTY that he had "a brother" named TROXELL who was "on the Commission." YANDELL admitted that he, TROXELL, and David Chance were the enterprise's three commissioners.

         c.        YANDELL mentioned that he "had" Travis. PETTY then clarified, "Travis BURHOP?" YANDELL affirmed and said that BURHOP was at Calipatria prison. YANDELL said that he trusted BURHOP with his life.

         d.        YANDELL told PETTY that nobody knew what they had going with PETTY or "where the shit was coming from." However, YANDELL had told TROXELL and BURHOP that they had something for them. YANDELL said he would only tell "brothers" he trusted face-to-face about who PETTY was and that PETTY was "hooking them up." PETTY said that, so long as people didn't know his name, law enforcement who caught them would think it came from someone at Golden State Packages.

         e.        YANDELL asked whether PETTY had ever told anyone, besides his "buddies at High Desert," what was going on. I interpreted this as a reference to PETTY's

efforts to import prison contraband using sealed packages sent by his employer, Golden State Overnight, an authorized CDCR contractor.  PETTY explained that he was cutting that prison, meaning High Desert prison, off.  PETTY told YANDELL that he had been doing a deal with "Bubba" and "Buck."

            f.        PETTY explained that he told them that no one needed to know where the shit was coming from.  PETTY said they needed to mask the source of the contraband because that job was how PETTY fed his children.  PETTY told YANDELL that an "ese," meaning a Hispanic man, knew because he had two phones.  PETTY explained that he told the guy that PETTY would make sure that he got the two phones.  However, after that, PETTY was shutting down.  PETTY said that he was done.  I interpreted this to mean that PETTY intended to stop sending items into High Desert prison.  PETTY told YANDELL that what he was doing with YANDELL was not worth losing his job.  YANDELL agreed.

            g.        PETTY believed that, if prison officials intercepted his contraband packages, they would not suspect him.  Instead, the officials would think that the parcels had been sent by someone at "Golden State Packages" – not by someone at PETTY's employer, "Golden State Overnight."  PETTY believed that law enforcement would, therefore, target Golden State Packages and that he would be shielded from detection by law enforcement.  He would maintain plausible deniability.

            h.        YANDELL discussed AB business and explained how he had been placed on "the commission" for the Aryan Brotherhood.

      i.      Based upon this and subsequent calls, I believe that PETTY was using his employer's business, Golden State Overnight, as a cover for shipping contraband to YANDELL and other prisoners. The contraband included cell phones, drugs, and other items.

     2.     On August 18, 2016, at about 4:42 p.m., YANDELL received an intercepted call from PETTY, to whom YANDELL referred by the moniker "Rune."

      a.      During the call, PETTY described distracting his boss while he "pulled the order." PETTY said it would be three to five days. PETTY described how he was going to place cell phones, batteries, chargers, mini hack saw blades, drill bits, ear pieces, and other items inside Little Debbie snacks, including Honey Cakes. PETTY also described other contraband items, which I believe were drugs.

      b.      PETTY said that the box would be sealed as if it were straight from the vendor. YANDELL said he could sell the small phones for $1,000 each. PETTY described the quality of the heroin and methamphetamine he was sending to YANDELL.

      c.      YANDELL said he would give PETTY an extra bonus of $1,000 for his efforts. YANDELL said people were begging for drugs inside the prison. PETTY confirmed the name of the Folsom prison inmate, David Wall, who was supposed to receive the package on behalf of the enterprise.

     3.     On August 29, 2016, at about 7:23 p.m., PETTY made an intercepted call to YANDELL. During the call, PETTY confirmed that the package containing Folsom prison contraband was almost complete. PETTY also revealed that he was almost ready to send a similar package to High Desert prison.

a.     During the call, YANDELL described flat phones that were 4.5 inches tall. YANDELL asked PETTY if he could still swing that. PETTY said the order might come through that night, but if it did not, then PETTY could swing it. PETTY said that, if the package didn't come through that night, then he could take all day tomorrow "to fuck with it."

b.     PETTY told YANDELL that he took the tobacco all the way out and re-boxed it. However, PETTY hadn't had time to vacuum seal it. PETTY said he didn't want to have the package come through tonight, before he was ready. YANDELL said that was cool: He would be afraid of it smelling and then throwing the whole thing off.

c.     YANDELL told PETTY that YANDELL was talking to CORBETT. YANDELL asked whether PETTY was sending three of them. YANDELL said he had told CORBETT that they needed to stop talking because they were going to start getting "x-rayed and shit." PETTY admitted that he was just sending one box to his comrade at High Desert prison just to clear that shit with "Bubba" and "Buck." PETTY said that was going to be it because he wasn't going to fuck with that prison anymore. PETTY said he had the set up with Bubba and Buck before PETTY talked to YANDELL.

d.     YANDELL asked whether PETTY had done this before. I took this to be an inquiry about whether he had previously shipped contraband into prison. PETTY said no. However, PETTY knew the package hit his warehouse because Bubba and Buck had sent a test run.

e.     YANDELL said he wanted to make sure. He relayed that CORBETT had said that it was a lock because it had been done before. PETTY said that the

90

package they ordered came in on a day when PETTY had a corporate meeting. Therefore, PETTY didn't want to cut it. However, PETTY had the package in his hands.

           f.       YANDELL said PETTY had to stay safe, first and foremost. YANDELL didn't want to get PETTY caught up and arrested. PETTY said that was why he had told YANDELL he would do it but that he wanted to be smart about it. PETTY wanted to make sure that YANDELL and the others understood. That was why PETTY stayed in constant contact with YANDELL.

           g.       YANDELL said that he and SYLVESTER were fine when they were keeping the phones to themselves and not telling anybody. However, YANDELL said that "the blacks" found out when YANDELL and SYLVESTER started sharing with the "Mobsters" and their friends. YANDELL said they were being extra careful because they didn't want the attorney and that lady – presumably MACNAMARA and DEMAR – to get busted. YANDELL said SYLVESTER got caught because "the blacks" told.

           4.       On August 30, 2016, at about 7:41 p.m., PETTY made an intercepted call to YANDELL. During the call, PETTY described how he was concealing the contraband in the package to be shipped to Folsom prison.

           a.       Specifically, PETTY said that the phones would be concealed in the "fudge brownies." PETTY said that YANDELL would get one phone with each package of brownies, for a total of three phones.

           b.       PETTY also said he was tampering with the Folgers coffee jar. PETTY said it was hard to open in a way that would not alert law enforcement officers who unscrewed the cap. PETTY said he got it. However, the work was not up to his standards

91

because it didn't look clean enough. PETTY mentioned that the oatmeal was easier. Before the call dropped, PETTY said that the oatmeal, honey bun boxes, and brownies were "golden." He said that he never saw them, meaning law enforcement, open that box: It was sealed, superglued, and looked better than when it came from the factory.

5.    On August 30, at 7:48 p.m., YANDELL and PETTY resumed their conversation in another intercepted call. PETTY confirmed he was close to being able to send the package from his employer's warehouse into Folsom prison.

a.    During the call, YANDELL said that Matt HALL would bring PETTY eight additional cell phones at a later date. That way, PETTY would be able to send the phones in a later contraband shipment.

b.    Based on later discussions, I believe that Matt HALL was able to meet with PETTY and supply additional phones to him.

6.    On September 2, 2016, at about 1:51 p.m., PETTY made an intercepted call to YANDELL. During the call, PETTY confirmed that the packages had shipped out. PETTY said one should arrive at Folsom prison shortly because the company guaranteed overnight delivery. I believed PETTY's reference to "packages" meant that, as planned, he had sent another contraband parcel to High Desert prison.

a.    YANDELL expressed great concern because Wall, the inmate to whom the package was addressed, had been locked up. YANDELL and PETTY discussed the consequences of this development and the possibility that the package might be returned to the sender. YANDELL described various steps he would take to get possession of the package.

b.      PETTY said that the contraband was in the Honey Buns, the fudge

brownies, the Quaker oatmeal container, and the Oatmeal Creme Pie box. PETTY said that

everything was in the center of the box and that, if YANDELL opened the boxes, the contraband

would be in the middle of the packages.

**U.      September 2 and 6, 2016 – Prison officials disrupted Aryan Brotherhood plot
to smuggle contraband by seizing parcels loaded with hidden cargo sent by
Justin PETTY.**

1.      YANDELL's intercepted calls with PETTY made clear that they planned

to send a contraband package into Folsom prison. Thus, on September 2, 2016, agents from the

DEA and the CDCR Special Service Unit coordinated with Folsom prison investigators. They

suggested that the Folsom prison investigators look for a package sent from Golden State

Overnight to an inmate named Wall.

a.      On September 2, Folsom prison investigators intercepted a

package sent from Golden State Overnight and addressed to inmate David Wall. In the package,

officers discovered three cell phones, two black USB cellular phone charging cables, six

grinding discs, seven lighters, one cell phone battery, seven small screw drivers – five with flat

heads and two with Phillips heads, two Bluetooth ear pieces, 10 small metal saw blades, 25.64

gross grams of methamphetamine, and 20.33 gross grams of tar heroin.

b.      As PETTY had described in calls to YANDELL, the contraband

items were hidden inside food packages, including a box of Quaker Oats, a box of Honey Buns

snacks, a box of fudge brownies, and similar items. The contraband was concealed in a manner

designed to avoid detection by prison staff who would have searched the box's contents before

giving them to inmate Hall.

c.      The DEA Western Regional Lab subsequently confirmed that

some of the substances seized from the package contained 24.5 grams of actual

methamphetamine and 15.264 grams of heroin.

d.      Below are some photographs of the contraband parcel and its

contents.






