UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

United States of America,

Plaintiff,

v.

Ronald Yandell, et al.,

Defendants.

No. 2:19-cr-00107-KJM

ORDER

The government alleges the defendants in this case participated in a racketeering conspiracy, committed murder and trafficked in methamphetamine and heroin. In a previous order, this court severed the trial for six of the defendants who face the most serious allegations and charges: Ronald Yandell, Daniel Troxell, William Sylvester, Brant Daniel, Pat Brady and Jason Corbett. Five of them now face charges carrying a maximum penalty of death, though the government has not determined whether to seek the death penalty. Their trial was previously scheduled to begin in March 2023, but the court vacated and reset the trial for February 2024 in a recent status conference.

Three of the six defendants—Daniel, Troxell and Sylvester—now move to further sever their trial and set a trial date in May 2023. As explained in this order, the charges against all six defendants were properly joined in the same indictment. They have not shown a six-defendant trial in February 2024 would compromise their trial rights. Nor have they shown a six-defendant

trial would "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The court **denies** the motion.

## I. BACKGROUND

This case is the result of a years-long federal investigation into an alleged Aryan Brotherhood conspiracy to traffic drugs and exert influence in California prisons. *See* Nehring Aff. at 1, ECF No.1. The government describes the Aryan Brotherhood as "a race-based gang formed in the California prison system in about 1964 by white inmates who wanted to gain power and authority in prison." *Id.* at 17. All of its members are men. *Id.* at 18. They have organized themselves in both the federal and state prisons systems, including in California. *See id.* at 23 n.2.

A few details about the Aryan Brotherhood's membership and the alleged conspiracy are necessary to understand the defendants' current motion to sever. Members of the Aryan Brotherhood have been named as defendants in many federal prosecutions, leading one federal court to describe the group as "rather notorious" many years ago. *United States v. McKinney*, 954 F.2d 471, 473 (7th Cir. 1992). The Aryan Brotherhood's violent history and rules have even led to disputes about whether simply identifying a person with the group might lead to unfair prejudice. *See generally, e.g.*, *United States v. Abel*, 469 U.S. 45 (1984); *United States v. Mills*, 704 F.2d 1553 (11th Cir. 1983). At one point, for example, the Aryan Brotherhood had "a policy of 'blood in, blood out': potential members must commit a murder to gain full membership, and can only leave when they die." *United States v. Bingham*, 653 F.3d 983, 987 (9th Cir. 2011). That policy might have relaxed in more recent years, *see id.* at 987 n.1, but according to the government, once a recruit is admitted into full membership, he must "commit any criminal act that the enterprise asks of him," including murder, Nehring Aff. at 18. Members must not cooperate with law enforcement, must keep their word and must not appear cowardly, among other rules. *See id.* People closely affiliated with the Aryan Brotherhood who are not members are "associates." *Id.* at 19. They must follow orders from members. *Id.*

Today, the government alleges, the California Aryan Brotherhood, run by a three-man "commission," includes a wide-ranging enterprise of drug trafficking, gambling, intimidation,

extortion, violence and obstruction of justice. *Id.* at 18–21. According to the criminal complaint in this action, the group has experienced a resurgence in California prisons under the terms of a settlement agreement that resolved a 2009 class action lawsuit about the extended solitary confinement of inmates based in part on their gang affiliations. *See* Order Granting Final Approval of Class Action Settlement Agreement, *Ashker v. Governor*, No. 09-5796 (N.D. Cal. Jan. 26, 2016), ECF No. 488. The government alleges that under the terms of this settlement agreement, many members of the Aryan Brotherhood who had previously been isolated from one another could move more freely within the prison system. Nehring Aff. at 25. This freedom allowed them to communicate and exert influence more easily. *Id.*

The government alleges the first defendant named in this case, Ronald Yandell, joined the federal Aryan Brotherhood in the 1990s while he was serving a federal sentence for conspiracy to manufacture methamphetamine. *Id.* at 22. Yandell has also claimed he killed for the Aryan Brotherhood in the 1980s while confined in a California prison. *See id.* at 81. After a murder conviction in the 2000s, Yandell is serving a life sentence in California prison. *Id.* at 22. By 2016, he was claiming to be one of the Aryan Brotherhood commissioners within the California prison system, along with defendant Troxell and a third man, David Chance, who is not named as a defendant in this case. *Id.* at 22, 65, 87.