2.      On September 2, 2016, at about 2:05 p.m., PETTY made an intercepted

call to YANDELL. PETTY confirmed that a Folsom prison official named "C. Howard" had

taken delivery of his package at 8:58 a.m.

3.      In an intercepted call made to YANDELL at 2:08 p.m., PETTY fretted
that his fingerprints would be all over the contraband items and that, if the package were
returned, his employer would inevitably discover the contraband. The two men speculated that
perhaps one of their phones was wiretapped. Then, they seemed to reject that possibility.

4.      Based on the content of YANDELL's previous conversations with
PETTY, agents from DEA and the CDCR Special Services Unit alerted CDCR investigators at
High Desert prison about the possibility of a contraband package sent from PETTY's employer,
Golden State Overnight. On September 6, 2016, High Desert investigators intercepted a package
sent from Golden State Overnight and addressed to an inmate named Tony Barron.

a.      Within the package, officers discovered about ten cell phones, 241
gross grams of heroin, and 133 grams of methamphetamine.

b.      The cell phones and controlled substances were hidden inside
boxes of Oatmeal Creme Pies and fudge brownies. They were concealed in a manner designed
to avoid detection by prison staff who would have searched the box's contents before giving
them to inmate Barron.

c.      The DEA Western Regional Laboratory subsequently confirmed
that some of the substances seized from the package contained 140.496 grams of heroin and 39.9
grams of actual methamphetamine.






**V.    Intercepted calls confirmed that PETTY sent contraband into Folsom and High Desert Prisons on behalf of the Aryan Brotherhood.**

1.     On September 5, 2016, at about 1:31 p.m., YANDELL received an intercepted call from BURHOP. During this call, the two discussed packages that YANDELL had arranged to be smuggled into the Folsom and High Desert prisons. YANDELL told BURHOP that, in a few weeks, he had lost $12,000 in contraband.

2.     Subsequent intercepted calls revealed that, for several weeks, YANDELL, PETTY, and CORBETT were not able to determine whether prison investigators had intercepted the High Desert package.

3.      On October 6, 2016, at about 9:43 p.m., YANDELL made an intercepted call to PETTY.  During the call, YANDELL asked whether PETTY had called CORBETT about the package that PETTY had sent to High Desert Prison.  YANDELL asked PETTY to find out about the package because not knowing was making YANDELL nervous.

a.      PETTY said he was going to track the package with the tracking number.  YANDELL said he wanted to know what happened because nobody knew.  PETTY said that he heard that the package was there, meaning at High Desert.

b.      YANDELL and PETTY then speculated about what might be delaying delivery to the designated inmate at High Desert prison.

c.      PETTY reiterated that he would track the package and see whether it would tell him whether the inmate received it.

4.      On October 6, 2016, at about 10:01 p.m., PETTY made an intercepted call to YANDELL.  During the call, PETTY confirmed that he had spoken to CORBETT.  PETTY explained that CORBETT planned to call the mother of the inmate to whom the package had been addressed.  In this way, CORBETT would try to get information about the package.  Then, PETTY could try to locate the package within his employer's system.  YANDELL told PETTY to track the package sent to High Desert and get back to him.

5.      On October 10, 2016, at about 7:05 p.m., PETTY made an intercepted call to YANDELL.  During the intercepted call, PETTY asked if YANDELL had heard anything about the High Desert package.  YANDELL said he had not heard anything but said that some white inmates at High Desert had been busted with cell phones.

97

a.      During this call, YANDELL and PETTY discussed a new plan to use a Golden State Overnight package to send drugs and other contraband into Folsom prison.

b.      During part of the discussion, PETTY confirmed that he had met with Matt HALL. PETTY said he now only owed $100 to HALL.

c.      Based on this and other intercepted calls, I believe that HALL bought some contraband – possibly very small cell phones – and gave it to PETTY for packaging and sending to YANDELL and SYLVESTER. As part of that transaction, I believe PETTY still owed $100 to Matt HALL because HALL had fronted the cost of purchasing the contraband. I believe that PETTY was slowly paying HALL back.

6.      On October 19, 2016, High Desert prison investigators searched inmate Barron's cell. Inside, they found a dictionary with Barron's name and CDCR number on the exterior. Between two pages of the dictionary, an investigator found a small piece of paper. On the piece of paper was written the name "Ruin" and a phone number. This phone number matched one that YANDELL had used to call PETTY during August and September 2016.

## W.    September 2016 – YANDELL and BURHOP planned to receive heroin from Mexican Mafia Member Michael TORRES.

1.      On September 5, 2016, at about 1:31 p.m., YANDELL received an intercepted call from BURHOP. During this call, YANDELL and BURHOP discussed, among other things, splitting a kilogram of heroin supplied by TORRES.

a.      YANDELL asked whether BURHOP still had the "black," meaning heroin. BURHOP said they should contact Mosca to be sure.

98

b.      BURHOP asked YANDELL whether his "girl" was still doing well.  I interpreted this as BURHOP asking whether QUESENBERRY was still arranging drug deals.  YANDELL said that she was supposed to "be hooking up with dude for 10 pieces."  In other words, QUESENBERRY was supposed to be arranging a sell ten-ounce sale of heroin.  YANDELL explained that he was trying to "get things for six," meaning that he was trying to obtain ounces of heroin for $600 each.

c.      BURHOP suggested that he and YANDELL "just get a whole fuckin' key," meaning an entire kilogram of heroin.  YANDELL said that Mosca's heroin source was not a "mobster," meaning he was not a Mexican Mafia member.  However, YANDELL believed that Mosca's source "wouldn't burn Mosca" because if he did, Mosca "would kill them."

d.      YANDELL estimated that, at the price of $600 per ounce, one kilogram of heroin would cost about $24,000.  However, YANDELL said he would try to get Mosca to provide the kilogram for $22,000.  BURHOP said that he would be ready.

2.      On September 9, 2016, at about 7:12 p.m., YANDELL made an intercepted call to BURHOP.  During the call, YANDELL and BURHOP discussed YANDELL's cultivating TORRES to supply BURHOP's drug operation with heroin.  As described below, on October 24, 2016, agents seized a significant portion of the heroin supplied by TORRES during a search warrant executed on BURHOP's stash house in Fontana, California.

a.      During the September 9 call, YANDELL explained the plan to receive heroin from TORRES.  In particular, YANDELL said, "I went down there this morning and talked to that Mosca.  Because I had sent that kite the night before that I talked to you, and I

99

hadn't heard back from him . . . I went and told him, 'Hey, check this out, man.' I said, 'My homeboy, Travis, down there. You know, he wants to do somethin', man. We need to get some of that good shit, man, for 600, for 600 a piece, man.'" BURHOP said, "Yeah."

        b.      YANDELL described TORRES's response to his request for heroin at $600 per ounce: "He goes, 'OK. Eh, let me, let me make a call. Let me call up tonight, man. We'll do this shit, man.'" BURHOP replied, "OK." Later in the call, YANDELL said, "I told this dude that we need to bust a move on this fuckin', uh, this kilo, man, for, uh, 24. And he tried to say, '25, right?' And I said, 'Oh no, man. Billy said you said 22 to 24. It would be 24 if it is 600 a piece.' And he goes, 'Yeah, yeah. That's right.'"

        c.      In this call, I believe that YANDELL relayed a conversation that he had with TORRES. According to YANDELL, he asked TORRES to arrange a heroin supply for BURHOP. YANDELL asked TORRES to supply the heroin at $600 per ounce, which would make a kilogram worth $24,000. TORRES initially told YANDELL he would charge $25,000 for a kilogram of heroin. However, YANDELL told TORRES that SYLVESTER had relayed that the price would be between $22,000 to $24,000 per kilogram. YANDELL pointed out that, if each ounce of heroin cost $600, then a kilogram would cost $24,000. TORRES agreed.

        2.      In October 2016, SYLVESTER used YANDELL's phone. There, SYLVESTER was intercepted speaking to TORRES in a number of drug-related phone conversations. In the calls, SYLVESTER and TORRES discussed various heroin deals that would make up for the low-quality heroin that TORRES had initially supplied to BURHOP.

        a.      For example, during an intercepted call between SYLVESTER and TORRES on October 12, 2016, at about 6:59 p.m., TORRES inquired what price was being

100

charged for a kilogram of heroin through BURHOP's supplier. SYLVESTER said he wasn't sure. TORRES represented that his supplier was claiming he had high-quality heroin available, but TORRES remained skeptical about whether it really was as high-quality as the supplier claimed. TORRES told SYLVESTER that if his supplier could provide high-quality heroin, then TORRES would try to lower the price on a kilogram to lower than what BURHOP was being charged and then TORRES would get a kilogram of heroin at the lower price every two to three weeks.

           b.       Toward the end of intercepted call between SYLVESTER and TORRES on October 11, TORRES confirmed that he needed to get three ounces of heroin supplied by BURHOP.