After the settlement agreement in *Ashker*, Yandell was transferred to less restrictive confinement in the state prison in Folsom, California, where his cellmate was defendant Sylvester, another Aryan Brotherhood member. *Id.* at 26–27. As noted above, Sylvester is one of the defendants who currently moves to sever his trial. According to the government, Yandell directed murders, assaults and a multi-state drug trafficking conspiracy using a contraband phone in the cell he and Sylvester shared. *See, e.g., id.* at 27, 36–37, 40–61, 63–68, 75–82. Federal authorities came upon this conspiracy after police seized drugs from a courier in Missouri. *See id.* at 37–39. Through undercover operations and wiretaps, they came to believe that many of the people later named as defendants in this case were sending and receiving drug orders to and from Yandell outside the prison. *See id.* at 40–61. The government alleges Sylvester was part of these plans. For example, the scheme allegedly included a licensed attorney and a woman who posed

as his paralegal who passed contraband to Sylvester under the cover of fake client consultations. *See id.* at 53–63, 100–01. Yandell referred to Sylvester as his "partner" in the alleged drug-dealing enterprise. *Id.* at 65.

The government does not tie Troxell to the alleged drug conspiracy as closely. But by alleging Troxell and Yandell were both on the "commission," it connects Troxell to the alleged criminal enterprise from a different angle. For example, as the government alleges in the superseding indictment, "Troxell had significant authority over the enterprise" by virtue of his position, "including [by] resolving disputes among Aryan Brotherhood members and, when necessary, approving the murder of current or former members of the Aryan Brotherhood." Superseding Indictment at 6, ECF No. 1375.

One conflict surrounded an Aryan Brotherhood member named James Mickey. Yandell thought Mickey had not retaliated as aggressively as he should have against an enemy, and Yandell believed Mickey had stolen money from the gang. *See* Nehring Aff. at 76–79. The government claims it heard Yandell say on an intercepted phone call that Troxell had agreed with his plan to kill Mickey, "the sooner, the better." *Id.* at 76, 77. It notified prison authorities, who moved Mickey into protective custody. *Id.* at 78. The government thus charges Troxell with conspiring with Yandell to kill Mickey. Superseding Indictment at 9, 12. Another conflict involved the potential murder of another Aryan Brotherhood member, Kenneth Johnson. *See* Nehring Aff. at 65–68. Yandell wanted to kill Johnson, and he claimed he had spoken extensively with Troxell about it. *Id.* at 66. Yandell and Troxell also discussed Johnson's history in a recorded call. *See id.* at 105. Despite Troxell's involvement, he claims to have disagreed with Yandell about what to do with Johnson, and the government does not allege Troxell agreed to Johnson's murder. *See* Superseding Indictment at 11–12. Finally, in another recorded call, Yandell claimed Troxell had agreed with a proposal to kill an Aryan Brotherhood member named Paul Diaz. *See* Nehring Aff. at 81–82. But again, the government has not charged Troxell with conspiring to kill Diaz. *See* Superseding Indictment at 13.

The government also alleges Troxell and Yandell made decisions about the group's membership together. It claims, for example, that Yandell and Troxell were attempting to "build

an army," Nehring Aff. at 65, and it claims they spoke about the potential membership of another defendant in this action, Jason Corbett, *see id.* at 79 n.14; *id.* at 82. Yandell allegedly promised Corbett full membership if he killed Paul Diaz, and as noted above, Yandell claimed Troxell had approved that killing. *See id.* at 79–82.

The third defendant who moves to sever his trial is Brant Daniel, also allegedly a member of the Aryan Brotherhood. Like Troxell, Daniel was recorded speaking on the phone with Yandell about murders, including the plan to kill Johnson. *Id.* at 82–83. He and Yandell also spoke about the Aryan Brotherhood's attempts to kill a member named Michael Trippe, *id.* at 107–08, 110–11, and about the murder of another inmate, Doug Maynard, *id.* at 114–16. But the government alleges Daniel's efforts to further the Aryan Brotherhood's objectives went far beyond phone calls. It also claims he violently and openly attacked and killed another inmate in the Salinas Valley Prison in an attempt to maintain his position within the gang and to reinforce the Aryan Brotherhood's reputation. *See id.* at 124–27.

The United States filed the criminal complaint in this case in May 2019. ECF No. 1. The original indictment, filed in June 2019, named sixteen defendants, including Yandell, Troxell, Sylvester and Daniel, and included fourteen counts. *See generally* Indictment, ECF No. 25. The charges included conspiracy to participate in a racketeer influenced corrupt organization, conspiracy to murder and several drug distribution conspiracies. *See generally id.* Daniel, Troxell and Sylvester all were charged with conspiracy to participate in a racketeering enterprise. *Id.* at 7–8. In addition, the government charged Troxell with conspiracy to murder in aid of racketeering, *id.* at 13, and Sylvester with participating in conspiracies to distribute methamphetamine and heroin, *id.* at 15–16, 17. None of the crimes charged in the original indictment were punishable by death, but the allegations against five defendants could potentially have supported charges of crimes punishable by death, so the court appointed "learned" counsel to represent those defendants under 18 U.S.C. § 3005 and treated the case essentially as a capital case. *See* ECF Nos. 108, 109, 111, 119, 120. Yandell, Sylvester and Daniel were in the original group facing allegations that might eventually lead to capital charges. Troxell was not.