### X.    September 23, 2016 – Matt HALL burglarized an Orange County house, and stole a pistol, heroin, and a safe.

           1.       On September 23, 2016, YANDELL made an intercepted call to HALL. During this lengthy call, the men discussed multiple criminal activities, including a burglary that HALL had committed that day.[17] Information revealed in the call was also used in a search warrant executed at HALL's residence on September 30, 2016.

           2.       During the September 23 call, HALL told YANDELL that a woman had solicited him about burglarizing a local drug dealer. The woman believed this dealer had a safe

---

[17] This call, and many of HALL's intercepted calls and texts with YANDELL before September 30, 2016, were made with HALL using a phone assigned (213) 915-1044. During a search of HALL's residence on September 30, 2016, Los Angeles Sheriff's Department deputies found a Samsung Galaxy phone in the bathroom of HALL's apartment. Later forensic analysis showed that the phone had a number of (213) 915-1044. The phone also had user names of "MH," and "Matt Hall," along with a number of selfie-style photographs depicting HALL's face in them.

filled with drugs, firearms, and some money. HALL said the residence was only three minutes from MAZZA's house in Orange County.

      3.      HALL said that this woman had let HALL into the victim's home. HALL said that, while he was there, he stole a Smith & Wesson 9mm pistol that was on a shelf out in the open. HALL said he also took a large bag that contained what the woman thought was six ounces of "China white" heroin. However, HALL said he thought that it was closer to a pound and worth a lot of money.

      4.      HALL then said that he and some others removed a 600 to 700-pound safe from the residence. HALL said that the safe was very difficult to move. They transported it in one person's vehicle but later transferred it to HALL's Mercedes-Benz.

      5.      HALL told YANDELL that he had just arrived home and parked the vehicle in his garage. HALL said that the stolen safe was so large and heavy that it was ruining his leather back seats. He couldn't remove the safe by himself. HALL described the safe as very expensive and sophisticated with an electronic security key pad and a key. HALL didn't think he would be able to force the safe open and would, instead, have to hire a locksmith. HALL's female accomplice had said that additional drugs and firearms were likely in the safe. HALL said he was sitting there with the pistol in his lap. His little scale was too small to weigh the bag of drugs.

      6.      HALL said he would send YANDELL a picture of the stolen goods. Agents subsequently intercepted a photograph sent from HALL to YANDELL. It showed a large, clear, plastic, Ziploc bag containing a white, powdery substance. A Mercedes-Benz ignition key rested on top of the bag.



7.      HALL and YANDELL subsequently exchanged numerous text messages

discussing a mutual associate to whom they could sell the heroin.  For example, at about 5:01

p.m., they exchanged the following:

YANDELL:   How much weight is? Put that bich on the scales??

HALL:      I'm going to put this bitch on a scale in the next couple of minutes I got to
           get this fucking shit out of my car before it destroys my backseat.  But you
           know what gangster had to take that shit. Thee was 5 of us there I took
           everything.

YANDELL:   And that's exactly why I pushed to make u a brother.

**Y.      September 30, 2016 – Officers search Matt HALL's house and seize multiple
          firearms, body armor, and other items.**

1.      On September 30, 2016, members of the Los Angeles County SWAT team

executed a search warrant at HALL's residence, located at 151½ Manhattan Avenue, Hermosa

Beach, California.  During the search, deputies seized six firearms, body armor, zip ties, live

ammunition, gang-related communications, and Nazi paraphernalia.  At the time, HALL and

MAZZA were both present.

a.      During the search, detectives found about five pistols of various models and calibers and a special construction M-4 style rifle.  They also found one ballistic vest.  Below are three photographs from evidence seized in the raid.



b.      One of the pistols – an automatic, 9mm Smith & Wesson pistol – matched the description of the weapon that HALL told YANDELL he had stolen.  Deputies also found a digital scale and a small amount of suspected methamphetamine in the bathroom near the toilet.

2.      On September 30, 2016, at about 1:27 p.m., KEETON made an intercepted call to YANDELL.  During the call, YANDELL told KEETON that HALL and MAZZA had been raided and arrested.  YANDELL said they had no details about why or what had been found.

3.      On the afternoon of September 30, 2016, HALL and MAZZA were released on bail.

4. Later that day, at about 5:21 p.m., YANDELL made an intercepted call to fellow AB Commission member Danny TROXELL. During the call, YANDELL and TROXELL speculated and agreed that the search and arrests related to the robbery and murder at the Anaheim hotel. PENI members had been arrested for this incident in July 2016, and Johnson and HALL were under investigation. YANDELL speculated that the PENI member and Johnson had "snitched," which led to the raid on HALL. Both YANDELL and TROXELL agreed that some phones had been tapped.

5. On September 30, YANDELL also sent an intercepted text to BURHOP. It read, "Cyco and Popeye were busted this morning don't call their phones."

## Z. October 1, 2016 – Matt HALL admitted to YANDELL that officers caught him possessing guns.

1. After being released from custody on September 30, 2016, HALL got a new phone. On October 1, 2016, at about 8:10 p.m., HALL used this new phone to place an intercepted call to YANDELL.

2. During this call, HALL described how the Los Angeles County Sheriff's Department executed a search warrant at his residence at 2 a.m. He told YANDELL that he "got busted with nine of them choppers," meaning nine firearms. Police actually seized only six firearms. HALL said that he was about an hour away from obtaining two more guns. HALL admitted he had "put work in for that cache." HALL claimed that he had hundreds of rounds of ammunition, .45-caliber guns, 9mm-caliber guns, .40-caliber guns, and "a chopper," slang for an assault rifle. HALL said it had been weird because they had known too much, and he had not kept the guns in the house. YANDELL asked HALL if he believed that this had to do with

105

"Kenwood" and "that situation." I interpreted this to be a reference to Johnson and the July 2016 robbery and homicide in Anaheim.

3.      HALL later said that Kenwood had done business and talked in front of his cellmate, which had been bad. HALL had received a call "out of the blue" from Kenwood's cellmate the day before the raid. HALL added that he planned on immediately obtaining more firearms because he "felt naked without them." HALL said that he wanted both of his .45's and that they better have a dozen rounds each.

4.      HALL complained that PENI was "a joke." HALL said that everyone was suspect. YANDELL asked HALL what he was going to do. HALL said he was going to get more guns. HALL said he was not going back into custody and was debating whether to show up to his next court date.

### AA.   August to October 2016 – YANDELL discussed the plan to murder Aryan Brotherhood member Michael Trippe and assigned the murder to AB member Donald "Popeye" MAZZA.

1.      During this investigation, agents intercepted multiple calls in which YANDELL and other Aryan Brotherhood members discussed an ongoing effort to murder AB member Michael "Thumper" Trippe.

2.      According to YANDELL's intercepted calls, the effort to kill Trippe was initially assigned to Aryan Brotherhood member Elliott "Rascal" Grizzle.

a.      Until recently, Grizzle had been serving a life sentence in California prison for a murder conviction. Grizzle was released in early November 2015, after

the California Court of Appeal granted him post-conviction relief because of the alleged ineffectiveness of his trial counsel.[18] This freed him to murder Trippe, who was out of custody.

    b.  However, on March 27, 2017, a San Diego County Superior Court convicted Grizzle of a new first-degree murder. According to published news reports from the trial, Grizzle and two accomplices went on May 11, 2016, to a San Carlos residence to buy drugs. While there, they bound and blindfolded the home occupants. Then, they ransacked the home in search of marijuana and money. The victim, Brent Adler, arrived home during the home invasion. He put up a fight in the driveway, was shot three times, and died. Grizzle fled, and San Diego County issued a homicide arrest warrant for him. Grizzle was ultimately arrested in Hawthorne, Nevada. On August 25, 2017, San Diego Superior Court Judge Laura Halgreen sentenced Grizzle to 159 years to life in prison. Grizzle's new imprisonment made him unable to kill Trippe.

    3.  Law enforcement intercepted several calls in which YANDELL discussed the history and status of the Aryan Brotherhood's efforts to kill Trippe. YANDELL claimed that Grizzle had tried to kill Trippe several times but that each attempt had been unsuccessful. Calls established that, after Grizzle was arrested again, Donald "Popeye" MAZZA agreed to kill Trippe on behalf of the Aryan Brotherhood.