The case moved forward. The government produced a large amount of discovery, including more than 100,000 pages of documents and hundreds of hours of audio and video recordings. *See, e.g.*, Stip. & Order (Jan. 25, 2023) at 2, ECF No. 1405. The parties also litigated several pretrial motions on a broad range of topics, including discovery, subpoenas, the conditions of the defendants' confinement, their consultations with counsel and their representation.

Uncertainty about potential capital charges has loomed large in the background. The defendants who now move to sever were among those who made presentations to the government under the capital cases protocol in an attempt to ward off any capital charges. *See, e.g.*, *United States v. Fernandez*, 231 F.3d 1240, 1243 (9th Cir. 2000) (summarizing this protocol). The government has declined to take the death penalty off the table. It also has consistently and stringently resisted any limits on its unilateral authority to supersede the indictment and make decisions about whether to seek the death penalty. *See, e.g.*, Gov't Resp. to Order to Show Cause, ECF No. 921.

Throughout the pretrial period, the court has excluded time from accruing toward the limits imposed by the Speedy Trial Act. It did so almost always without objection. The case is complex, defense counsel has needed time to prepare for trial and pretrial motions were pending. *See, e.g.*, Mins., ECF No. 842 (recording the court's order excluding time for these reasons on the parties' agreement); *see also* 18 U.S.C. § 3161(h)(1), (6), (7) (relevant provisions of the Speedy Trial Act).

In December 2021, more than two years after the case began, the court directed the parties to meet and confer about whether a trial could begin in early 2023. *See* Mins., ECF No. 954. Six of the defendants, those facing the most serious charges for the most violent crimes—including Troxell, Sylvester and Daniel—asked the court to sever their cases from the case against the other defendants and schedule a six-defendant non-capital trial for early 2023. *See* Joint Status, ECF No. 973. In other words, assuming the government would not supersede the indictment and would not seek the death penalty, these six defendants proposed to break off the charges against them and try their combined case first, beginning in early 2023. *See id.* The court adopted that

proposal and scheduled a six-defendant trial for March 2023. Mins., ECF No. 988. It later also adopted the parties' joint proposal for a detailed schedule for pretrial motions and disclosures. *See* Order (Sept. 6, 2022), ECF No. 1269.

In December 2022, with the trial date and disclosure deadlines at hand, the government filed a superseding indictment. ECF No. 1375. For the most part, the superseding indictment rested on the same allegations as its predecessor. Crucially, however, it added four charges for murder in aid of racketeering under 18 U.S.C. § 1959(a)(1) and (2) against five defendants. Sylvester and Daniel are in this group of five, but not Troxell. *See* Superseding Indictment at 17–22. The maximum penalty for these new charges is death. *See* 18 U.S.C. § 1959(a)(1). The government has taken care to note, however, it still has not "made a final determination on whether to pursue the maximum penalty" of death. Superseding Indictment at 54–55 nn.8–11.

After reviewing the superseding indictment, most of the defendants named in the newly added charges for murder in aid of racketeering asked to continue the previously scheduled trial until early 2024. *See* Joint Status Report, ECF No. 1394. Sylvester was part of that group. *See id.* Daniel, by contrast, asked the court to keep the previously scheduled March 2023 trial date. *See* Daniel Status Report, ECF No. 1392. Troxell's position was unclear. His counsel signed the joint report that included the request for a continuance, but he was not among the "death-eligible" defendants who specifically made that request. *See* Joint Status Report at 2, ECF No. 1394.

At a status conference, the court vacated the March 2023 trial date and reset the trial to begin in February 2024. Mins., ECF No. 1404. Daniel asked the court to keep the previously scheduled March 2023 trial date. *Id.* Despite Sylvester's previous request to reset the trial date, he joined Daniel's request to keep the March 2023 trial on calendar. *Id.* Defendant Troxell also clarified he requested a trial later than March 2023 but earlier than February 2024. *See id.* The court declined to set an earlier trial date because no defendant had moved to sever, and none argued the government had wrongly included him in the same indictment. *See id.* The court directed defendants Sylvester, Daniel and Troxell to meet and confer with the government about a briefing schedule on a motion to sever. *See id.*

Daniel, Troxell and Sylvester then moved to sever the already severed trial into two trials of three defendants each. This plan would result in a total of three trials: the first would begin in May 2023 or the summer of 2023[1] and would include defendants Daniel, Troxell and Sylvester; the second would begin in February 2024 and would include defendants Yandell, Brady and Corbett; the third would begin at some later date and would include the remaining defendants.