    4.  YANDELL spoke with Brant DANIEL during one of these calls, which occurred on August 19, 2016, at about 5:17 p.m. During the call, YANDELL and DANIEL

18 On October 29, 2015, the court granted Grizzle's habeas petition and directed the Del Norte County Superior Court to re-impose a previous plea offer that Grizzle's trial counsel had allegedly failed to communicate. The result was that Grizzle's lengthy murder sentence was reduced to a time-served sentence, and Grizzle was promptly released from custody.

discussed how "Rascal" (Grizzle) had just been arraigned in San Diego for assault with a firearm, murder, attempted murder, and robbery. YANDELL asked what Grizzle had robbed, and DANIEL said "some dude's dope." YANDELL lamented that Grizzle had had access to "kilos of pure heroin, kilos of pure meth" but had become a drug addict. YANDELL said that, earlier, "Rascal drove up there with all their dope and phones, and he was so strung out that he missed both days and overslept." YANDELL said that Grizzle had taken an extra ounce of heroin as payment. YANDELL said that, if Grizzle would have "smoked Thumper, he would have cleaned all this shit up." DANIEL said that he had kept telling Grizzle he had to do it and could fix everything. However, Grizzle hadn't done so. YANDELL said Grizzle "had the world at his fingertips." DANIEL remarked that Grizzle had a "taste of freedom, and he went crazy."

        5.      On August 28, 2016, YANDELL and BRADY discussed efforts to kill Trippe. During an intercepted call made at about 8:56 p.m., YANDELL and BRADY discussed various AB members and associates. BRADY mentioned that he had heard that Thumper was an FBI informant. YANDELL said that Grizzle had tried to kill Thumper several times because of Thumper's status as an informant. YANDELL explained that Grizzle had agreed to kill Thumper because Grizzle had to make amends for becoming a heroin addict when he got out of prison. YANDELL said he told Grizzle it was acceptable to kill Thumper's wife if she was with him but not to kill Thumper's kids. YANDELL further explained that Grizzle got arrested on a separate murder soon thereafter and never had the opportunity to kill Thumper. YANDELL and BRADY also discussed MAZZA and their belief that he should not have been made an AB

member. They said he had become a member only because he had brought the PENI gang into the enterprise's criminal activities.[19]

      6.     During an intercepted call between YANDELL and Donald "Popeye" MAZZA on August 31, 2016, at about 8:24 p.m., the two discussed the need for "brothers" on the outside of prison to help AB members who were incarcerated. MAZZA explained that he did not want to be responsible for supporting 30 or more incarcerated members because it made no sense. During the call, they also discussed the situation with "Kenwood" Johnson and his issues. MAZZA also expressed his belief that Matt HALL was a good candidate to become a new member of the Aryan Brotherhood. Finally, during the call, although the two avoided using overt language about criminal acts, MAZZA acknowledged that if YANDELL made a decision on the "situation in San Diego" (referring to the need to kill Michael Trippe) then all YANDELL had to do was tell MAZZA and it would be handled.

      7.     On September 23, 2016, at about 4:33 p.m., YANDELL discussed Trippe with Matt HALL. During an intercepted call, HALL told YANDELL that he had met with other "brothers" at Don's (MAZZA's) house. The group had discussed arranging Thumper's murder. HALL told YANDELL that the group had expressed some hesitance about killing Thumper, because Thumper was an AB member, not merely an associate. HALL said the gathered AB members asked whether Thumper's kill order had been confirmed. YANDELL affirmed.

19    This intercepted comment matches information provided by CW-1. According to CW-1, the Aryan Brotherhood recruited MAZZA because he was one of the founding members of PENI. CW-1 said MAZZA presented a "perfect opportunity" to finish what had been attempted with the recruitment of NLR gang members. Specifically, CW-1 said that the Aryan Brotherhood wanted to incorporate a pre-existing street gang so that the enterprise would have out-of-custody soldiers who could earn money, pay tribute to incarcerated AB members, and commit criminal acts outside of prison. Thus, by admitting a founding PENI member, the Aryan Brotherhood hoped to gain influence over members of the PENI street gang.

According to HALL, MAZZA had agreed to do one killing, and "Rick" (believed to be AB member Rick Rainey) had agreed to do another unspecified killing. HALL said that he told all the brothers that they had to be active because "there's no retirement program here, … no 401K." They had to do "licks" and "be active" and "get down." A "lick," in my experience is slang for a robbery and HALL previously used the term to describe the July 2016 robbery/homicide in Anaheim. HALL told YANDELL that they were all ready to participate.

8.      On October 1, 2016, at about 8:10 p.m., YANDELL and HALL again discussed MAZZA's assignment to kill Trippe. This call occurred shortly after Los Angeles County officers had searched HALL's residence and found him with MAZZA. During one portion of the call, HALL said that MAZZA had been tasked with killing someone. HALL said that he felt bad about getting MAZZA in trouble when MAZZA was out on bail. But, HALL said, "he needs to go kill that dude, right?" Later, HALL said again that MAZZA was out on bail but needed "to go handle that shit."

9.      YANDELL and DANIEL discussed the plot to kill Trippe during a call intercepted on October 9, 2016, at about 6:17 p.m.

        a.      During this call, YANDELL said that he had spoken on the phone with "Rascal" (Grizzle) when Rascal was hunting "Thumper" (Trippe). YANDELL expressed concern about compromising comments he had made in these previous conversations. For example, YANDELL had told Grizzle not to murder Trippe in front of Trippe's kids. However, YANDELL told Grizzle that, if it was just Trippe and Trippe's wife or girlfriend, then she could go with him too, meaning Grizzle could kill her as well. In his conversation with DANIEL, YANDELL speculated that "they" (law enforcement) probably heard that call because Grizzle's

"old lady" was probably cooperating with law enforcement. YANDELL also told DANIEL that "Slider" had called him about Thumper. Slider asked if they should kill Thumper, on whom they had "paperwork."

        b.      During this call, YANDELL claimed that SYLVESTER had told him that "the Feds" were going to get YANDELL in six months because "the Feds" wanted YANDELL. DANIEL asked whether "the feds" wanted YANDELL. YANDELL affirmed, adding that the feds wanted YANDELL and had YANDELL on the phone. YANDELL predicted that he would be indicted in six to eight months. YANDELL said they probably also had him talking to Slider about killing Trippe.

        c.      YANDELL told DANIEL that he had been a target ever since he joined the Commission. DANIEL agreed. YANDELL said he was about start "killing these motherfuckers" himself. DANIEL said he felt like doing that, too, because he had idiots around him.

        10.      As a result of these and other calls, law enforcement agents identified Trippe as an AB member living in California. Officers found him and told him that his life was in danger.

### BB.    October 15, 2016 – CORBETT ordered the murder of Doug Maynard at High Desert Prison; Aryan Brotherhood associate Bobby Stockton carries out the hit.

        1.      On October 15, 2016, at about 1:32 p.m., Aryan Brotherhood associate Bobby Stockton murdered Doug Maynard on the D yard at High Desert prison. Stockton did so on Jake CORBETT's order. CORBETT issued the order to enforce compliance with the Aryan

Brotherhood's codes and to further CORBETT's desire to gain admission to, and increase his position with, the Aryan Brotherhood.

        2.     According to CW-2, Maynard had become an Aryan Brotherhood target because he owed money at another prison and had a drug problem.[20]

        a.     Maynard had previously incurred drug debts at one prison and been counseled not to drink or do drugs. Transferred to a second prison, Maynard got in trouble because he again owed money on the yard. Then transferred to High Desert prison, Maynard racked up another debt. At that point, the Aryan Brotherhood determined that Maynard needed to be eliminated.

        b.     According to CW-2, CORBETT issued the order to kill Maynard. Stockton was eager to execute the murder because he was anxious to earn membership in the Aryan Brotherhood.

---

20     CW-2 is an incarcerated former member of the Sacramaniacs, a street gang that functions as a prison gang when its members are incarcerated. Sacramaniacs are subordinate to the Aryan Brotherhood within California prisons. CW-2 has extensive criminal history that includes felony crimes of violence and drug trafficking convictions. As a result, CW-2 was incarcerated in California prisons off and on between 1996 to the present. In 2009, CW-2 became a member of the Sacramaniacs. As a Sacramaniac, CW-2 committed multiple acts of violence on behalf of, and at the direction of, Aryan Brotherhood members and associates in multiple California prisons. Between 2014 and 2017, CW-2 held positions of authority over other white inmates based upon instructions and assignments given to CW-2 by Aryan Brotherhood members in two different California prisons. Specifically, between 2014 and 2015, Aryan Brotherhood member Travis BURHOP gave CW-2 authority to conduct drug trafficking, collect drug debts, and manufacture weapons while they were incarcerated at Calipatria prison. Similarly, between 2015 and 2017, Aryan Brotherhood member Jake CORBETT and, later, AB member Pat BRADY assigned CW-2 to police other white inmates while they were incarcerated at High Desert prison. CW-2 also manufactured weapons, sold drugs, and collected debts for the enterprise. In addition, CW-2 was involved in a scheme to defraud the IRS of money while incarcerated at High Desert. CW-2 was provided no promises or assurances by CDCR or the U.S. Attorney's Office, except that CDCR agreed to transfer CW-2 to a prison that was more convenient for family visits. CW-2 dropped out of gang life and ceased functioning as a Sacramaniac in approximately August 2017 because he wanted to be out of prison. Once he left the prison yard, CW-2 described receiving additional motivation to cooperate against the Aryan Brotherhood because members of the enterprise disrespected him and his family. He developed a hatred for how they treated him because he felt disrespected.