Daniel argues any further delays will deprive him of a speedy trial, and he argues a six-defendant trial will be unmanageable. *See generally* Daniel Mot., ECF No. 1426; Daniel Reply, ECF No. 1446. Troxell argues he is at risk of being found guilty by mere association with defendants like Yandell, who allegedly ordered murders, hatched murder plots, or committed murders themselves. Troxell Mem., ECF No. 1433. Troxell argues similarly that a joint trial might prevent him from asserting defenses based on his claim there were schisms with the Aryan Brotherhood's leadership. *See generally* Troxell Reply, ECF No. 1445. Sylvester did not explain the basis for his joinder in a written motion or brief. *See generally* Sylvester Joinder, ECF No. 1431. At hearing, Sylvester espoused many of Daniel's arguments, including that he should not be forced to wait longer for a trial because the government is responsible for most of the delay. The government opposes the motions. *See generally* Opp'n, ECF No. 1439. The court heard arguments at a combined hearing and status conference on February 22, 2023. Mins., ECF No. 1449. Jason Hitt, David Spencer, and Ross Pearson appeared for the United States. Todd Leras appeared for Troxell. Hayes Gable appeared for Sylvester. John Balazs and Timothy Warriner appeared for Daniel.

## II. TROXELL

The court begins with Troxell because some of his brief contests his inclusion not only in a joint trial but in a joint indictment as well. *See, e.g.*, Troxell Mem. at 5 (arguing this is a case of "improper joinder").

"Joinder of charges against multiple defendants is governed by Federal Rule of Criminal Procedure 8(b)." *United States v. Ford*, 632 F.2d 1354, 1371 (9th Cir. 1980), *overruled on other*

---

[1] Troxell's proposal for his trial date was unclear. He confirmed in a status conference on March 22, 2023, that he would be ready to go to trial in August 2023.

*grounds by United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc). Under Rule 8(b), an indictment may include charges against more than one defendant if the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). This rule "is construed liberally in favor of joinder." *United States v. Sarkisian*, 197 F.3d 966, 975 (9th Cir. 1999) (quoting *United States v. Baker*, 10 F.3d 1374, 1386 (9th Cir. 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000)). Whether a group of events are part of the same "series of acts of transactions" under Rule 8(b) "depends on the degree to which the events are related." *Ford*, 632 F.2d at 1371. "[T]here must be some greater 'logical relationship' between the occurrences," such as a "common plan, scheme, or conspiracy." *Id.* at 1372 (citations omitted).

The allegations against Troxell fit this description. The government alleges Troxell is a long-time member of the Aryan Brotherhood and was a member of its leadership at the time of the events underlying the charges against him. Superseding Indictment ¶ 17. The government will likely attempt to prove at trial that under Troxell's leadership, the Aryan Brotherhood organized murders, made bribes, trafficked drugs and committed other crimes. *Id.* ¶ 25. According to the indictment, he "had significant authority over the enterprise, including resolving disputes among Aryan Brotherhood members and, when necessary, approving the murder of current or former members of the Aryan Brotherhood." *Id.* ¶ 17. These allegations and those against the other defendants are logically related "transactions" under Rule 8(b), so they were properly joined in the same indictment.

When the government has properly indicted defendants jointly, a joint trial is the "preference in the federal system." *Zafiro*, 506 U.S. at 537. Joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Id.* (quoting *Richardson v. Marsh*, 481 U.S. 200, 2009 (1987)). But under Rule 14, if a joint trial "appears to prejudice a defendant," the court may sever the trial "or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of

the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. In many cases, "less drastic measures, such as limiting instructions," will suffice. *Id.* "The burden is on the defendant to show 'clear,' 'manifest,' or 'undue' prejudice from a joint trial." *United States v. Mikhel*, 889 F.3d 1003, 1046 (9th Cir. 2018) (quoting *United States v. Polizzi*, 801 F.2d 1543, 1553–54 (9th Cir. 1986)).

As summarized above, Troxell first argues the other defendants are accused of much more direct and violent wrongdoing, and he contrasts these charges with his "limited" involvement and the "ambiguous" evidence the government is likely to offer against him. *See* Troxell Mem. at 6–7. It is true that "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty." *Zafiro*, 506 U.S. at 539. "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." *Id.* But "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540. "The inevitable consequence of any joint trial is that the jury will become aware of evidence of one crime while considering a defendant's guilt or innocence of another crime." *United States v. Decoud*, 456 F.3d 996, 1009 (9th Cir. 2006). District courts have much "less drastic measures" than severance to combat the risk of prejudice, "such as limiting instructions." *Zafiro*, 506 U.S. at 539. These less drastic measures "often will suffice." *Id.*

Troxell has not shown a jury is likely to confuse the evidence or wrongly assume he is liable by mere association, and he has not shown severance is the only viable solution. The court will be prepared to give limiting instructions, give the jury a clear verdict form, and permit separate questioning and argument. These and other means will allow Troxell to highlight differences between the evidence against him and the other defendants in a joint trial. As in other similarly complex racketeering cases, "the predicate or underlying crimes alleged are well within the ability of the ordinary juror to understand." *United States v. Fernandez*, 388 F.3d 1199, 1244 (9th Cir. 2004), *as modified*, 425 F.3d 1248 (9th Cir. 2005). The same is true of any defense Troxell anticipates putting on. A jury is likely to understand his individualized response to the government's case in a joint trial: he did not commit any murders; he did not tell anyone to

commit any murders; the government has instead relied on inferences drawn from the circumstances to tie him to the alleged enterprise and those circumstances are limited. He has not explained why he cannot press that point in a joint trial.