c.       CW-2 believed that CORBETT assigned this murder to Stockton because CORBETT did not like Stockton. According to CW-2, by giving Stockton the order to kill Maynard, CORBETT believed he would solve two problems: Maynard would be killed, and because Stockton had committed the murder, he would then be transferred out of High Desert prison. After Maynard's murder, CORBETT commented to CW-2 and others that Stockton wasn't really a candidate for Aryan Brotherhood membership: If Stockton was going to be considered, CORBETT said, it would have already occurred.

d.       In planning Maynard's murder, other AB associates at High Desert prison manufactured a knife. The knife was ultimately placed in a manila folder and given to Stockton. On the day of the murder, CW-2 saw Stockton take the knife from the manila envelope and put it in his waistband. Stockton then made his way to the yard and found Maynard.

e.       Video footage shows that Stockton approached and, without hesitation, began using his right hand to stab Maynard in his head and upper torso. Maynard fell to the ground and lay motionless on his stomach. He was not defending himself. Nevertheless, Stockton continued to stab Maynard repeatedly in his head and torso.

f.       CDCR officers immediately ordered inmates to "get down." Except for Stockton, the inmates complied. Stockton continued his attack with more stabbings to Maynard's head and torso.

g.       As CDCR officers approached Maynard, Stockton finally stopped. He stood up and tossed a white object with his right hand. Then, Stockton walked away from Maynard, about 20 feet towards the center of the yard. Stockton laid down on his stomach on the

113

ground. Officers later recovered the white object and discovered that it was a flat, metal knife measuring 6 inches long by 1 inch wide.

h.     Officers found that Maynard was bleeding heavily but still conscious and breathing. Medical staff arrived and immediately began treating Maynard's wounds. When medical staff rolled Maynard to his right side, they saw several torso punctures that were bleeding profusely.

i.     Despite medical staff efforts, Maynard succumbed to his injuries. Dr. Abdur-Rahman pronounced him dead at about 1:50 p.m. The medical exam revealed that Maynard had sustained 37 stab wounds.



3.     During an intercepted call beginning at about 6:12 p.m. on October 16, 2016, YANDELL discussed Maynard's murder with DANIEL.

a.     During the call, YANDELL confided to DANIEL that YANDELL and SYLVESTER had first ordered Maynard stabbed when Maynard was at Folsom prison. Specifically, YANDELL asked DANIEL if he remembered YANDELL telling him about

114

Maynard, a homeboy of his from the Bay Area. YANDELL described mentioning Maynard to DANIEL about three months earlier. DANIEL affirmed. YANDELL admitted that he and SYLVESTER had his [Maynard's] "ass stabbed up there," meaning in Folsom prison. DANIEL affirmed. YANDELL said Maynard survived the attack. Afterward, YANDELL told Maynard that they were even. However, while Maynard was imprisoned at High Desert, Maynard continued to violate the AB's codes of conduct. YANDELL said that, as a result, BRADY and CORBETT had arranged for Maynard's murder.

    b.  I corroborated YANDELL's admission that he and SYLVESTER ordered the stabbing of Maynard in 2016, when Maynard was housed at Folsom prison. Video footage shows that, on June 1, 2016, at about 12:45 p.m., two white inmates – Anthony Junkin and Kenneth Ferrell – approached Maynard while he was on the B facility recreation yard in Folsom prison. Ferrell came up behind Maynard while Junkin approached in front of Maynard. Ferrell grabbed Maynard's arms from behind. Junkin repeatedly stabbed Maynard's torso with a weapon. Afterward, CDCR officers recovered an inmate-manufactured weapon wrapped in a shirt. It was concealed in a trash can near where Junkin and Ferrell were found after Maynard's attack. Medical staff found that Maynard had suffered three puncture wounds in his abdomen. They performed surgery.

    c.  During his intercepted October 16 call with DANIEL, YANDELL gave more insight into why Maynard was eventually murdered. YANDELL explained that, when Maynard went to High Desert, he was "talking smack" about SYLVESTER and YANDELL having him stabbed at Folsom. YANDELL explained that YANDELL's home boy, Stockton, questioned Maynard about Maynard's claim. According to YANDELL, Stockton

killed Maynard the next day, after they came out of lock down. DANIEL replied that Maynard deserved this for talking shit. YANDELL agreed. He explained that Maynard had been housed in a part of High Desert with Pat (BRADY). Maynard told BRADY that his brothers had had him stabbed – an apparent reference to the June 1 stabbing at Folsom. YANDELL said that he told Maynard that he got stabbed for burning YANDELL and his brother. But YANDELL claimed that they also told Maynard that they were even after Maynard survived the stabbing at Folsom. In other words, YANDELL had assured Maynard that he was not going to have his people kill Maynard.

       d.      After that occurred, YANDELL said that BRADY told Maynard that there would be no using drugs at High Desert prison until BRADY straightened everything on the yards there. Nevertheless, Maynard started using drugs and buying dope from the "niggers" at High Desert prison. YANDELL told DANIEL that Maynard got transferred to a different part of High Desert prison with CORBETT. CORBETT then had Stockton "smoke his bitch ass." DANIEL agreed. YANDELL said that, after they came out of lock down, they killed Maynard's "bitch ass" with a 14-inch "bone crusher," meaning a prison-made weapon. DANIEL replied that this is what Maynard got for running his mouth.

       e.      YANDELL told DANIEL that YANDELL was going to get rid of his phone. He thought that they, meaning law enforcement, would be coming for them because Maynard was killed after being moved from one line to the other.

**CC.    October 17–18, 2016 – YANDELL arranged for heroin to be delivered from southern California by Travis BURHOP's courier Nickolas Perez; The UC bought the heroin from Jeanna QUESENBERRY in Sacramento.**

1.     On October 17, 2016, YANDELL made intercepted calls to Nickolas

Perez, the primary drug courier for Travis BURHOP. During the intercepted calls, Perez agreed

to bring a large amount of tar heroin and white heroin to QUESENBERRY in Sacramento.

Perez said he was leaving late at night and would arrive early the following morning. YANDELL

told him that QUESENBERRY would get him a room for when he arrived in Sacramento.

2.     GPS phone locator information for Perez's telephone showed that, after

leaving his residence late that evening, the phone stopped briefly at 7960 Ferndale Drive,

Fontana, California. I believe Perez picked up heroin from the stash house, before driving north

to Sacramento. In the early morning of October 18, 2016, Perez arrived in Sacramento and

QUESENBERRY rented him a room at the Hawthorne Suites, located at 321 Bercut Drive.

3.     Surveillance agents positioned at the Hawhorne Suites saw Perez walking

through the hotel parking lot near a silver Suzuki Equator, registered to another BURHOP

courier: Kathleen NOLAN. Agents subsequently retrieved the surveillance video from the

Hawthorne Suites parking lot and positively identified that Perez was in the parking lot meeting

with QUESENBERRY on October 18. In addition, Hawthorne Suites produced hotel records

confirming that a "Jeanna Smith" had rented a room during October 17–18.

4.     Eventually, QUESENBERRY requested that I meet her near the

Hawthorne Suites for the heroin deal. Agents watched QUESENBERRY drive from her stash

pad to the Hawthorne Suites. After she arrived, agents saw her walk from the parking lot, cross

the street to a Chevron parking lot, and meet with me. QUESENBERRY got into my car and

117

sold me black heroin and white heroin in exchange for $9,600. During this initial drug deal, I arranged to buy more heroin later that day.

        a.        The DEA Western Regional Lab subsequently confirmed that the packages that QUESENBERRY initially sold me on October 18 contained 20 grams and 24.8 grams of heroin.

        5.        After the first drug deal, I left the area and surveillance watched QUESENBERRY. She walked from the Chevron back to the Hawthorne Suites. Later that afternoon, agents saw QUESENBERRY and Perez exit the hotel together and get into their cars. QUESENBERRY drove back to the Chevron to meet with me; Perez drove down the street while the second drug deal took place. QUESENBERRY got into my car and sold me more heroin in exchange for $4,280.

        a.        The DEA Western Regional Lab confirmed that the drugs purchased from QUESNEBERRY during the second controlled purchase on October 18 contained 99.3 grams of heroin.

        6.        During our interaction that day, QUESENBERRY related that the courier had to go back to southern California shortly. GPS phone locator information for Perez's phone showed that Perez departed Sacramento and returned to his house in San Bernardino County the following day, October 19, 2016.

        7.        After the drug deal, YANDELL and SYLVESTER made intercepted calls to BURHOP and others. During these intercepted calls, they discussed the fact that Perez was needed in southern California because BURHOP needed Perez to transport several pounds of drugs "back east" in the coming days.

118

8.     On the evening of October 20, 2016, Perez's GPS phone locator data showed that he left his house late at night. Shortly after midnight (now bleeding into the morning of October 21) Perez arrived at 7960 Ferndale Drive, in Fontana, California – this address was a suspected stash pad controlled by BURHOP and frequently accessed by Perez. Perez's phone remained at 7960 Ferndale Drive for about two and a half hours in the early morning hours of October 21. Shortly before 3:00 a.m., Perez left 7960 Ferndale heading east on the freeway for several hours. He eventually crossed into Nevada.