Troxell also argues a joint trial will risk confusion about his liability because other members of the conspiracy doubted Troxell's commitment to the enterprise. If Troxell is tried together with these defendants, he argues, he may be wrongly portrayed as going along with a plan when in truth he resisted it. Troxell Reply at 4–11. Conflicts such as these are not new or remarkable. In *Zafiro*, for example, the Supreme Court confronted a more direct conflict between two defendants tried jointly. Each claimed innocence and said the other was guilty. *See* 506 U.S. at 535–36, 540–41. A joint trial was still appropriate. Separating the trial into two would not have prevented the government from offering evidence about what the other alleged conspirators had done. *Id.* at 540. As the Ninth Circuit explained in *Fernandez*, "a joint trial is particularly appropriate where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials." 388 F.3d at 1242. Neither does a joint trial relieve the government of its obligation to prove each defendant's liability beyond a reasonable doubt. *Zafiro*, 506 U.S. at 540–41. This court can remind the jury of this burden however often is necessary, and it is well established "juries are presumed to follow their instructions." *Id.* at 540 (quoting *Richardson*, 481 U.S. at 211).

Finally, by proposing a joint trial with Daniel and Sylvester, Troxell undercuts his argument that a six-defendant trial will deprive him of his trial rights. In a trial with Daniel and Sylvester, Troxell would likely confront many of the same potential prejudices he would face in a trial with the other defendants. Daniel, like Yandell, allegedly committed or planned murders to achieve the Aryan Brotherhood's purposes. Daniel, like Yandell, expressed doubts about Troxell's commitment to the Brotherhood. *See* Troxell Reply at 8–9. And Sylvester, like Yandell, was a partner in the alleged drug-trafficking scheme.

## III. DANIEL

Daniel does not dispute he was properly joined with the other defendants named in the indictment under Rule 8(a). He argues primarily that if he must await a joint trial in 2024, he will have been deprived of his right to a speedy trial. Daniel Mot. at 6–8; Daniel Reply at 2–6. He also argues a joint trial will deprive him of his rights under the Speedy Trial Act, and he argues a joint trial will be unmanageable. Daniel Mot. at 9–10; Daniel Reply at 6–11. The court first addresses the Sixth Amendment.

### A. Constitutional Right to a Speedy Trial

Neither the Ninth Circuit nor the Supreme Court appears to have decided whether a defendant's right to a speedy trial is one of the "specific trial rights" that, if at risk in a joint trial, can justify a severance under Rule 14. One reason might be that joint trials usually save time. Trying multiple defendants one by one would require "that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying." *Richardson*, 481 U.S. at 210. These costs increase in larger conspiracy prosecutions like this one. *See id.* at 209–10.

At the same time, joint trials do not necessarily lead to a speedier resolution for each codefendant. If codefendants are tried one after the next, then the first defendants in line might very well receive a speedier trial than they would have if all had been tried together. For that reason, federal courts outside the Ninth Circuit and district courts within the Circuit have entertained arguments along the lines of the one Daniel presses, i.e., that a severed trial is necessary to avoid the risk that a particular defendant will not receive a speedy trial. *See, e.g.*, *United States v. Zar*, 790 F.3d 1036, 1043–44 (10th Cir. 2015); *United States v. Rakestraw*, No. 18-01695, 2021 WL 3668316, at *6–9 (D. Ariz. June 16, 2021), *report and recommendation adopted*, 2021 WL 3046905 (D. Ariz. July 20, 2021); *United States v. Serafini*, 7 F. Supp. 2d 529, 553–55 (M.D. Pa. 1998), *aff'd on a separate holding*, 167 F.3d 812 (3d Cir. 1999). Unquestionably, a criminal defendant's right to a speedy trial "is as fundamental as any of the rights secured by the Sixth Amendment." *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967). It is "one of the most basic rights preserved by our Constitution." *Id.* at 226. The constitutional

right to a speedy trial must be among those "specific trial rights" that can justify a separate trial under Rule 14(a). This court must therefore determine whether "there is a serious risk that a joint trial would compromise" Daniel's constitutional right to a speedy trial.