## DD.     October 21, 2016 – Las Vegas police seized five pounds of methamphetamine from Nickolas Perez, one of Aryan Brotherhood's drug couriers.

1.     On October 21, 2016, at about 12:10 p.m., Las Vegas Metro Police Detective R. Schaffner stopped Nickolas Perez north of Las Vegas, where he was driving north on Interstate 15. The stop resulted in police seizing about five pounds of methamphetamine from Perez's car. Perez later made extensive incriminating admissions, including that he was working as a drug dealer for BURHOP.

a.     At the time of the stop, Perez drove a rented silver Nissan Altima with Missouri plates. During Perez's interaction with Detective Schaffner, he appeared very nervous and admitted that his driver's license was suspended. He gave varying explanations of he was traveling that day. He claimed the car belonged to his friend NOLAN, another BURHOP drug courier.[21]

---

21     Investigators later determined that the Nissan Altima driven by PEREZ on October 21, 2016, was registered to NOLAN at 17 Norwood Trailer Court, Washington, Missouri 63090.

b.      Perez ultimately got out of the car, was handcuffed, and moved

away from the driver's side.  Afterward, Detective Schaffner noticed a small baggie on the

ground near where Perez had been standing.  The baggie contained a white crystalline substance.

A subsequent field test was positive for the presence of methamphetamine.

c.      "Buster," a trained narcotics detection dog, alerted to the presence

of a controlled substance near the trunk and near the rear, passenger wheel well of Perez's car.

2.      Officers searched the trunk.  In the spare tire compartment, they found a

large, clear, plastic, heat-sealed bag containing methamphetamine.  Moving the trunk liner more,

investigators found two other bags of methamphetamine in a natural void on the passenger side

of the spare tire area.  In the rear, driver's wheel well area, investigators recovered two more

bags of methamphetamine.

a.      In total, investigators recovered five, heat-sealed, plastic bags of

methamphetamine.  The DEA Western Regional Lab subsequently confirmed that these bags

held a total of 2,193.692 grams of actual methamphetamine.

3.      Police arrested and detained Perez.  A few days later, Perez agreed to

speak to me.  In sum, Perez admitted that, since early 2016, BURHOP and NOLAN had been

directing him to transport methamphetamine to Missouri and South Dakota.  Perez admitted that

the five pounds of methamphetamine seized from his car belonged to BURHOP and were

supposed to be distributed in South Dakota.

a.      In his statement, Perez described meeting BURHOP in 2012 or

2013.  Initially, BURHOP invested in Perez's ongoing heroin distribution operation in San

Bernardino County.  During this time, Perez also delivered heroin to BURHOP's customers.

120

b.           After a period of incarceration, Perez began in early 2016 to transport drugs to Missouri and South Dakota on BURHOP's behalf and at his direction. Perez admitted that he had delivered methamphetamine at least two or three times to Missouri.

c.           Perez said that BURHOP's drug trafficking operation also included "Kat." Upon reviewing her DMV photograph, Perez subsequently identified "Kat" as NOLAN. Perez said that NOLAN was a courier for BURHOP. On occasion, Perez traveled with NOLAN to deliver drugs to Missouri. According to Perez, NOLAN primarily transported drugs for BURHOP and collected BURHOP's drug money.

d.           In early 2016, NOLAN and Perez also traveled to South Dakota to deliver drugs for BURHOP. Initially, NOLAN and Perez agreed to alternate trips to South Dakota. However, NOLAN soon began going to South Dakota much more regularly. Perez estimated that he transported BURHOP's drugs to South Dakota about six times. Perez delivered between two and six pounds of methamphetamine during each trip. He wasn't sure exactly how many pounds he carried on some of the trips.

e.           Perez further admitted that he had transported BURHOP's heroin to Sacramento three times during 2016. Perez said he was instructed to meet with a woman named "Gina." After viewing her DMV photograph, Perez identified "Gina" as Jeanna QUESENBERRY. Perez said that QUESENBERRY rented him a hotel room each time he went to Sacramento. On his last trip, Perez believed he had delivered six ounces of white heroin and seven or eight ounces of tar heroin to QUESENBERRY.

f.           Perez said QUESENBERRY worked for the Aryan Brotherhood. He also admitted that BURHOP was with the AB. Perez said he was very scared of the Aryan

Brotherhood.  He felt they would have him killed if they found out he was cooperating with law enforcement.

g.        Perez also described collecting drug money at BURHOP's

direction.  Specifically, Perez collected BURHOP's drug money from KEETON and HALL after they transported drugs to Sacramento.  Perez said that, when he collected BURHOP's drug money, he normally took a small commission for himself and gave the remaining drug money to BURHOP's girlfriend.

h.        Perez also confirmed the location of a stash house in Fontana,

California, that was being used by BURHOP's operation.  As discussed in the next section, agents corroborated this aspect of Perez's information through a search warrant executed at the Fontana stash house on October 24, 2016.

i.        In November 2016, Perez made bail and was released from

custody.  Despite telling me that he would cooperate with law enforcement, I believe that Perez continued to function for BURHOP and the enterprise after his release.

### EE.    October 24, 2016 – Officers seized one pound of heroin supplied by Mexican Mafia Member Michael TORRES from BURHOP's stash pad in Fontana, California.

1.        On October 24, 2016, members of the Ontario Upland Narcotics Task

Force and DEA's High-Intensity Drug Trafficking Area Task Force Group 50 executed a search warrant at BURHOP's stash pad, located at 7960 Ferndale Drive, Fontana, California.[22]

---

22        During surveillance on August 24, 2016, agents saw a brown, 2003 Ford Explorer registered to NOLAN parked in the driveway of this address.

Searching agents recovered heroin supplied by incarcerated Mexican Mafia member Michael TORRES to BURHOP.[23]  Agents also found a significant amount of methamphetamine and a smaller amount of cocaine.

        2.       Specifically, during their search, agents discovered a grey Bunker Hill Security digital safe in the closet area of the master bedroom.  From inside the safe, agents recovered:

        a.       Five clear, plastic, vacuum-sealed bundles containing 1,942 grams of actual methamphetamine.

        b.       Two clear, plastic, vacuum-sealed bundles containing 719 grams of black tar heroin.

        c.       Two clear plastic bindles containing 9.52 grams of cocaine.

        d.       A clear plastic bindle containing miscellaneous pharmaceutical pills.

        e.       Three small digital scales.  In my experience, these scales are typically used by drug traffickers to weigh specific drug amounts before they are distributed to customers.

---

23      Before this seizure, agents intercepted multiple calls between YANDELL and BURHOP where YANDELL discussed partnering with TORRES, a Mexican Mafia member incarcerated at Folsom with YANDELL and SYLVESTER.  The agreement was for TORRES's Los Angeles drug supplier to provide BURHOP's people with heroin.  BURHOP had a different source and was leery of working with any new drug source.  Nevertheless, BURHOP acquiesced in the request of YANDELL and SYLVESTER to work with TORRES.  In an undercover capacity, I purchased some of the heroin supplied by TORRES during the controlled buy on October 18, 2016.  However, as BURHOP feared, TORRES's heroin was substandard and was thus sitting in BURHOP's stash pad because he had not been able to sell it.  As a consequence of TORRES supplying this bad heroin, agents later intercepted calls between SYLVESTER and TORRES in which the two discussed various heroin deals that would make up for the low-quality heroin that TORRES had initially supplied to BURHOP.

        f.      The DEA Southwest Lab confirmed each of the drugs and their

amounts.

        3.      Inside dresser drawers along the north wall of the master bedroom, agents

also discovered four clear plastic Ziploc bags containing methamphetamine and three clear

plastic Ziploc bags containing suspected marijuana.

        a.      The DEA Southwest Lab subsequently confirmed that these bags

contained 134 grams of actual methamphetamine and more than 30 grams of marijuana.

**FF.      October 29, 2016 – Aryan Brotherhood member Brant DANIEL murdered Zachary Scott at Salinas Valley Prison to maintain and increase his position with the Aryan Brotherhood.**

        1.      On October 29, 2016, at about 9:30 a.m., Aryan Brotherhood member

Brant DANIEL murdered Zachary Scott on the B yard at Salinas Valley prison.  DANIEL did so

to maintain and increase his position in the enterprise.  Leonard Dunning assisted DANIEL in

this murder.

        2.      CDCR officers first realized an assault was underway at about 9:30 a.m.,

when they saw DANIEL and Dunning striking Scott in his face and upper torso.

        3.      CDCR officers immediately coordinated a response to quell the attack.  As

staff moved on the assailants, they repeatedly ordered DANIEL and Dunning to stop and to "get

down," meaning to lay prone on the ground.  Ignoring these commands, DANIEL and Dunning

continued to strike Scott in his face and upper torso.  Many of the responding officers believed

that DANIEL and Dunning were using their closed fists to assault Scott.  Subsequent evidence

revealed that DANIEL was armed with a prison-made weapon and inflicting severe puncture

wounds on Scott's body.