"The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused." *Barker v. Wingo*, 407 U.S. 514, 519 (1972). Not only must defendants be treated decently and fairly; the broader public has an interest in speedy trials as well. *Id.* at 519–21. Pretrial detention is costly and has "a destructive effect on human character." *Id.* at 520–21 (citation omitted). Delays also might work unfairly to the advantage of a defendant who would be convicted if memories had not faded. *See id.* at 521. The very concept of a "speedy trial" is also quite "slippery." *Id.* at 521–23. How long is too long when "justice is supposed to be swift but deliberate"? *Id.* at 521. "[T]here is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial." *Id.*

These difficulties have led the Supreme Court to prescribe a "balancing test" that considers the prosecution's and defense's actions alike. *See id.* at 530. (1) How long is the delay between the indictment and trial? (2) What caused that delay? (3) When did the defendant demand a speedy trial, if at all? (4) And what prejudice has the defendant suffered because of the delay, if any? *See id.*

These questions and their answers are intertwined. If the government intentionally holds the prosecution back "to gain some impermissible advantage at trial," the delay weighs "heavily against the government." *Doggett v. United States*, 505 U.S. 647, 656 (1992). Negligent delays by the prosecution might also deprive a defendant of the right to a speedy trial, even if defendants cannot say whether they suffered any specific prejudice as a result. *Id.* at 656–57. But when the government has diligently pursued a prosecution, even lengthy delays do not deprive defendants of their right to a speedy trial unless they can show the delays specifically prejudiced their defense. *Id.* at 656.

Because the four questions above are so "related," they "must be considered together" in the context of the broader circumstances. *Barker*, 407 U.S. at 533. But length of delay does work

independently as a threshold barrier to the broader balancing test: some delays are so short and so "ordinary" that no further investigation is necessary; defendants simply cannot prove they were deprived of their right to a speedy trial, no matter the broader circumstances. *See Doggett*, 505 U.S. at 651–52. Delays of a month or two almost certainly fit this category. *See United States v. Gregory*, 322 F.3d 1157, 1161–62 & n.3 (9th Cir. 2003). Delays of a year or more usually warrant a closer look. *See United States v. Lonich*, 23 F.4th 881, 893 (9th Cir. 2022). There is no bright line. *Id.*

Starting, then, with the length of the delay in this case, Daniel was initially indicted on June 14, 2019. ECF No. 25. The government superseded the initial indictment on December 8, 2022. ECF No. 1375. If Daniel is tried with the other defendants in early 2024 as currently planned, then a little more than one year will have passed since the superseding indictment was returned, but more than three years will have passed since the initial indictment was returned.

Whether one year or three, that delay warrants a closer look at all of the relevant factors and the broader circumstances. *See Lonich*, 24 F.3d at 893–94; *Gregory*, 322 F.3d at 1161–62 & n.3. Although more than three years will have passed from the date of the initial indictment if Daniel goes to trial in early 2024, the court cannot say Daniel's trial has been wrongly or unfairly delayed for three years. Daniel did not assert his right to a speedy trial until January 2023, approximately one month after the superseding indictment was returned. *See* Daniel Status Rep., ECF No. 1392. At that point, he was scheduled to be tried with several other defendants in March 2023. *See* Order (Sept. 6, 2022), ECF No. 1269; Mins. (Aug. 31, 2022), ECF No. 1263. He had agreed to that trial date as well. He had even suggested, along with the other defendants, that a trial might actually need to begin much later: the charges against him were complex and serious; the record was long; he needed time to seek evidence, review it with his counsel, strategize and make a presentation to the government about the potential addition of capital charges; the coronavirus pandemic made meetings with attorneys and other members of his defense team difficult to schedule; policies of the California Department of Corrections and Rehabilitation, which is housing Daniel pending trial under an agreement with the U.S. Marshals Service, had frustrated confidential consultations with counsel; and Daniel had filed several pretrial motions,

some complex. *See, e.g.*, Daniel's First Mot. Discovery, ECF No. 702; Daniel's Mot. Transfer, ECF No. 703; Daniel's Mot. Compel, ECF No. 960; Daniel Status Rep., ECF No. 1121; Proposed Sched., ECF No. 1220; Joint Rep., ECF No. 1254; Stip. & Proposed Order, ECF No. 1372. Even today, Daniel is prepared to wait until May 2023 to begin his trial. *See* Daniel Resp., ECF No. 1427.

Daniel faults the government for taking so long to supersede the indictment with what in his view are "the same allegations in the initial indictment." Daniel Mot. at 7. He also ascribes the delay to the government's unexplained failure to decide whether it will pursue the death penalty. *See id.* The government is not without responsibility for delay. It has produced discovery slowly. It has resisted deadlines and time limits for superseding the indictment and deciding whether to pursue the death penalty. Even assuming without deciding, however, the government has delayed the prosecution purposefully or negligently, if Daniel goes to trial in early 2024, he will have been forced to wait about eight or nine months longer than he now believes necessary. In other words, describing the circumstances in the terms of the first three *Barker* factors puts the delay in its proper context:

(1) The length of the delay: If Daniel goes to trial in early 2024, he will have been forced to wait about eight or nine months longer than he believes is necessary;

(2) The reasons for the delay: The broader delay in bringing Daniel's case to trial is in large part attributable to its complexity, Daniel's efforts to prepare a robust defense, and factors beyond both parties' control, while the government has contributed to the delay; and

(3) Whether and when Daniel asserted his right to a speedy trial: Daniel did not assert his right to a speedy trial until very recently, in January 2023.