4.     CDCR officers moved closer and repeatedly commanded DANIEL and Dunning to stop their assault. The commands did not stop them. Once Scott fell to the ground, DANIEL issued strong blows to Scott's upper torso. Meanwhile, Dunning stood over Scott and used his foot to stomp on Scott's head numerous times. DANIEL and Dunning only stopped their attack when officers deployed grenades toward them.

5.     After DANIEL and Dunning stopped their attack, Scott stood up. Responding officers could see that his face was bleeding profusely and that his white t-shirt was soaked in blood. Scott took about five steps away from DANIEL and Dunning and then fell back on the ground. As officers took control of the scene, Scott sat up, disoriented. He spit up blood and uttered, "I can't breathe." Scott died soon afterward.

6.     Officers found a prison-made weapon near DANIEL and Dunning. The weapon was more than eight inches long and about one-inch wide.

7.     As officers moved in to restrain DANIEL, he said, "Yeah I did it. It was me. I did it, and that's all I have to say about that." DANIEL then yelled an announcement to the other inmates laying prone on the B yard: "In 72 hours, all you woods are gonna have 14 days to get off this weak-ass PC yard."

a.     I believe that DANIEL was telling the other white inmates that, after three days passed ("72 hours"), they would have "14 days" to assault another disfavored inmate. Doing so would prompt their transfer from the Salinas Valley B facility, which DANIEL compared to a yard that housed gang dropouts and sex offenders. Such prison yards are called "PC" – protective custody – yards.

125

        b.       The CDCR holds in protective custody inmates who are

cooperating or who have cooperated with law enforcement. It also places gang dropouts and sex

offenders, who are universally targeted for assault, in protective custody.

        c.       When DANIEL addressed the "woods" present on the B yard, he

used a shortened version of the term "Peckerwoods," a common slang term for non-affiliated

white inmates who are expected to function under the Aryan Brotherhood. "Woods" do not have

the same status as gang-affiliated AB associates, but while they are incarcerated, they are still

expected to act in accordance with the enterprise's codes of conduct.

        8.      While officers collected evidence and documented the crime scene,

DANIEL made a number of spontaneous, incriminating statements to CDCR Investigative

Services Unit Investigator C. Bittner. This is part of their exchange:

DANIEL:     That's the one that went in his back. I hit him too hard. It's not even
                broke. The knuckle is, though. It happens. It came out his chest. I hit
                him so hard, it went in his back and out his chest.

Bittner:      Right through him.

DANIEL:     Right through him. 'Cause Simlick. You remember Simlick? The one
                that locked up? If he was here on that day right now, he would have been
                number two. I was gonna hit this one and that one.

Bittner:      Simlick

DANIEL:     Two of them. You guys would have had a double homicide.

        9.      I later consulted with CDCR Gang Investigator Bittner to better

understand what DANIEL meant.

     a.     For example, DANIEL said, "It's not even broke.  The knuckle is, though."  Investigator Bittner understood DANIEL to be describing an injury to DANIEL's hand and saying that he hit Scott hard enough to break DANIEL's own knuckle.

     b.     DANIEL said, "I hit him so hard, it went in his back and out his chest."  Investigator Bittner understood DANIEL to say that, when DANIEL struck Scott with his prison-made weapon, DANIEL used so much force that the weapon entered Scott's back, penetrated it, and then poked through Scott's chest.

     c.     DANIEL mentioned "Simlick" and made comments about him. Investigator Bittner understood DANIEL say that, if inmate Joseph Simlick had been housed on the B facility at Salinas Valley prison that day, then DANIEL would have also murdered Simlick.

     d.     According to Investigator Bittner, Simlick had requested protective custody on October 24, just four days before Scott's murder.

     10.     Dr. Venus Azar of the Monterey County Sheriff's Office, Coroner Division, conducted Scott's autopsy.  Dr. Azar concluded that Scott's death was caused by seventeen stab wounds throughout his arms, shoulders, abdomen, chest, ribcage, and face.

     11.     On June 7, 2017, DANIEL pled guilty to murdering Scott, a violation of California Penal Code § 187.  A Monterey County Superior Court judge sentenced him to 30 years to life in prison.  On the same day, Dunning pled guilty to manslaughter.  He was sentenced to 22 years in prison.

### GG. December 22, 2016 – QUESENBERRY sells additional heroin to the DEA undercover agent; Surveillance observes QUESENBERRY deliver proceeds to Kathleen NOLAN

1.      On December 22, 2016, agents developed additional evidence of Kathleen NOLAN's direct participation in the drug trafficking conspiracy. In particular, on December 22, 2016, I arranged to purchase two types of heroin from QUESENBERRY after a month or so of recorded calls discussing prices and quantities. During the conversations leading to the December 22 drug deals, QUESENBERRY told me that there was a large amount of tar heroin available and she could arrange for her southern California source to deliver more powder heroin. I ultimately bought five ounces of tar heroin and two and a half ounces of powder heroin from QUESENBERRY on December 22, 2016.

2.      In the days leading up to these deals, QUESENBERRY said that her source would make sure to send the driver from "down south" on the evening before our deals so that the drugs would be ready on the morning of December 22.

3.      On the morning of December 22, 2016, QUESENBERRY told me that she wanted to meet at the Kohl's store at 4700 Natomas Boulevard in North Sacramento. She added that this store was around the corner from her new spot, which I interpreted to mean stash pad. At about 11:55 a.m. that morning, surveillance agents located QUESENBERRY's white Acura at 11 Button Court.

4.      I drove to the Kohl's parking lot and then called QUESENBERRY at about 12:35 p.m. She said she was down the street, bagging everything up, and would be at the Kohl's in about 15 minutes. At about 1:00 p.m., agents saw QUESENBERRY drive away from Button Court. She arrived at the Kohl's store at about 1:04 p.m.

5.      QUESENBERRY parked her white Acura next to my car and got into the

passenger seat.  She sold me an amount of tar heroin for $4,450 and, in the same deal, about 92

grams of powder heroin for another $2,200.

6.      The DEA Western Regional Laboratory later confirmed that

QUESENBERRY sold 121 grams of tar heroin and 50.6 grams of powder heroin.

7.      During this drug deal, QUESENBERRY and I realized there was a

discrepancy in what I had ordered from her.  Specifically, QUESENBERRY forgot an additional

half ounce that I had ordered during our earlier conversations.  She agreed to return to her stash

pad and immediately bring back the remaining half ounce.

8.      Agents followed QUESENBERRY directly back to 11 Button Court.

Another drug trafficking associate of QUESENBERRY's, Katherine Fuimaono, came out of the

residence, got into QUESENBERRY's car, and then got out two minutes later.[24]  At about

1:20 p.m., QUESENBERRY drove away again and arrived in the Kohl's parking lot a short time

later.  She got into my car and sold me the additional half ounce of white powder heroin for

$500.

9.      The DEA Western Regional Laboratory later confirmed that

QUESENBERRY had sold 10.3 grams of a mixture containing powder heroin.

---

[24]     This drug deal, and related criminal charges against QUESENBERRY and Katherine Fuimaono, are not
presented in this Criminal Complaint because, on May 9, 2019, a Sacramento grand jury indicted these distributions
under seal in *United States v. Quesenberry, et al.*, Case No. 2:19-cr-0081 KJM.  Instead, these distributions are
presented to demonstrate the involvement of Kathleen NOLAN in the drug trafficking conspiracy after the wiretaps
ended in this investigation.

10.     QUESENBERRY told me that her sources had told her to apologize to me and that they would have more white heroin next time. She also explained that there had been a problem with finding the white heroin this time: The person who maintained the stash house had hidden it shortly before police arrested him for domestic violence. However, no one knew where he put it.

11.     QUESENBERRY returned to her white Acura and drove away. Surveillance followed her as she drove directly to a Chevron gas station on Del Paso Boulevard and Sport Parkway. There, surveillance agents watched QUESENBERRY meet with Kathleen NOLAN, who was driving a dark Nissan SUV. Agents positively identified NOLAN in the Nissan SUV by comparing the person they spotted meeting with QUESENBERRY with NOLAN's DMV photo. The two women left the station and drove in tandem back to QUESENBERRY's residence on Las Animas Circle. They arrived at about 2 p.m. and both walked inside QUESENBERRY's house. NOLAN left QUESENBERRY's house at about 2:42 p.m. and drove away.

12.     Like KEETON, HALL, and Perez during the earlier drug deals discussed above, on December 22, I believe NOLAN met with QUESENBERRY to collect a portion of the proceeds from the tar and powder heroin that QUESENBERRY sold to me that day. I further believe, consistent with previous deals in this investigation, NOLAN was returning to southern California to distribute the proceeds consistent with instructions from YANDELL and/or BURHOP.

130

**HH.** **July 20, 2018 – Aryan Brotherhood members Jake CORBETT and Pat BRADY murdered Donald Pequeen at High Desert Prison to maintain and increase their position with the Aryan Brotherhood.**

1.      On July 20, 2018, at about 2:15 p.m., Aryan Brotherhood members Jake CORBETT and Pat BRADY murdered Donald Pequeen on the D facility at High Desert prison. CORBETT and BRADY did so to maintain and increase their position in the enterprise.