For these reasons, the court finds a severance would be justified only if the eight or nine month delay would cause Daniel to suffer unfair prejudice under the fourth part of the *Barker* test.

"Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532. It is not enough that some prejudice might occur before trial. *Gregory*, 322 F.3d at 1163. Prejudice is relevant only

when it is attributable to the delay. *See id.* The Supreme Court listed three categories of relevant prejudice in *Barker*: "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the defense will be impaired." 407 U.S. at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

Daniel cites the conditions of his pretrial confinement to show he will suffer prejudice if he must await a joint trial in 2024. He claims to be in "oppressive solitary confinement with no family contact visits and only a 15-minute monthly personal call." Daniel Reply at 6–7. To that end, he submitted an unauthorized supplemental exhibit, a "classification committee chrono," which reports he is confined in "Administrative Segregation United (ASU) at California State Prison, Sacramento (SAC)" for several reasons: (1) "to facilitate court proceedings in Sacramento County; (2) "due to [his] endorsement at Corcoran SHU, for the Step Down Program of the Security Threat Group (STG) step down process";[2] (3) and "[a]dditionally," he was "being retained in ASU due to being involved in a conspiracy to participate in a Racketeering Enterprise and related crimes." Suppl. Ex. B, ECF No. 1464. Daniel has not explained why he did not attach this exhibit to his original motion or reply, but the court will consider it. Doing so will not result in unfair prejudice to the government.

Although this case is the reason for Daniel's confinement in a Sacramento-area prison, and although the allegations against Daniel in this case may be one reason he is housed in the administrative segregation unit, it is not clear the conditions of his confinement would be different if he were not currently awaiting a federal trial. Daniel claims he has been detained in the same oppressive conditions "for seven continuous years," long before he was charged in this

[2] The court takes judicial notice of the state's publicly available description of its "Step Down Program" as an "incentive-based, multi-step process for the management of Security Threat Group (STG) affiliates." Cal. Dep't of Corr. & Rehab., "Step Down Program," https://www.cdcr.ca.gov/rehabilitation/sdp/ (last visited Mar. 22, 2023). "The SDP provides incarcerated individuals placed in a Security Housing Unit (SHU) or a Restricted Custody General Population (RCGP) the opportunity to earn enhanced privileges by refraining from participation in STG affiliations and behaviors. The ultimate goal of SDP is to assist validated STG affiliates with transitioning to a general population setting." *Id.*

case. Daniel Mot. at 7. He is serving a sentence of thirty years to life imprisonment after pleading guilty to a state law manslaughter charge. *See* Opp'n at 4 (citing Nehring Aff. at 127). It would be speculation to reach any conclusions about the likely conditions of Daniel's confinement after trial here, even assuming the jury reaches a verdict in his favor.

Contrary to Daniel's argument in reply, his membership in the *Ashker* class does not support his request for a severed trial. *See* Daniel Reply at 4–5. His counsel's correspondence with counsel for *Ashker* class members does not show otherwise. *See* Daniel Reply Ex. A, ECF No. 1448. If anything, that correspondence suggests Daniel has avenues to relief through the settlement agreement in *Ashker*.

For these reasons, there is no "serious risk" that if Daniel's trial is not severed, he will be deprived of his right to a speedy trial under the Sixth Amendment. A potential Sixth Amendment violation does not justify severance under Rule 14. *See Zafiro*, 506 U.S. at 539.

**B. Speedy Trial Act**

Beyond the Sixth Amendment, Daniel also relies on the federal statute known as the Speedy Trial Act. For many of the same reasons a delay until early 2024 will not deprive Daniel of his Sixth Amendment right to a speedy trial, the same delay is reasonable under 18 U.S.C. § 3161(h)(6). "As relevant here, the Speedy Trial Act requires that a criminal trial begin within seventy days from the date on which the indictment was filed, or the date on which the defendant makes an initial appearance, whichever occurs later." *United States v. Olsen*, 21 F.4th 1036, 1040 (9th Cir.) (per curiam), *cert. denied*, 142 S. Ct. 2716 (2022). But "there are valid reasons for greater delay in particular cases." *Zedner v. United States*, 547 U.S. 489, 497 (2006). "For example, the Act excludes . . . '[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." *Id.* (brackets in original) (quoting 18 U.S.C. § 3161(h)(6)).