2.      A review of video surveillance from the day revealed that Pequeen was initially talking to BRADY. While Pequeen was distracted by BRADY, CORBETT came up from behind Pequeen, removed a prisoner-made weapon, and began stabbing Pequeen repeatedly in the back. As Pequeen attempted to flee CORBETT's attack, BRADY then removed a prisoner-made weapon from his waistband and chased Pequeen in concert with CORBETT. They caught Pequeen with the assistance of two other inmates and BRADY then violently stabbed Pequeen in the upper back. During the attack, Pequeen fell to the ground and guards then issued verbal commands for all inmates to "get down." CORBETT and BRADY continued their attack on Pequeen, stabbing him repeatedly in the head, neck, and torso. Pequeen attempted to defend himself but his efforts were unsuccessful as CORBETT and BRADY held him down and continued stabbing him. Officers quickly saw Pequeen bleeding profusely from his neck and torso.

3.      As responding officers closed in on the attackers, both CORBETT and BRADY stood up from Pequeen's body and walked away. They each discarded prisoner-made weapons as they walked. Officials recovered CORBETT's weapon very close to Pequeen's body. It was a flat metal-type weapon fashioned to a point at one end with a cloth-type material at the other end as a handle. They found BRADY's weapon a short distance away from the

131

victim's body.  It also was a flat metal-type weapon fashioned to a point at one end with a cloth type material at the other end as a handle.  Investigators noted that one of the murder weapons had "SS" lightning bolts etched into its side.  This symbol on one of the murder weapons is meant to send a message to other inmates that Pequeen's murder was a hit carried out by the Aryan Brotherhood because the enterprise often uses symbols from Nazi Germany to demonstrate its strength within the prison system.

4.      Officers attempted life-saving efforts on Pequeen, but they were unsuccessful.  Ultimately, Dr. M. Davis pronounced dead at about 2:52 p.m.  His body had more than 10 puncture wounds in his head, neck, and torso.

5.      CDCR officials removed CORBETT and BRADY and examined them.  Both had Pequeen's blood on their inmate clothing and shoes.  These items were collected and preserved as evidence of the murder.  Investigators believe that CORBETT and BRADY killed Pequeen to maintain and their position with the Aryan Brotherhood and the use of the stylized weapon was mean to send a message to other inmates who would defy the enterprise.

6.      The diagram below shows where CORBETT and BRADY murdered Pequeen within the D-yard at High Desert prison.



132

## VII.   SUMMARY OF PROBABLE CAUSE

Based upon the facts and circumstances set forth above, I submit that there is probable cause to believe that the defendants committed the following crimes:

| Defendant | Counts | Description of Charges | Page Numbers in Affidavit |
|---|---|---|---|
| **Ronald YANDELL, aka "Renegade"** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 2 – 5/27/16 to 12/22/16 | Conspiracy to distribute and possess with intent to distribute heroin and methamphetamine (2 counts) | 36–50, 70–72, 85–88, 98–101, 119–124 72–73, 119–122, 128–130 |
| | Count 10 – 8/11/16 to 9/6/16 | | 86–98 |
| | Count 3 – 7/11/16 | Distribution of heroin (3 counts) | 40–42 |
| | Count 4 – 7/24/16 | | 42–49 |
| | Count 7 – 8/12/16 | | 68–69 |
| | Count 6 – 8/11/16 | Distribution of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |
| | Count 5 – 8/11/16 to 10/1/16 – (Kenneth Johnson) | Conspiracy to Commit Murder in Aid of Racketeering (5 counts) | 70–73, 83–86, 105–106 |
| | Count 8 – 8/20/16 to 8/21/16 – (James Mickey) | | 75–79 |
| | Count 9 – 8/20/16 to 8/21/16 – (Paul Diaz) | | 79–82 |
| | Count 11 – 8/29/16 to 10/9/16 – (Michael Trippe) | | 106–111 |
| | Count 13 – 6/1/16 to 10/15/16 – (Doug Maynard) | | 111–116 |
| **William "Billy" SYLVESTER, aka "Billy from Norco"** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 6 – 8/11/16 | Dist. of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |

133

| Defendant | Counts | Description of Charges | Page Numbers in Affidavit |
|---|---|---|---|
| Pat BRADY, aka "Big Pat" | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 16 – 7/1/18 to 7/20/18 | Conspiracy to Commit Murder in Aid of Racketeering (Donald Pequeen) | 131–132 |
| Jason "Jake" CORBETT | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 9 – 8/20/16 to 8/21/16 | Conspiracy to Commit Murder in Aid of Racketeering (Paul Diaz) | 79–82 |
| | Count 10 – 8/11/16 to 9/6/16 | Conspiracy to distribute and possess with intent to distribute methamphetamine and heroin (Importation of drugs into High Desert prison concealed within packages) | 86–98 |
| | Count 14 – 10/1/15 to 10/15/15 | Conspiracy to Commit Murder in Aid of Racketeering (Doug Maynard) | 111–116 |
| | Count 16 – 7/1/18 to 7/20/18 | Conspiracy to Commit Murder in Aid of Racketeering (Donald Pequeen) | 131–132 |
| Matthew HALL, aka "Psycho" | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 2 – 7/11/16 to 10/24/16 | Conspiracy to distribute and possess with intent to distribute heroin | 36–50, 72–73, 119–122 |
| | Count 4 – 7/24/16 | Distribution of heroin | 42–49 |
| | Count 5 – 8/11/16 to 10/1/16 | Conspiracy to Commit Murder in Aid of Racketeering (Kenneth Johnson) | 70–73, 83–86, 105–106 |
| | Count 12 – 8/29/16 to 10/9/16 | Conspiracy to Commit Murder in Aid of Racketeering (Michael Trippe) | 106–111 |

| Defendant | Counts | Description of Charges | Page Numbers in Affidavit |
|---|---|---|---|
| **Samuel KEETON** | Count 2 – 5/27/16 to 12/22/16 | Conspiracy to distribute and possess with intent to distribute heroin and methamphetamine | 36–50, 72–73, 119–122, 128–130 |
| | Count 3 – 7/11/16<br><br>Count 7 – 8/12/16 | Distribution of heroin (2 counts) | 40–42<br><br>68–69 |
| | Count 6 – 8/11/16 | Dist. of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |
| **Michael TORRES, also known as "Mosca"** | Count 2 – 5/27/16 to 12/22/16 | Conspiracy to distribute and possess with intent to distribute heroin (AB-Mexican Mafia alliance) | 70–72, 85–88, 98–101, 122–124 |
| **Jeanna QUESENBERRY** | Count 2 – 5/27/16 to 12/22/16 | Conspiracy to distribute and possess with intent to distribute heroin | 36–50, 72–73, 119–122, 128–130 |
| | Count 3 – 7/11/16<br><br>Count 4 – 7/24/16<br><br>Count 7 – 8/12/16 | Distribution of heroin (3 counts) | 40–42<br><br>42–49<br><br>68–69 |
| | Count 6 – 8/11/16 | Distribution of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |
| **Kevin MACNAMARA** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 6 – 8/11/16 | Distribution of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |
| **Kristen DEMAR** | Count 1 – 10/7/11 to present | RICO Conspiracy | 28–129 |
| | Count 6 – 8/11/16 | Distribution of methamphetamine (smuggling drugs into Folsom prison) | 50–63, 69–70, 73–75 |

135

| Defendant | Counts | Description of Charges | Page Numbers in Affidavit |
|---|---|---|---|
| **Justin PETTY, also known as "Rune"** | Count 10 – 8/11/16 to 9/6/16 | Conspiracy to distribute and possess with intent to distribute methamphetamine and heroin (Importation of drugs into Folsom and High Desert prisons concealed within packages) | 86–98 |
| **Kathleen NOLAN** | Count 2 – 5/27/16 to 12/22/16 | Conspiracy to distribute and possess with intent to distribute heroin | 36–50, 72–73, 119–122, 128–130 |

For these reasons, I respectfully request that a Criminal Complaint be issued against the defendants for the crimes detailed above and, based upon this Criminal Complaint, arrest warrants be issued for each of these defendants.

## VIII.  SEALING REQUEST

This Affidavit describes a significant, ongoing investigation of the activities of the Aryan Brotherhood.  The case remains covert, and we continue to develop new investigative leads. Many of the target subjects are out-of-custody.  The United States believes that public disclosure of either the Criminal Complaint or this Affidavit will cause the out-of-custody targets to flee or to take other actions to conceal their locations prior to the conclusion of this broad, ongoing investigation.

The United States believes that public disclosure of either this Criminal Complaint or this

Affidavit could cause the incarcerated targets to protect themselves and others from prosecution

by destroying evidence. They might also obstruct justice by instructing others to destroy

evidence or to lie to law enforcement officers. Further, they might retaliate against people they

suspect have cooperated with this investigation. Therefore, the United States respectfully

requests that the Criminal Complaint and this Affidavit be sealed until further order of the Court.

*United States v. Doe*, 870 F.3d 991, 1000 (9th Cir. 2017).

I swear under penalty of perjury, that the foregoing information is true and correct to the

best of my knowledge, information and belief.

Brian Nehring, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before
me on the ___ day of May, 2019

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

Jason Hitt
Assistant U.S. Attorney

137