Courts "gauge the reasonableness of delay on a case by case basis." *United States v. Hall*, 181 F.3d 1057, 1062 (9th Cir. 1999) (quoting *United States v. Franklin*, 148 F.3d 451, 457 (5th Cir. 1998)). Asking two basic questions provides guidance: whether the delay was necessary to make a joint trial possible and whether the defendant has suffered any "actual prejudice." *Id.*

(quoting *Franklin*, 148 F.3d at 457). Delays often are reasonable in complex cases involving "voluminous discovery, a large number of counts, several defendants, ongoing investigations in other districts, and potential witnesses from other countries." *United States v. Lewis*, 611 F.3d 1172, 1176 (9th Cir. 2010). A joint trial also is "particularly appropriate" in a conspiracy case, *United States v. Jenkins*, 633 F.3d 788, 807 (9th Cir. 2011), so delays in a conspiracy prosecution might be reasonable if necessary to avoid a severance, *see United States v. Casellas*, 842 F. App'x 95, 97 (9th Cir. 2021) (unpublished). By contrast, the Ninth Circuit has held a delay is not reasonable if its purpose is simply to secure a codefendant's guilty plea and to allow that codefendant to become a witness for the government at trial. *See Hall*, 181 F.3d at 1062–63.

The delay in this case is tied to making a joint trial possible. This case is complex. Discovery is voluminous. The government will likely rely on the same body of evidence to prove the conspiracy charges and allegations against Daniel as others allegedly involved in the same conspiracy. The defendants have needed time to review and seek discovery and litigate pretrial motions. And as explained above, Daniel has not shown he will likely suffer actual prejudice if the joint trial does not begin before early 2024.

Federal courts have denied motions to sever in similar circumstances. In *United States v. Zar*, for example, the Tenth Circuit affirmed the district court's decision to deny a motion to sever because the delay would not subject the defendants to lengthier pretrial detention, they had not previously asserted a right to a speedy trial, and "the government planned to present one primary body of evidence." 790 F.3d at 1043–44. In *United States v. Rakestraw*, the district court denied a motion to sever in a multi-defendant conspiracy case despite the defendant's lengthy period of pretrial detention. *See* 2021 WL 3668316, at *6–9. *See also, e.g.*, *United States v. Contreras*, 216 F. Supp. 3d 299, 304, 306–08 (W.D.N.Y. 2016) ("The Court finds that [delay] reasonable because, in the Court's extensive experience with RICO prosecutions in this District in recent years, this case has moved forward with customary promptness given the presence of multiple defendants, the large number of allegations and the complexity of the racketeering case." (citations, quotation marks, and alterations omitted)); *United States v. Ford*, 155 F. Supp. 3d 60, 69 (D.D.C. 2016) (denying motion to sever in "seven-defendant conspiracy prosecution" despite

eleven-month delay); *United States v. Noriega*, 746 F. Supp. 1548, 1558–63 (S.D. Fla. 1990) (denying severance after considering length of delay, pretrial motion practice and discovery and conditions of confinement).

### C. Trial Management

Finally, Daniel argues a joint trial will be difficult to manage. *See, e.g.*, Reply at 6–11. A six defendant trial will present challenges, but the alternative to a joint trial is two severed trials. Each would involve similarly large collections of documents and recordings about similar crimes and the same alleged conspiracy. Both may include weighty charges and allegations about drugs and murders. Daniel has not shown how a severance will save time and effort in this case.

The jury's task also may be quite challenging in a joint trial, but Daniel has not shown a severed trial will meaningfully alleviate that challenge. He relies primarily on generic arguments that could be asserted in most large cases. For example, Daniel argues "there will invariably be a great many instances in which the court will at trial admit evidence as to some defendants but not others." Daniel Reply at 6 (quoting *United States v. Gallo*, 688 F. Supp. 736, 751 (E.D.N.Y. 1987)). It is unlikely a severance will address this problem given the government alleges Daniel, Troxell and Sylvester were part of the larger racketeering conspiracy; in a separate trial, the jury still would be required to carefully consider evidence for a variety of nuanced purposes.

## IV. SYLVESTER

Sylvester offers no independent arguments in support of his request to sever. The court cannot conclude his trial rights will be at risk if he must await a joint trial in early 2024. Separating Sylvester's trial from Yandell's also would be wasteful. As summarized above, for example, the government alleges Yandell and Sylvester conspired to traffic drugs from within the same prison cell, so severing Sylvester's trial from Yandell's would likely force the government to present a great deal of evidence about that alleged conspiracy and the same events in two trials to two juries.

/////

## V. CONCLUSION

For the reasons explained above, the motion to sever (ECF No. 1426) is **denied**.

IT IS SO ORDERED.

DATED: March 22, 2023.

CHIEF UNITED STATES DISTRICT JUDGE